## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **TIMOTHY D. LAURENT** : | |
| **On behalf of himself and on** : **behalf of all others similarly situated,** : |  |
| **Plaintiff,** : **v.** : | |
| **PRICEWATERHOUSECOOPERS LLP,** : | Civil Action No. 06- |
| **THE RETIREMENT BENEFIT** : **ACCUMULATION PLAN FOR EMPLOYEES** : **OF PRICEWATERHOUSECOOPERS LLP,** : | Class Action |
| **and** : | |
| **THE ADMINISTRATIVE COMMITTEE** : **TO THE RETIREMENT BENEFIT** : **ACCUMULATION PLAN FOR EMPLOYEES** : **OF PRICEWATERHOUSECOOPERS LLP** : | |
| **Defendants.** : | |

RECEIVED
MAR 23 2006
U.S.D.C. S.D. N.Y.
CASHIERS

### CLASS ACTION COMPLAINT

Plaintiff, by and through his counsel, alleges as follows:

### NATURE AND SUMMARY OF THIS ACTION

1.      This is an action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA") challenging the legality of the design of The Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP ("RBAP"). The RBAP is an ERISA-governed "cash balance" defined benefit pension sponsored by Defendant PricewaterhouseCoopers LLP

("PwC") that covers PwC's entire workforce, ranging from partners and principals to rank-and-file employees and support staff.

2.      Plaintiff alleges that the RBAP fails to comply on its face and in operation with the ERISA <u>standard for calculating lump sum benefits</u> payable from a cash balance pension plan.  Specifically, the RBAP uses an interest rate to calculate lump sums that does not satisfy the standard established by the Second Circuit in *Esden v. Bank of Boston*, 229 F.3d 154 (2d Cir. 2000).

3.      Plaintiff further alleges that the RBAP fails to comply on its face and in operation with ERISA's <u>accrued benefit standards</u> in the manner required by *Esden*.  Specifically, the RBAP fails to comply with *Esden's* mandate that "interest credits" promised under a cash balance plan must be taken into account in determining whether a plan complies with ERISA's benefit accrual requirements.  The RBAP also fails to comply with *Esden's* instruction that the value of a participant's normal retirement benefit under a cash balance pension plan must be preserved.

4.      Plaintiff respectfully requests a declaration from the Court that the RBAP fails to satisfy these "*Esden*" standards; an order requiring Defendants to reform the RBAP to the extent necessary to comply with these standards, effective retroactively to the date the unlawful plan provisions were adopted and implemented; and an order requiring Defendants to then recalculate and pay benefits due under the RBAP to Plaintiff and other members of the proposed Class.

## JURISDICTION

5.      This Court has subject matter jurisdiction over this action by virtue of 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States

and pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), which provides for jurisdiction of actions brought under Title I of ERISA.

6.      This Court has personal jurisdiction over the Defendants because they reside in, do business in, or have significant contacts with, this District or the United States, and because ERISA provides for nationwide service of process.  ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

## VENUE

7.      Venue is proper in this district, under ERISA § 502(e), 29 U.S.C. § 1132(e), because this district is where some of the breaches took place and where one or more Defendants reside and/or may be found.

## EXHAUSTION OF REMEDIES

8.      Exhaustion of Plan remedies is not required because the core allegations in this action are that the terms of the RBAP violate the law.  Congress intended that statutory questions of this nature be adjudicated by Article III judges, not employer-appointed plan administrators.

9.      In any event, Plaintiff should be excused from any otherwise applicable requirement to exhaust plan remedies for one or more of the following reasons.  First, as noted, Plaintiff raises no claims as to which it would be appropriate to defer to the Plan's administrator.  Second, the Plan does not provide any meaningful claims process for challenges to the legality of the Plan's design of the type alleged in this suit.  Third, any remedy provided under the terms of the Plan for the violations asserted would be inadequate because the Plan's claims procedures and remedies do not contemplate

reformation of the Plan's provisions to the extent they are unlawful.  Finally, any attempt

to exhaust would be futile under the circumstances.

10.     Even if exhaustion were required here, Plaintiff has fully complied with

and exhausted the Plan's internal claims procedures.[1]

## THE PARTIES

11.     Plaintiff Timothy D. Laurent of Inverness, Illinois, a former PwC

employee, was and remains a participant, as defined in ERISA § 3(7) in the RBAP.  In

2002, after terminating employment with PwC, he requested a single lump sum

distribution of his benefit from the RBAP.  On or about May 20, 2002, Mr. Laurent was

paid the nominal balance of his hypothetical cash balance account, an amount less than

the value of his accrued benefit.

12.     Defendant PricewaterhouseCoopers LLP ("PwC") is a Delaware limited

liability partnership organized and existing pursuant to the PwC Partners and Principals

Agreement (incorporated herein by reference).  PwC is the sponsor of the RBAP.  PwC's

headquarters are located at 300 Madison Avenue, New York, New York 10017-6204.

All references to "PwC" include its predecessors, including Price Waterhouse LLP and

Coopers & Lybrand LLP.

13.     Defendant The Retirement Benefit Accumulation Plan for Employees of

PricewaterhouseCoopers LLP ("RBAP" or the "Plan") is a "cash balance" pension plan

covering PwC partners and principals ("partners"), directors, and employees.  The RBAP

---

[1] Mr. Laurent previously filed two lawsuits asserting claims similar to those asserted in this
action, among other claims.  The first action, filed on November 5, 2004, was dismissed without
prejudice for lack of proper venue. *Laurent v. PricewaterhouseCoopers LLP*, No. 04-809 (S.D.
Ill.).  The second action, filed on June 28, 2005, was dismissed voluntarily without prejudice by
Mr. Laurent.  *Laurent v. PricewaterhouseCoopers LLP*, No. 05-1291 (D.D.C.).  Mr. Laurent's
filing of these earlier lawsuits, together with subsequent proceedings in the cases, fully satisfied
the conditions set forth in RBAP § 10.6 for exhaustion of internal claims procedures.

is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A) and more precisely a "defined benefit plan," *see* RBAP at 1-2, within the meaning of ERISA § 3(35) and IRC § 414(j), and a "pension plan" within the meaning of IRC § 401(a) and Treasury Regulation ("Treas. Reg.") § 1.401-1(b)(1)(i).[2]  The Plan is overseen and administered in significant part by individuals who work and/or reside in this District. For example, many of the Plan's Trustees and members of the Plan's Administrative Committee work and/or reside in the District; the Plan's IRS determination letters were addressed to PwC's offices in this District; and the Plan's lead actuaries during all or most of the years at issue in this lawsuit work and/or reside in the District.

14.     Defendant The Administrative Committee to the Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP (the "Administrative Committee" or "Committee") was and/or is the RBAP's Administrator within the meaning of ERISA § 3(16)(A).  The Committee and its current and former members were and/or are named fiduciaries with respect to the RBAP within the meaning of ERISA § 402(a).  A number of Committee members work and/or reside in this District.

## BACKGROUND

I.     **Basic Description of the RBAP and Plaintiff's Benefits Thereunder.**

15.     Prior to July 1, 1994, the RBAP's effective date, Price Waterhouse LLP, a predecessor of PwC, maintained for its employees a traditional defined benefit plan,

---

[2] "RBAP" refers, as the case may be, to the RBAP in its entirety or the document commonly referred to as the "RBAP plan document."  The RBAP plan document is an "Agreement" between, among others, PwC and "the Trustees" amended and restated effective July 1, 1995. References to the RBAP plan document are to that Agreement together with all amendments, exhibits, appendices, supplements, and agreements or side letters or special annual memoranda to partners, all of which, as updated to the present, are incorporated herein by reference.  References to the "RBAP" include the RBAP plan document and other RBAP plan documents such as the Summary Plan Description(s) ("SPD"), all of which are also incorporated herein by reference.

known as the Retirement Plan for Employees of Price Waterhouse LLP.  Effective June

30, 1994, Price Waterhouse LLP froze benefit accruals under that plan, effectively

replacing it with the RBAP, which became effective July 1, 1994.

16.     On July 1, 1998, Price Waterhouse LLP and Coopers & Lybrand LLP

merged to create PwC.  On that same date, Coopers & Lybrand LLP's traditional defined

benefit plan, the Coopers & Lybrand Retirement Plan, was amended to provide for a cash

balance formula substantially identical to the RBAP.  The two plans merged into the

Coopers & Lybrand Retirement Plan one year later, on July 1, 1999, and the merged plan

was amended and restated as the amended and restated RBAP.  (Accordingly, all

references to the RBAP herein should be read to include the Coopers & Lybrand

Retirement Plan from July 1, 1998 until July 1, 1999).

17.     The RBAP is what is known as a "cash balance" pension plan.  The

benefits payable under the Plan are calculated based on the value of the hypothetical

"account" established under the Plan for each participant.

18.     Similar to other cash balance plans, participants in the RBAP receive

hypothetical periodic "pay credits" to their hypothetical accounts each month.  Non-

partner employees receive credits equal to 5-8% of the employee's monthly

compensation.  Partners generally receive pay credits over a 10 year period equal to

approximately 10% of the maximum contribution permitted under ERISA.

19.     Account balances are adjusted each business day by hypothetical

"investment credits" (or debits), which are the RBAP's version of the more typical cash

balance "interest credits."  RBAP participants are required to choose from among a PwC-

selected menu of "investment experience choices" in which their accounts are deemed to

be invested, or else be defaulted into the money market fund. Participants may reallocate their deemed investment mix on a daily basis. The investment credits reflect the results of each participant's hypothetical investment performance.

20.     Under the terms of the RBAP, most participants have the right to leave their account balances in the Plan even after terminating employment or retiring and to continue receiving investment credits. RBAP § 2.13(b). More specifically, a participant with an account balance in excess of $5,000 at the time of his termination of employment is permitted to leave his or her benefits in the RBAP through April 1 of the year following the later of retirement or the date the participant attains age 70½. RBAP §§ 5.1, 5.6.

21.     A participant's right to receive future investment credits on his account balance through age 70½ accrues at the same time as the corresponding pay credits to which the investment credits relate – that is, the right to receive future investment credits through age 70½ is not conditioned on the performance of additional services for PwC. As a result, the future investment credits payable on existing account balances through April 1 of the year following the date a participant attains age 70½ are part of each RBAP participant's current "accrued benefit" within the meaning of ERISA and the Tax Code.

22.     The RBAP provides that a participant is fully vested upon the completion of five (5) years of service with PwC or a related employer. Plaintiff was fully vested under this provision by the time he terminated employment with PwC. Plaintiff's RBAP account balance exceeded $5,000 at the time of his termination of employment.

23.     As a result, at the time of his termination of employment, Plaintiff had a vested accrued benefit equal to (1) the nominal balance in his hypothetical cash balance

account, *plus* (2) the stream of future investment credits payable on such account balance through April 1 of the calendar year following the year in which he would attain age 70½.

24.     Plaintiff received a single lump sum payment from the Plan on or about May 20, 2002.  The payment was $24,432.65, an amount equal to the nominal balance in Plaintiff's cash balance account.

## II.     The RBAP's "Normal Retirement Benefit" Definition.

25.     Although a participant's benefit under the Plan nominally is expressed in terms of his or her "account" balance, because the RBAP is a "defined benefit" plan – not a "defined contribution" plan such as a 401(k) plan – ERISA requires that the benefit payable under the Plan must be formally expressed in terms of an annuity commencing at normal retirement age.  This "normal retirement benefit" is the lens through which the Plan must be tested for compliance with ERISA and Internal Revenue Code ("Tax Code") standards.  *See* ERISA § 3(23)(A)-(B), 29 U.S.C. § 1002(23)(A)-(B), and Tax Code § 411(a)(7)(A)(i)-(ii).

26.     According to Section 5.1 of the Plan document:  "A Participant's Normal Retirement Benefit shall be an amount equal to the Actuarial Equivalent (calculated by projecting the Deemed Account Balance to <u>Normal Retirement Age</u> using the <u>Deemed Plan Interest Rate</u>) of his or her Deemed Account Balance."  *Id.* (underlining added).

27.     Section 2.16 of the Plan document defines the Deemed Plan Interest Rate as the annual rate of interest equal to the interest rate on 30-year Treasury securities, as specified by the IRS for the month of February (or before July 1, 2001, the month of May) immediately preceding the plan year in which the calculation is made.

28.     Section 2.32 of the Plan document defines Normal Retirement Age as meaning:  "The earlier of the date a Participant attains age 65 or completes five (5) Years of Service."  Not coincidentally, this is the same date each participant vests in his or her benefits under the Plan, and thus the first date any participant could become entitled to a lump sum distribution.  RBAP § 6.1.

29.     Defendants did not disclose these definitions to RBAP participants, and in fact took steps to conceal the definitions and their impact on benefit calculations.

III.     **The RBAP's Unlawful Deemed Plan Interest Rate.**

30.     The RBAP's use of the Deemed Plan Interest Rate to project a participant's current account balance to normal retirement age is unlawful on its face and in operation.  According to the Second Circuit, a cash balance plan cannot specify any projection rate of its choosing.  Rather, the projection method must accurately reflect the value of expected future interest credits.

31.     Specifically, "for plans adopting variable interest rates," such as the RBAP, "the value of future interest credits [cannot be] projected using a rate that understates the value of those credits."  *Esden,* 229 F.3d at 167.  "For example, a plan that tied its interest credits to an outside index [might] provide[] that valuation projections assume an interest credit equal to the average actual interest credit over a certain number of previous periods. . . ."  *Id.* at 166 n.17 (citing Treas. Reg. § 1.401(a)(4)-8(c)(3)(v)(B), which "allow[s] just such a methodology for determining the value of a variable interest rate to be used for projection of cash account balance at normal retirement age").

32.     The Deemed Plan Interest Rate does not reflect the "average actual interest credit over a certain number of previous periods."  In fact, the RBAP's filings with the IRS indicate that the rate of interest on 30-year Treasury securities has been well below the Plan's own internal assumptions about the rate of future investment credits. *E.g.,* RBAP IRS Form 5500 for plan year ending June 30, 2004 (using an assumed rate of future investment credits equal to 6.5%, while the corresponding 30-year Treasury rate for the year was 4.81%).

33.     Nor can the rate of interest on 30-year Treasury securities be said to reflect a reasonable estimate of the value of expected future investment credits.  The best estimate of the value of expected future investment credits for RBAP participants – who are permitted to "invest" their account balances in a diversified portfolio of mutual funds, and who can change their investment mix on a daily basis – is a uniform rate for all Plan participants based on historical market averages.  The approximate long-term historical market rate of return of a portfolio invested 70% in equities and 30% in debt securities – a common recommendation for individual investors saving for retirement – is between 9% and 10%.  This is significantly higher than the historical average rate of interest on 30-year Treasury bonds.

34.     The use of a uniform rate based on historical averages is consistent with ERISA and Tax Code standards, as well as PwC's and the Plan's own practice.  For example, the RBAP also uses a uniform blended interest rate for purposes of projecting benefits to demonstrate compliance with Tax Code income nondiscrimination standards set forth under Tax Code § 401(a)(4) and the regulations thereunder.  *See* Treas. Reg. § 1.401(a)(4)-3(d)(2)(i) and -12 (requiring that benefits be normalized by projecting

benefits to age 65 using a standard interest rate).  When PwC performs calculations for purposes of estimating projected benefits under the RBAP for accounting and funding purposes, it also uses a uniform rate based on a blended average of projected investment returns.  *See, e.g.*, RBAP 2003 Valuation Report.

35.     As a result, the RBAP violates ERISA and the Tax Code on its face and in operation by using the rate on 30-year Treasury securities to calculate the projected normal retirement benefit under the Plan instead of a rate intended to accurately reflect the value of expected future investment credits.

## IV.     The RBAP's Unlawful Normal Retirement Age Definition.

36.     The RBAP's definition of Normal Retirement Age also is unlawful on its face and in operation.

37.     The Plan's definition of Normal Retirement Age is virtually unique.  It means that RBAP participants are deemed to reach their "normal retirement age" after completing 5 years of service with PwC, regardless of their age, with the relatively rare exception of the person who starts work for PwC after age 60.  Plaintiff himself reached his "normal" retirement age at age 30, for example – quite unbeknownst to him because Defendants intentionally hid this "fact" from participants for fear that, if disclosed, it would unravel the scheme alleged herein and result in participant lawsuits, as it in fact has.

38.     The RBAP's purported "normal retirement age" of 5 years of service regardless of age fails to satisfy the statute's plain language requirements and the long-settled understanding that a pension plan's normal retirement age be no lower than the

earliest age that is reasonably representative of a typical retirement age for the covered workforce.  In the case of PwC's workforce, while participants in the RBAP may change employers after a few years, they do not normally withdraw from full-time work and live on their savings and/or pension after 5 years of employment regardless of their age.

39.     As if to demonstrate this, the RBAP has consistently reported on its annual IRS Form 5500 information return to the IRS and the Department of Labor that, for actuarial and financial accounting purposes, the assumed retirement age of employees who participate in the RBAP is age 60 for partners and age 65 for everyone else.  (Under PwC's partnership agreement, partners generally are required to retire at age 60 – *i.e.*, their normal retirement age is age 60.)  Actuarial and accounting rules require actuaries and accountants to base their assumptions on their best estimate of when retirement will *in fact* typically occur, focusing on substance rather than form.  IRC § 412(c)(3)(B); FAS 87 ("Employers' Accounting for Pensions") ¶¶ 39, 43.  Thus, the retirement age assumptions in the IRS Form 5500s represent an admission by PwC and the RBAP that the true "normal" retirement age of RBAP participants is age 60 for partners and age 65 for non-partners.

40.     A further admission (by conduct) that 5 years of service is not a true normal retirement age of employees who participate in the RBAP is that when RBAP participants reach "Normal Retirement Age" they are not informed by the Plan or PwC of that "fact."  At the completion of 5 years of service, participants do not receive a "suspension of benefits notice" informing them that by continuing to work past normal retirement age, the economic value of their "normal retirement benefit" may erode.  Such a notice is required at normal retirement age unless a plan provides for actuarial

adjustment of the normal retirement benefit, *see* 29 C.F.R. § 2530.203-3(b)(4), which the RBAP does not do.

41.     PwC itself admitted in a September 1999 letter to the IRS that its 5-year retirement age is not a "normal" normal retirement age.  However, neither before or after the RBAP's effective date of July 1994 did PwC seek to alert the IRS of its view (and seek some form of ruling, in the form of a revenue ruling or private letter ruling) that it was possible to define 5 years of employment, regardless of age, as the RBAP's normal retirement age.

42.     PwC wrote regulators in September 1999 about the matter only after the practice of using a 5-year retirement age was exposed in the pension press in a series of embarrassing articles – including one in which one expert aptly said the 5-year rule "guts" the statute – that reported that regulators were concerned and might investigate and take action to halt the practice.[3]

43.     The 1999 letter admits that the 5-year retirement age – which PwC euphemistically dubbed "a low normal retirement age" – is "a retirement age that is

---

[3] *See*, *e.g.,* "Cash Balance: Trouble for Bank Plans?  IRS Scrutinizes Shortened Retirement Ages," *Pensions & Investments,*  May 31, 1999 ("'The five-year normal retirement age looks like a contrivance to get around rules,' said an expert who did not wish to be identified"; "[o]fficials from the Treasury Department and IRS have been scrutinizing plans like NationsBank's that have defined 'normal' retirement as occurring . . . after 5 years' tenure. . . .  Such shortened retirement ages short-circuit various pension rules pegged to the more conventional retirement ages of 60 and 65";  "A short retirement age 'guts' the Employee Retirement Income Security Act, said a cash balance plan expert who declined to be identified. 'Twenty-eight is not a normal retirement age.'"; "Other plans with short normal retirement ages could face the same scrutiny. They include PricewaterhouseCoopers LLP"); "Pension Downsizing, Continued," *Tax Notes,* May 24, 1999 ("now something has come along that even the slightly embarrassed Treasury may not be able to ignore.  Pension advisers, emboldened by a decade of improvidently granted determination letters and reliance on a reassuring sentence in a preamble to an otherwise irrelevant regulation, have begun playing fast and loose with retirement ages in cash balance plans. . . .  Retire in Five Years?  [NationsBank's] new plan takes a hyper-technical approach to the question of what constitutes a normal retirement age . . . .  PricewaterhouseCoopers, which designed the NationsBank plan, put the same retirement age provision in its own plan.").

defined in the plan document that is well below th[e] actual typical retirement age." Ex. 1, Letter from Ira Cohen, PricewaterhouseCoopers LLP, to IRS Commissioner Charles O. Rossotti and Deputy Assistant Secretary for Tax Policy Jonathan Talisman, dated Sept. 30, 1999, *reprinted in* Tax Notes Today, Nov. 18, 1999.

44.     The letter further admits that the 5-year "age" cannot be considered a "'normal' normal retirement age," such as age 65. *Id.*   But PwC says that the IRS is to blame for the RBAP's use of a fictitious normal retirement age, calling it "a necessary result of poor rulemaking by the Treasury Department." *Id.*  The letter says that the fictitious normal retirement age was a reaction to the IRS's "needless[]" publication of unreasonable rules, and that the government should have anticipated such an "equal and opposite" reaction. *Id.*

45.     In any event, participants in the RBAP were not clearly informed about the definition of Normal Retirement Age set forth in the formal Plan document, and the definition is inconsistent with other definitions contained in Plan documents distributed to Plan participants.[4]  As a result, the definition in the formal Plan document is not valid and binding.

46.     Neither when Price Waterhouse first adopted the 5-year Normal Retirement Age, nor when PwC amended the Coopers & Lybrand Retirement Plan to adopt the 5-year Normal Retirement Age, did Defendants notify employees, in the form of an ERISA section 204(h) notice or otherwise, about the 5-year "age."

---

[4] As previously explained, the RBAP is more than just the RBAP formal Plan document.  There are other RBAP Plan documents, including the RBAP Summary Plan Description.  An SPD is a "plan document" at least to the same extent as the document that formally describes the terms of the plan.  It is almost always the only plan document participants are ever provided and ever see. Such is the case here where PwC kept the RBAP formal Plan document closely held and did not distribute it to Plaintiff or virtually any other non-partner participant.

47.     In fact, the  Defendants repeatedly represented to participants, and are currently representing to participants, that age 65 is the RBAP's normal retirement age. The RBAP SPDs for 1999-2005 state that "normal retirement age" under the RBAP is age 65, not the completion of 5 years of service.  *See* RBAP 1999 SPD at 14, 2000 SPD at 21, 2003 SPD at 24, 2004 SPD at 24, 2005 SPD at 23.

48.     Furthermore, until very recently, the "Glossary" on the RBAP's website for Plan participants defined "Normal Retirement Age (NRA)" as: "The age, as established by the plan, at which retirement normally occurs."  PwC employees covered by the RBAP do not normally retire after 5 years of employment with PwC.  According to the Plan's Form 5500 filings, the RBAP assumes retirement normally occurs between age 60 and 65.

49.     The definitions in the SPDs and website Glossary should trump the definition set forth on the formal Plan document, especially as they were specifically designed to fraudulently conceal the unlawful attempt to state a 5-years-of-work definition of normal retirement age and the other illegal plan terms discussed herein.

50.     Absent a valid definition of "normal retirement age" in the plan, ERISA and the terms of the Plan itself require that age 65 be used as the default normal retirement age.  *See* ERISA § 3(24), 29 U.S.C. § 1002(34), IRC § 411(a)(8), and Treas. Reg. § 1.411(a)-7(b)(1).

## CLAIMS FOR RELIEF

## COUNT ONE

## UNLAWFUL LUMP SUM "WHIPSAW" CALCULATION

51.     Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

52.     Plaintiff brings this claim on behalf of himself and the proposed Lump Sum Class.

53.     Under ERISA §§ 3(23)(A) and 204(c)(3), the accrued benefit under a defined benefit plan must be expressed in terms of the annuity that it will yield at normal retirement age; and if the benefit is paid at any other time or in any other form, the benefit paid must be worth at least as much as that annuity.  *See also* Tax Code §§ 411(a)(7)(A)(i) and 411(c)(3), and Treas. Reg. §§ 1.411(a)-7(a)(1) and 1.411(c)-1(e).

54.     This means that if a participant requests a lump sum distribution of his benefits under a defined benefit plan, the lump sum that is paid by the plan must be worth at least as much as the annuity that would be payable at normal retirement age.  In the case of a "cash balance" defined plan, such as the RBAP, that expresses benefits by reference to a hypothetical account balance, the plan must project the balance of the hypothetical account forward to normal retirement age and then pay out the present value of that projected balance, computed according to ERISA § 205(g) and Tax Code § 417(e).

55.     To perform this required projection calculation, the plan must prescribe a method for determining the rate at which future interest credits will be applied to project the participant's accrued benefit as of normal retirement age.  The projection method

must accurately reflect the value of expected future interest credits.  *E.g.*, IRS Notice 96-8, 1996-1 C.B. 359-61.

56.     It is this last requirement – that the projection rate <u>accurately reflect</u> a reasonable estimate of future interest credits – that the RBAP fails to satisfy.  This was precisely the shortcoming of the cash balance plan addressed by the Second Circuit in *Esden*.  Just like the plan there, the RBAP *does* prescribe a method to project a participant's account balance to normal retirement age.  But rather than using a historical average or some other methodology intended to accurately estimate future investment credits, the RBAP establishes a rate that is intended to do anything but reflect a reasonable estimate of future investment credits.

57.     Instead, the rate specified in the RBAP – the "Deemed Plan Interest Rate" – is designed to permit the Plan to effectively sidestep, rather than comply with, the projection requirement approved by the Second Circuit.  Just like the interest rate used by the plan addressed in *Esden*, the Deemed Plan Interest Rate under the RBAP is unlawfully drafted so that whenever a participant elects a lump-sum distribution, the benefit received will always be simply his or her current account balance.

58.     The scheme works as follows:  The Deemed Plan Interest Rate is the same rate used by the RBAP to both *project* a participant's account balanced to normal retirement age, and then to *discount* the resulting normal retirement benefit back to present value – so together, the projection and discount (at the same rate) result in a meaningless round trip that always results in a benefit equal to exactly the current balance of a participant's hypothetical account.  RBAP §§ 2.2 and 5.4(b).  This is precisely what the Second Circuit concluded was unlawful in *Esden*.

59.     The result is that the RBAP violates ERISA and the Tax Code on its face and in operation when it calculates lump sum distributions by using a "Deemed Plan Interest Rate" equal to the rate on 30-year Treasury securities instead of a rate intended to accurately reflect the value of expected future investment credits.

60.     Any argument by Defendants that the Plan's purported use of a fictitious "normal retirement age" saves the RBAP from a violation of ERISA and *Esden* – on the grounds that the fictitious age effectively excuses the RBAP from performing the projection calculation altogether – is unavailing.  Defendants cannot rely on creative plan drafting to avoid the statutory requirement that lump sum payments can never be less than the present value of a participant's *lawfully defined* normal retirement benefit. ERISA is quite explicit that plan terms governing the calculation of lump sums are circumscribed by statutory requirements and restrictions.  The Plan cannot contract around the statute.  *E.g.,* ERISA § 404(a)(1)(D).

61.     In any event, the normal retirement age under the RBAP is in fact age 65, not the date the RBAP formal plan document purports to state as the normal retirement age.  *See supra,* ¶¶ 45-50.

62.     If lump sum benefits had been calculated in the manner required under ERISA and the Tax Code, Plaintiff and other members of the proposed Lump Sum Class would have received a larger distribution than the amounts in fact paid to them.

## COUNT TWO

### UNLAWFUL CONDITIONING OF ACCRUED BENEFITS

63.     Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

64.     Plaintiff brings this claim on behalf of himself and the proposed Class.

65.     Under ERISA § 203(a)(2), 29 U.S.C. § 1053(a)(2), and Tax Code § 411(a)(2), once a participant has satisfied a plan's vesting standards, the participant's accrued benefit cannot be made conditional upon a subsequent event or "subsequent forbearance." Treas. Reg. § 1.411(a)-4. For example, the benefit may not be made conditional on the distribution option chosen. Nor can the benefit be made conditional on the participant electing to leave her balance in the Plan.

66.     Section 2.1 of the RBAP purports to define a participant's Accrued Benefit as the participant's hypothetical current account balance. This is an incomplete and therefore inaccurate definition because it does not reflect a participant's total "accrued benefit" within the meaning of ERISA and the Tax Code. *See* ERISA § 3(23)(A), 29 U.S.C. § 1002(3)(23), and Tax Code § 411(a)(7)(A)(i).

67.     Under the terms of the RBAP, in return for performing services for PwC, a participant earns ("accrues") a pay credit based on the period of service *plus* the right to be credited with subsequent investment credits related to that pay credit through at least April 1 of the year following attainment of age 70½. The right to future investment credits accrues at the same time as the underlying pay credits because the investments credits are not conditioned on the performance of future services by the participant – the benefits are attributable to services the participant has already performed. Accordingly, a

participant's "accrued benefit" under the Plan at any point includes not only his current nominal account balance but also the stream of future investment credits payable with respect to that account balance.

68.     As a result, future investment credits promised under the Plan to a participant (on his existing account balance) cannot lawfully be made conditional on the distribution option chosen or on the participant electing to leave his balance in the Plan. *E.g.*, Treas. Reg. § 1.411(a)-4.

69.     Yet that is precisely what the RBAP does.  Future investment credits are expressly conditioned on a participant's forbearance from removing his benefits from the Plan.  RBAP § 2.13(b).  Investment credits also are conditional on the particular distribution option chosen: credits cease if distributions are paid in the form of an annuity, but not, for example, if paid in the form of a partial lump distribution pursuant to Section 5.4(a) of the RBAP.  *Id.*  Section RBAP § 6.1(b) confirms the Plan's unlawful treatment of future investment credits, providing that only the Plan-defined "Accrued Benefit" (which excludes future investment credits) become vested under the Plan.

70.     The terms of the RBAP therefore directly contravene ERISA § 203(a)(2), Tax Code § 411(a)(2), and Treas. Reg. § 1.411(a)-4, as interpreted by the Second Circuit in *Esden.*  When Plaintiff and other members of the Class commenced distribution of their RBAP benefit and were paid only the nominal balances in their hypothetical "accounts," they were forced to unlawfully forfeit the future investment credits that would have been credited to their cash balance accounts had they left their benefits in the plan until they attained age 70½.  *Id*.

20

71.     The RBAP's only possible defense is that participants received exactly what the Plan promised – that participants voluntarily withdrew their benefits before age 70½ and thereby voluntarily elected to forgo the receipt of future investment credits. This argument may sound appealing, but it is incorrect as a matter of law.  Whether RBAP participants received what the Plan promised is not the issue here.  The issue is whether the Plan's terms comply with the law.  They do not:  ERISA does not provide for an exception allowing a plan to offer an employee the voluntary choice of a partial forfeiture in exchange for a particular form of payment.  *E.g.,* Treas. Reg. § 1.411(a)-4(a).

72.     If benefits had been calculated in the manner required under ERISA and the Tax Code and future investment credits not forfeited under unlawful provisions of the Plan, Plaintiff and other members of the proposed Class who were paid a benefit from the Plan would have received a larger distribution than the amounts in fact paid to them.

## COUNT THREE

## AGE DISCRIMINATION UNDER ERISA § 204(b)(1)(H)

73.     Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

74.     Plaintiff brings this claim on behalf of himself and the proposed Class.

75.     The benefit formula used to compute participants' benefits under the RBAP violated and violates the age discrimination rules contained in ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and Tax Code § 411(b)(1)(H), because RBAP benefits accrue at a rate that is reduced because of age or the attainment of any age.

76.     This result follows inescapably when investment credits are taken into account for purposes of testing the Plan for age discrimination, as the Second Circuit has

instructed is required.  Taking investment credits into account, the Plan fails to comply with ERISA § 204(b)(1)(H) and Tax Code § 411(b)(1)(H) whether benefits are tested based on the projected life annuity commencing at normal retirement age or the present value of benefits that accrue under the Plan.  This problem is systematic, and affects Plaintiff and all other members of the proposed Class.

77.     As a result of the RBAP's discriminatory design, Plaintiff and other participants in the RBAP accrued benefits under the Plan that were less than the benefits they would have accrued had the Plan complied with ERISA and Tax Code nondiscrimination standards.

## COUNT FOUR

## FAILURE TO PRESERVE ACTUARIAL VALUE OF NORMAL RETIREMENT BENEFITS

78.     Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

79.     Plaintiff brings this claim on behalf of himself and the proposed Class.

80.     A participant's "normal retirement benefit" under a cash balance or other defined benefit pension plan generally is his accrued benefit under the plan commencing as of normal retirement age.  ERISA § 3(22), 29 U.S.C. § 1002(22), and IRC § 411(a)(9). Under ERISA, any benefit paid *after* normal retirement age must have an actuarial value that is no less than the actuarial value of this normal retirement benefit.  In other words, the actuarial value of a participant's accrued benefit payable as of his normal retirement age must be "locked in" as a minimum benefit – no benefit paid after the normal retirement age can have an actuarial value of less than this normal retirement benefit,

absent an applicable exception.  *See* ERISA §§ 203 and 204(c)(3), IRC §§ 411(a)

and 411(c)(3), and Proposed Treasury Regulations §§ 1.411(b)-2 and 1.411(c)-1.

81.    The RBAP failed and fails on its face, and in actual administration, to

satisfy this requirement because it did not and does not actuarially increase a participant's

benefit after normal retirement age.  This is the case regardless of whether the normal

retirement age under the RBAP is the date a participant completes 5 years of service, as

the RBAP Plan document purportedly defines it, or age 65, as Plaintiff asserts, or some

other age.

82.    The RBAP does continue to provide investment credits after normal

retirement age.  But unlike ordinary cash balance plans that provide continued *interest*

credits after normal retirement age, the RBAP's *investment* credits are not a substitute or

an adequate substitute for the actuarial adjustment required under ERISA §§ 203

and 204(c)(3) and Tax Code §§ 411(c)(3) and 401(a)(25).  The investment credits under

the RBAP are different from the interest credits provided under ordinary cash balance

plans because the investment credits can and do vary significantly from one period to the

next – and in some periods actually result in losses that *reduce* a participant's nominal

account balance.  The investment credits thus cannot be reliably used to maintain the

actuarial value of a participant's normal retirement benefit.

83.    As a result of this flaw in the RBAP, Plaintiff's and other participants'

vested normal retirement benefits under the RBAP were unlawfully reduced during

periods over which investment returns actually credited (or debited) to their accounts

were less than the actuarial adjustment required to maintain the value of their normal

retirement benefits.

84.     Neither the Plaintiff nor any other affected participant received a "suspension of benefits" notice within the meaning of ERISA § 203(a)(3)(B) and the regulations thereunder.  Therefore, no exception applies that would excuse such forfeitures.  *Id.*; Tax Code § 411(a)(3)(B).

85.     As a result of the violations described in this Count, Plaintiff and other members of the proposed Class accrued benefits under the Plan that were less than the benefits they would have accrued had the Plan complied with ERISA and Tax Code standards.

## CLASS ACTION ALLEGATIONS

86.     Plaintiff brings suit on behalf of himself and on behalf of all other participants and beneficiaries similarly situated under the provisions of Rule 23 of the Federal Rules of Civil Procedure with respect to violations alleged herein.

87.     The proposed Class is defined as:

All persons who participated in the Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP at any time after June 30, 1994, and the beneficiaries and estates of such persons, who at any point became vested or may become vested in their benefits under the Plan.

88.     Within this proposed Class is a proposed Lump Sum Subclass established solely for purposes of Count One, defined as follows:

All persons who participated in the Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP at any time after June 30, 1994, and the beneficiaries and estates of such persons, who at any point became vested or may become vested in their benefits under the Plan, and who received or may in the future receive a lump sum distribution of all or any portion of their accrued benefit under the Plan.

89.     The requirements for maintaining this action as a class action under Fed. R. Civ. P. 23(a) are satisfied in that there are too many Class and Subclass members for

joinder of all of them to be practicable.  There are tens of thousands of members of the proposed Class and Subclass dispersed among many states.

90.     The claims of the Class and Subclass members raise numerous common questions of fact and law, thereby satisfying the requirements of Fed. R. Civ. P. 23(a)(2). Every issue concerning liability is common to all Class and Subclass members because all such issues concern their entitlement to benefits calculated in a manner other than that calculated thus far and their or the Plan's entitlement to relief from harm caused by the violations of law and/or plan terms, rather than any action taken by Plaintiff or any Class or Subclass member.  In addition, every issue concerning relief is also common to the Class and Subclass for the same reason.

91.     Plaintiff's claims are typical of the claims of the Class and Subclass members, and therefore satisfy the requirements of Fed. R. Civ. P. 23(a)(3).  They do not assert any claims in addition to or different than those of the Class or Subclass.

92.     Plaintiff is an adequate representative of the Class and Subclass, and therefore satisfies the requirements of Fed. R. Civ. P. 23(a)(4).  The interests of Plaintiff are identical to those of the Class and Subclass.  Defendants have no unique defenses against them that would interfere with their representation of the Class and Subclass. Plaintiff has engaged counsel with considerable ERISA class action litigation experience.

93.     Additionally, all of the requirements of Fed. R. Civ. P. 23(b)(1) are satisfied in that the prosecution of separate actions by individual members of the Class or Subclass would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants and individual adjudications present a

risk of adjudications which, as a practical matter, would be dispositive of the interests of other members who are not parties.

94.     Alternatively, all of the requirements of Fed. R. Civ. P. 23(b)(2) also are satisfied in that Defendants' actions affected all Class and Subclass members in the same manner making appropriate final declaratory and injunctive relief with respect to the Class and Subclass as a whole.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that

A.     An order be entered certifying this action a class action and undersigned counsel as class counsel pursuant to Fed. R. Civ. P. 23;

B.     Judgment be entered against Defendants and on behalf of Plaintiff and the Class and Subclass; and

C.     An order be entered awarding, declaring or otherwise providing Plaintiff and the Class and Subclass all other such relief to which Plaintiff and the Class and Subclass are or may be entitled whether or not specified herein.

The relief Plaintiff seeks includes but is not limited to:

D.     An order declaring that Defendants violated and are violating ERISA's benefit calculation and accrued benefit standards in the specific manners alleged in Counts One through Four and otherwise;

E.     An order enjoining Defendants from continuing to violate the law and the terms of the Plan in the manners alleged or referenced in this Complaint, reforming the Plan, and compelling Defendants to bring the terms and administration of the Plan into

compliance with ERISA or the lawful provisions of the Plan, in all cases effective as of the date the alleged violations first occurred;

F.      An order requiring Defendants to re-calculate the benefits accrued and/or due under the terms of the Plan in accordance with the requirements of ERISA, and for the Plan to pay these amounts, plus interest, to or on behalf of all Class and Subclass members who received less in benefits or benefit accruals than the amount to which they are entitled;

G.      An order awarding pre- and post-judgment interest;

H.      An order awarding attorney's fees on the basis of the common fund doctrine (and/or other applicable law, at Plaintiff's election), along with the reimbursement of the expenses incurred in connection with this action.

By:

Eli Gottesdiener  [EG 0111]

**GOTTESDIENER LAW FIRM, PLLC**
498 7th Street
Brooklyn, NY  11215
(718) 788-1500
(718) 788-1650
eli@gottesdienerlaw.com

Attorney for the Plaintiff
and the proposed Class and Subclass

Dated:  March 23, 2006

27