## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

TIMOTHY D. LAURENT, *et al.*,

    **On behalf of themselves and all
others similarly situated,**

                 **Plaintiffs,**

      **v.**

**PRICEWATERHOUSECOOPERS LLP,** *et al.*,

                **Defendants.**

: **06 CV 2280 (MBM)**

RECEIVED
MAY 0 4 2006
U.S.D.C. S.D. N.Y.
CASHIERS

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, by and through their counsel, allege as follows:

### NATURE AND SUMMARY OF THIS ACTION

1.    This is an action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA") challenging the legality of the design of The Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP ("RBAP"). The RBAP is an ERISA-governed "cash balance" defined benefit pension sponsored by Defendant PricewaterhouseCoopers LLP ("PwC") that covers PwC's entire workforce, ranging from partners and principals to rank-and-file employees and support staff.

2.    Plaintiffs allege that the RBAP fails to comply on its face and in operation with the ERISA <u>standard for calculating lump sum benefits</u> payable from a cash balance pension plan. Specifically, the RBAP uses an interest rate to calculate lump

sums that does not satisfy the standard established by the Second Circuit in *Esden v. Bank of Boston*, 229 F.3d 154 (2d Cir. 2000).

3.      Plaintiffs further allege that the RBAP fails to comply on its face and in operation with ERISA's <u>accrued benefit standards</u> in the manner required by *Esden*. Specifically, the RBAP fails to comply with *Esden's* mandate that "interest credits" promised under a cash balance plan must be taken into account in determining whether a plan complies with ERISA's benefit accrual requirements.  The RBAP also fails to comply with *Esden's* instruction that the value of a participant's normal retirement benefit under a cash balance pension plan must be preserved.

4.      Plaintiffs respectfully request a declaration from the Court that the RBAP fails to satisfy these "*Esden*" standards; an order requiring Defendants to reform the RBAP to the extent necessary to comply with these standards, effective retroactively to the date the unlawful plan provisions were adopted and implemented; and an order requiring Defendants to then recalculate and pay benefits due under the RBAP to Plaintiffs and other members of the proposed Class and comply with *Esden* and ERISA in the future.

## **JURISDICTION**

5.      This Court has subject matter jurisdiction over this action by virtue of 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States and pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), which provides for jurisdiction of actions brought under Title I of ERISA.

6.      This Court has personal jurisdiction over the Defendants because they reside in, do business in, or have significant contacts with, this District or the United

States, and because ERISA provides for nationwide service of process.  ERISA

§ 502(e)(2), 29 U.S.C. § 1132(e)(2).

## VENUE

7.      Venue is proper in this district, under ERISA § 502(e), 29 U.S.C.

§ 1132(e), because this district is where some of the breaches took place, where the Plan

is administered, and where one or more Defendants reside and/or may be found.

## EXHAUSTION OF REMEDIES

8.      Exhaustion of Plan remedies is not required because the core allegations in

this action are that the terms of the RBAP violate the law.  Congress intended that

statutory questions of this nature be adjudicated by Article III judges, not employer-

appointed plan administrators.

9.      In any event, Plaintiffs should be excused from any otherwise applicable

requirement to exhaust plan remedies for one or more of the following reasons.  First, as

noted, Plaintiffs raise no claims as to which it would be appropriate to defer to the Plan's

administrator.  Second, the Plan does not provide any meaningful claims process for

challenges to the legality of the Plan's design of the type alleged in this suit.  Third, any

remedy provided under the terms of the Plan for the violations asserted would be

inadequate because the Plan's claims procedures and remedies do not contemplate

reformation of the Plan's provisions to the extent they are unlawful.  Finally, any attempt

to exhaust would be futile under the circumstances.

10.     Even if exhaustion were required here, Plaintiffs have fully complied with and exhausted the Plan's internal claims procedures.[1]

## THE PARTIES

11.     Plaintiff Timothy D. Laurent of Inverness, Illinois, a former PwC employee, was and remains a participant, as defined in ERISA § 3(7) in the RBAP.  In 2002, after terminating employment with PwC, he requested a single lump sum distribution of his benefit from the RBAP.  On or about May 20, 2002, Mr. Laurent was paid the nominal balance of his hypothetical cash balance account, an amount less than the value of his accrued benefit.

12.     Plaintiff Smeeta Sharon of New York, New York, a former PwC employee, was and remains a participant, as defined in ERISA § 3(7) in the RBAP.  In 2002, after terminating employment with PwC, she requested a single lump sum distribution of her benefit from the RBAP.  On or about April 30, 2002, Ms. Sharon was paid the nominal balance of her hypothetical cash balance account, an amount less than the value of her accrued benefit.

13.     Plaintiff Michael A. Weil of West Bloomfield, Michigan, a former PwC employee, was and remains a participant, as defined in ERISA § 3(7) in the RBAP.  Since terminating employment with PwC on or about December 14, 2001, Mr. Weil has

---

[1] Mr. Laurent previously filed two lawsuits on behalf of himself and a proposed class that included Ms. Sharon and Mr. Weil, asserting claims similar to those asserted in this action, among other claims.  The first action, filed on November 5, 2004, was dismissed without prejudice for lack of proper venue.  *Laurent v. PricewaterhouseCoopers LLP,* No. 04-809 (S.D. Ill.).  The second action, filed on June 28, 2005, was dismissed voluntarily without prejudice by Mr. Laurent.  *Laurent v. PricewaterhouseCoopers LLP,* No. 05-1291 (D.D.C.).  Mr. Laurent's filing of these earlier lawsuits, together with subsequent proceedings in the cases, fully satisfied the conditions set forth in RBAP § 10.6 for exhaustion of internal claims procedures.  Before Defendants' responsive pleadings in these previous lawsuits, none of the Defendants had clearly repudiated Mr. Laurent's, Ms. Sharon's, or Mr. Weil's right to the additional benefits they allege are or will be due under the theories presented in this Complaint.

maintained his RBAP account and has not yet requested a distribution of his accrued

benefit.  The current balance in his notional account is approximately $46,459.20.

14.      Defendant PricewaterhouseCoopers LLP ("PwC") is a Delaware limited

liability partnership organized and existing pursuant to the PwC Partners and Principals

Agreement (incorporated herein by reference).  PwC is the sponsor of the RBAP.  PwC's

headquarters are located at 300 Madison Avenue, New York, New York 10017-6204.

All references to "PwC" include its predecessors, including Price Waterhouse LLP and

Coopers & Lybrand LLP.

15.      Defendant The Retirement Benefit Accumulation Plan for Employees of

PricewaterhouseCoopers LLP ("RBAP" or the "Plan") is a "cash balance" pension plan

covering PwC partners and principals ("partners"), directors, and employees.  The RBAP

is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A) and more

precisely a "defined benefit plan," *see* RBAP at 1-2, within the meaning of ERISA

§ 3(35) and IRC § 414(j), and a "pension plan" within the meaning of IRC § 401(a) and

Treasury Regulation ("Treas. Reg.") § 1.401-1(b)(1)(i).[2]  The Plan is overseen and

administered in significant part by individuals who work and/or reside in this District.

For example, many of the Plan's Trustees and members of the Plan's Administrative

Committee work and/or reside in the District; the Plan's IRS determination letters were

---

[2] "RBAP" refers, as the case may be, to the RBAP in its entirety or the document commonly
referred to as the "RBAP plan document."  The RBAP plan document is an "Agreement"
between, among others, PwC and "the Trustees" amended and restated effective July 1, 1995.
References to the RBAP plan document are to that Agreement together with all amendments,
exhibits, appendices, supplements, and agreements or side letters or special annual memoranda to
partners, all of which, as updated to the present, are incorporated herein by reference.  References
to the "RBAP" include the RBAP plan document and other RBAP plan documents such as the
Summary Plan Description(s) ("SPD"), all of which are also incorporated herein by reference.

addressed to PwC's offices in this District; and the Plan's lead actuaries during all or most of the years at issue in this lawsuit work and/or reside in the District.

16.      Defendant The Administrative Committee to the Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP (the "Administrative Committee" or "Committee") was and/or is the RBAP's Administrator within the meaning of ERISA § 3(16)(A).  The Committee and its current and former members were and/or are named fiduciaries with respect to the RBAP within the meaning of ERISA § 402(a).  A number of Committee members work and/or reside in this District.

## BACKGROUND

### I.      Basic Description of the RBAP and Plaintiffs' Benefits Thereunder.

17.      Prior to July 1, 1994, the RBAP's effective date, Price Waterhouse LLP, a predecessor of PwC, maintained for its employees a traditional defined benefit plan, known as the Retirement Plan for Employees of Price Waterhouse LLP.  Effective June 30, 1994, Price Waterhouse LLP froze benefit accruals under that plan, effectively replacing it with the RBAP, which became effective July 1, 1994.

18.      On July 1, 1998, Price Waterhouse LLP and Coopers & Lybrand LLP merged to create PwC.  On that same date, Coopers & Lybrand LLP's traditional defined benefit plan, the Coopers & Lybrand Retirement Plan, was amended to provide for a cash balance formula substantially identical to the RBAP.  The two plans merged into the Coopers & Lybrand Retirement Plan one year later, on July 1, 1999, and the merged plan was amended and restated as the amended and restated RBAP.  (Accordingly, all references to the RBAP herein should be read to include the Coopers & Lybrand Retirement Plan from July 1, 1998 until July 1, 1999).

19.     The RBAP is what is known as a "cash balance" pension plan.  The benefits payable under the Plan are calculated based on the value of the hypothetical "account" established under the Plan for each participant.

20.     Similar to other cash balance plans, participants in the RBAP receive hypothetical periodic "pay credits" to their hypothetical accounts each month.  Non-partner employees receive credits equal to 5-8% of the employee's monthly compensation.  Partners generally receive pay credits over a 10 year period equal to approximately 10% of the maximum contribution permitted under ERISA.

21.     Account balances are adjusted each business day by hypothetical "investment credits" (or debits), which are the RBAP's version of the more typical cash balance "interest credits."  RBAP participants are required to choose from among a PwC-selected menu of "investment experience choices" in which their accounts are deemed to be invested, or else be defaulted into the money market fund.  Participants may reallocate their deemed investment mix on a daily basis.  The investment credits reflect the results of each participant's hypothetical investment performance.

22.     Under the terms of the RBAP, most participants have the right to leave their account balances in the Plan even after terminating employment or retiring and to continue receiving investment credits.  RBAP § 2.13(b).  More specifically, a participant with an account balance in excess of $5,000 at the time of his termination of employment is permitted to leave his or her benefits in the RBAP through April 1 of the year following the later of retirement or the date the participant attains age 70½.  RBAP §§ 5.1, 5.6.

23.     A participant's right to receive future investment credits on his account balance through age 70½ accrues at the same time as the corresponding pay credits to which the investment credits relate – that is, the right to receive future investment credits through age 70½ is not conditioned on the performance of additional services for PwC. As a result, the future investment credits payable on existing account balances through April 1 of the year following the date a participant attains age 70½ are part of each RBAP participant's current "accrued benefit" within the meaning of ERISA and the Tax Code.

24.     The RBAP provides that a participant is fully vested upon the completion of five (5) years of service with PwC or a related employer.  Plaintiffs were fully vested under this provision by the time they terminated employment with PwC.  Plaintiffs' RBAP account balances exceeded $5,000 at the time of their termination of employment.

25.     As a result, at the time of their termination of employment, each Plaintiff had a vested accrued benefit equal to (1) the nominal balance in their hypothetical cash balance account, *plus* (2) the stream of future investment credits payable on such account balance through April 1 of the calendar year following the year in which they would attain age 70½.

26.     Plaintiffs Laurent and Sharon received a single lump sum payment from the Plan on or about May 20, 2002 (Mr. Laurent) and April 30, 2002 (Ms. Sharon).  The payment made to Mr. Laurent was $24,432.65, an amount equal to the nominal balance in his cash balance account.  The payment made to Ms. Sharon was $9,527.02, an amount equal to the nominal balance in her cash balance account.  Plaintiff Weil has not yet requested a distribution of his accrued benefit but if he did he would, today, receive an

amount equal to the nominal balance in his cash balance account at the time of distribution or an annuity based on that balance.

## II.     The RBAP's "Normal Retirement Benefit" Definition.

27.     Although a participant's benefit under the Plan nominally is expressed in terms of his or her "account" balance, because the RBAP is a "defined benefit" plan – not a "defined contribution" plan such as a 401(k) plan – ERISA requires that the benefit payable under the Plan must be formally expressed in terms of an annuity commencing at normal retirement age.  This "normal retirement benefit" is the lens through which the Plan must be tested for compliance with ERISA and Internal Revenue Code ("Tax Code") standards.  *See* ERISA § 3(23)(A)-(B), 29 U.S.C. § 1002(23)(A)-(B), and Tax Code § 411(a)(7)(A)(i)-(ii).

28.     According to Section 5.1 of the Plan document:  "A Participant's Normal Retirement Benefit shall be an amount equal to the Actuarial Equivalent (calculated by projecting the Deemed Account Balance to Normal Retirement Age using the Deemed Plan Interest Rate) of his or her Deemed Account Balance."  *Id.* (underlining added).

29.     Section 2.16 of the Plan document defines the Deemed Plan Interest Rate as the annual rate of interest equal to the interest rate on 30-year Treasury securities, as specified by the IRS for the month of February (or before July 1, 2001, the month of May) immediately preceding the plan year in which the calculation is made.

30.     Section 2.32 of the Plan document defines Normal Retirement Age as meaning:  "The earlier of the date a Participant attains age 65 or completes five (5) Years of Service."  Not coincidentally, this is the same date each participant vests in his or her

benefits under the Plan, and thus the first date any participant could become entitled to a lump sum distribution.  RBAP § 6.1.

31.     Defendants did not disclose these definitions to RBAP participants, and in fact took steps to conceal the definitions and their impact on benefit calculations.

### III.     The RBAP's Unlawful Deemed Plan Interest Rate.

32.     The RBAP's use of the Deemed Plan Interest Rate to project a participant's current account balance to normal retirement age is unlawful on its face and in operation.  According to the Second Circuit, a cash balance plan cannot specify any projection rate of its choosing.  Rather, the projection method must accurately reflect the value of expected future interest credits.

33.     Specifically, "for plans adopting variable interest rates," such as the RBAP, "the value of future interest credits [cannot be] projected using a rate that understates the value of those credits."  *Esden,* 229 F.3d at 167.  "For example, a plan that tied its interest credits to an outside index [might] provide[] that valuation projections assume an interest credit equal to the average actual interest credit over a certain number of previous periods. . . ."  *Id.* at 166 n.17 (citing Treas. Reg. § 1.401(a)(4)-8(c)(3)(v)(B), which "allow[s] just such a methodology for determining the value of a variable interest rate to be used for projection of cash account balance at normal retirement age").

34.     The Deemed Plan Interest Rate does not reflect the "average actual interest credit over a certain number of previous periods."  In fact, the RBAP's filings with the IRS indicate that the rate of interest on 30-year Treasury securities has been well

below the Plan's own internal assumptions about the rate of future investment credits.
*E.g.,* RBAP IRS Form 5500 for plan year ending June 30, 2004 (using an assumed rate of
future investment credits equal to 6.5%, while the corresponding 30-year Treasury rate
for the year was 4.81%).

35.     Nor can the rate of interest on 30-year Treasury securities be said to reflect
a reasonable estimate of the value of expected future investment credits.  The best
estimate of the value of expected future investment credits for RBAP participants – who
are permitted to "invest" their account balances in a diversified portfolio of mutual funds,
and who can change their investment mix on a daily basis – is a uniform rate for all Plan
participants based on historical market averages.  The approximate long-term historical
market rate of return of a portfolio invested 70% in equities and 30% in debt securities –
a common recommendation for individual investors saving for retirement – is between
9% and 10%.  This is significantly higher than the historical average rate of interest on
30-year Treasury bonds.

36.     The use of a uniform rate based on historical averages is consistent with
ERISA and Tax Code standards, as well as PwC's and the Plan's own practice.  For
example, the RBAP also uses a uniform blended interest rate for purposes of projecting
benefits to demonstrate compliance with Tax Code income nondiscrimination standards
set forth under Tax Code § 401(a)(4) and the regulations thereunder.  *See* Treas. Reg.
§ 1.401(a)(4)-3(d)(2)(i) and -12 (requiring that benefits be normalized by projecting
benefits to age 65 using a standard interest rate).  When PwC performs calculations for
purposes of estimating projected benefits under the RBAP for accounting and funding

purposes, it also uses a uniform rate based on a blended average of projected investment returns.  *See, e.g.*, RBAP 2003 Valuation Report.

37.     As a result, the RBAP violates ERISA and the Tax Code on its face and in operation by using the rate on 30-year Treasury securities to calculate the projected normal retirement benefit under the Plan instead of a rate intended to accurately reflect the value of expected future investment credits.


## IV.     The RBAP's Sham Normal Retirement Age Definition.

38.     The RBAP's definition of Normal Retirement Age is a sham that lacks substance and therefore is properly disregarded for purposes of applying provisions of ERISA and the Tax Code.

39.     The Plan's definition of Normal Retirement Age is virtually unique.  It means that RBAP participants are deemed to reach their "normal retirement age" after completing 5 years of service with PwC, regardless of their age, with the relatively rare exception of the person who starts work for PwC after age 60.  Plaintiff Laurent himself reached his "normal" retirement age at age 30, for example – quite unbeknownst to him because Defendants did not disclose this "fact" to participants in the RBAP's summary plan description (or elsewhere), even though such disclosure is legally required under ERISA regulations.

40.     While PwC employees who participate in the RBAP may change employers after a few years, they do not normally withdraw from full-time work and live on their savings and/or pension after 5 years of employment regardless of their age.  In fact, the RBAP has consistently reported on its annual IRS Form 5500 information return

to the IRS and the Department of Labor that, for actuarial and financial accounting purposes, the assumed retirement age of employees who participate in the RBAP is age 60 for partners and age 65 for everyone else.  (Under PwC's partnership agreement, partners generally are required to retire at age 60 – *i.e.*, their normal retirement age is age 60.)  Actuarial and accounting rules require actuaries and accountants to base their assumptions on their best estimate of when retirement will *in fact* typically occur, focusing on substance rather than form.  IRC § 412(c)(3)(B); FAS 87 ("Employers' Accounting for Pensions") ¶¶ 39, 43.  Thus, the retirement age assumptions in the IRS Form 5500s represent an admission by PwC and the RBAP that the true "normal" retirement age of RBAP participants is age 60 for partners and age 65 for non-partners.

41.     A further admission (by conduct) that the Plan's purported definition of "normal retirement age" is a sham is that when RBAP participants reach "Normal Retirement Age" they are not informed by the Plan or PwC of that "fact."  At the completion of 5 years of service, participants do not receive a "suspension of benefits notice" informing them that by continuing to work past normal retirement age, the economic value of their "normal retirement benefit" may erode.  Such a notice is required at normal retirement age unless a plan provides for actuarial adjustment of the normal retirement benefit, *see* 29 C.F.R. § 2530.203-3(b)(4), which the RBAP does not do.

42.     PwC itself admitted in a September 1999 letter to the IRS that the purpose of its 5-year retirement age was to "avoid" the requirement that benefit calculations take into account projected future interest credits – *i.e.*, to avoid the calculation methodology found by the Second Circuit in *Esden* to be *required* under ERISA.  Ex. 1, Letter from Ira Cohen, PricewaterhouseCoopers LLP, to IRS Commissioner Charles O. Rossotti and

Deputy Assistant Secretary for Tax Policy Jonathan Talisman, dated Sept. 30, 1999,

*reprinted in* Tax Notes Today, Nov. 18, 1999.

43.    PwC wrote regulators after one of its clients, NationsBank (now the Bank

of America) was exposed in a series of embarrassing press articles as having adopted the

5-year retirement age – a practice criticized as a "contrivance" that "guts" the statute.[3]

44.    The letter explains that the fictitious retirement age was conceived by

PwC as a way to counter the impact of IRS's "needless[]" publication of IRS Notice 96-

8, which set forth the benefit calculation methodology applicable to cash balance pension

plans – and which the Second Circuit has since described as "an authoritative

interpretation of existing statutes and regulations."  *Esden*, 229 F.3d at 171.

45.    PwC complained that  "the IRS pigeonholes cash balance plans in a

manner that is fundamentally inconsistent with their basic design or rational pension

policy."  *Id.*  PwC was upset that the IRS had interpreted ERISA as requiring cash

balance plans to take into account projected interest credits when calculating benefits,

because they are *defined benefit* plans – rather than allowing such plans to express

benefits as simply the current balance of a participant's account, the way *defined*

*contribution* plans do:  "However, that elegant equation – the account equals the account

---

[3] *See*, *e.g.,* "Cash Balance: Trouble for Bank Plans?  IRS Scrutinizes Shortened Retirement
Ages," *Pensions & Investments,*  May 31, 1999 ("The five-year normal retirement age looks like
a contrivance to get around rules";  "Such shortened retirement ages short-circuit various pension
rules pegged to the more conventional retirement ages of 60 and 65";  "A short retirement age
'guts' the Employee Retirement Income Security Act.");  "Pension Downsizing, Continued," *Tax
Notes,* May 24, 1999 ("now something has come along that even the slightly embarrassed
Treasury may not be able to ignore.  Pension advisers, emboldened by a decade of improvidently
granted determination letters and reliance on a reassuring sentence in a preamble to an otherwise
irrelevant regulation, have begun playing fast and loose with retirement ages in cash balance
plans. . . .  Retire in Five Years?  [NationsBank's] new plan takes a hyper-technical approach to
the question of what constitutes a normal retirement age . . . .  PricewaterhouseCoopers, which
designed the NationsBank plan, put the same retirement age provision in its own plan.").

– is not in the IRS's current mathematical repertoire." *Compare Esden*, 229 F.3d at 159

n.6 ("However 'hybrid' in design a cash balance plan may be, it remains subject to a

regulatory framework that is in many regards rigidly binary.")

46.     PwC did not like this result because it believed the "IRS rules go out of

their way to severely punish employers who credit true market related investment

adjustments" – *e.g.*, investment credits of the type provided by PwC under the RBAP.

"What kind of policy precludes market rates of return from being applied to cash balance

accounts . . . ?"

47.     Thus acknowledging that the plans like the RBAP that provide "market

rates of return" would face a whipsaw problem under the IRS's interpretation of the law,

PwC explained that rather than comply, it would fight back:

> Sir Isaac Newton's third law of motion states that for every action there is
> an opposite and equal reaction.  The IRS regulations needlessly created the
> Whipsaw Effect (the action).  The Whipsaw Effect, however, disappears
> once a participant reaches his or her normal retirement age (because there is
> no longer a need to project into the future – the minimum lump sum rules
> require projection only until normal retirement age).  Interestingly, the
> logical reaction to the IRS's action is to reduce the normal retirement age
> (the reaction) because the Whipsaw Effect would disappear at that point.

*Id.*

48.     The letter goes on to admit that use of an artificially low retirement age

could have "undesirable" collateral effects:  for example, a 5-year retirement age could be

used by a plan sponsor to sidestep core ERISA vesting and benefit accrual standards. *Id.*

(describing the "Law Flaw [that] will be exploited in previously unimagined ways").  But

no matter. PwC explained that regardless of the potential negative impact on the ERISA

regulatory scheme, the firm should be viewed not as a villain, but as a "hero" for devising

the low retirement age strategy:  PwC's actions were justified because "[i]t is only

through the strength and wisdom of our hero in this saga (the low normal retirement age)

that the pension policy dragon (the Whipsaw Effect) created by the IRS has been foiled."

*Id.*

49.     In any event, participants in the RBAP were not clearly informed about

the definition of Normal Retirement Age set forth in the formal Plan document, and the

definition is inconsistent with other definitions contained in Plan documents distributed

to Plan participants.[4]  As a result, the definition in the formal Plan document is not valid

and binding.

50.     Defendants repeatedly have represented to Plaintiffs and other participants

that <u>age 65</u> is the RBAP's normal retirement age.  The RBAP SPDs for 1999-2005 state

that "normal retirement age" under the RBAP is age 65, not the completion of 5 years of

service.  *See* RBAP 1999 SPD at 14; 2001 SPD at 21; 2003 SPD at 24; 2004 SPD at 24;

2005 SPD at 23 (reflecting the most recent formulation, which informs participants that

they have the right to: "Obtain a statement telling you whether you have a right to receive

a pension at normal retirement age (age 65).")[5]

51.     Furthermore, until very recently, the "Glossary" on the RBAP's website

for Plan participants defined "Normal Retirement Age (NRA)" as: "The age, as

---

[4] As previously explained, the RBAP is more than just the RBAP formal Plan document.  There are other RBAP Plan documents, including the RBAP Summary Plan Description.  An SPD is a "plan document" at least to the same extent as the document that formally describes the terms of the plan.  It is almost always the only plan document participants are ever provided and ever see. Such is the case here where PwC kept the RBAP formal Plan document closely held and did not distribute it to Plaintiffs or virtually any other non-partner participant.

[5] At least some SPDs before 1999 appear to have disclosed that the Plan used a low normal retirement age "for plan purposes," but these SPDs also contain language that implies the low age would not be used as a contrivance to pay departing participants simply their current account balance.  For participants who elected a lump sum, the 1998 SPD stated: "The amount of the lump sum payment will be equal to the actuarially equivalent present value of your retirement benefit at the time that payment is made."  1998 SPD at 110-11.

established by the plan, at which retirement normally occurs." PwC employees covered

by the RBAP do not normally retire after 5 years of employment with PwC. According

to the Plan's Form 5500 filings, the RBAP assumes retirement normally occurs between

age 60 and 65.

52.     The definitions in the SPDs and website Glossary should trump the

definition set forth on the formal Plan document, especially as they were specifically

designed to fraudulently conceal the unlawful attempt to state a 5-years-of-work

definition of normal retirement age and the other illegal plan terms discussed herein.

53.     Absent a valid definition of "normal retirement age" in the plan, ERISA

and the terms of the Plan itself require that age 65 be used as the default normal

retirement age. *See* ERISA § 3(24), 29 U.S.C. § 1002(34), IRC § 411(a)(8).


### CLAIMS FOR RELIEF

### COUNT ONE

### UNLAWFUL LUMP SUM "WHIPSAW"CALCULATION

54.     Plaintiffs repeat and re-allege the allegations contained in the foregoing

paragraphs of this Complaint as if fully set forth herein.

55.     Plaintiffs bring this claim on behalf of themselves and the proposed

Lump Sum Class.

56.     Under ERISA §§ 3(23)(A) and 204(c)(3), the accrued benefit under a

defined benefit plan must be expressed in terms of the annuity that it will yield at normal

retirement age; and if the benefit is paid at any other time or in any other form, the

benefit paid must be worth at least as much as that annuity. *See also* Tax Code §§ 411(a)(7)(A)(i) and 411(c)(3), and Treas. Reg. §§ 1.411(a)-7(a)(1) and 1.411(c)-1(e).

57.     This means that if a participant requests a lump sum distribution of his benefits under a defined benefit plan, the lump sum that is paid by the plan must be worth at least as much as the annuity that would be payable at normal retirement age. In the case of a "cash balance" defined plan, such as the RBAP, that expresses benefits by reference to a hypothetical account balance, the plan must project the balance of the hypothetical account forward to normal retirement age and then pay out the present value of that projected balance, computed according to ERISA § 205(g) and Tax Code § 417(e).

58.     To perform this required projection calculation, the plan must prescribe a method for determining the rate at which future interest credits will be applied to project the participant's accrued benefit as of normal retirement age. The projection method must accurately reflect the value of expected future interest credits. *E.g.*, IRS Notice 96-8, 1996-1 C.B. 359-61.

59.     It is this last requirement – that the projection rate accurately reflect a reasonable estimate of future interest credits – that the RBAP fails to satisfy. This was precisely the shortcoming of the cash balance plan addressed by the Second Circuit in *Esden*. Just like the plan there, the RBAP *does* prescribe a method to project a participant's account balance to normal retirement age. But rather than using a historical average or some other methodology intended to accurately estimate future investment credits, the RBAP establishes a rate that is intended to do anything but reflect a reasonable estimate of future investment credits.

60.     Instead, the rate specified in the RBAP – the "Deemed Plan Interest Rate" – is designed to permit the Plan to effectively sidestep, rather than comply with, the projection requirement approved by the Second Circuit.  Just like the interest rate used by the plan addressed in *Esden*, the Deemed Plan Interest Rate under the RBAP is unlawfully drafted so that whenever a participant elects a lump-sum distribution, the benefit received will always be simply his or her current account balance.

61.     The scheme works as follows:  The Deemed Plan Interest Rate is the same rate used by the RBAP to both *project* a participant's account balanced to normal retirement age, and then to *discount* the resulting normal retirement benefit back to present value – so together, the projection and discount (at the same rate) result in a meaningless round trip that always results in a benefit equal to exactly the current balance of a participant's hypothetical account.  RBAP §§ 2.2 and 5.4(b).  This is precisely what the Second Circuit concluded was unlawful in *Esden*.

62.     The result is that the RBAP violates ERISA and the Tax Code on its face and in operation when it calculates lump sum distributions by using a "Deemed Plan Interest Rate" equal to the rate on 30-year Treasury securities instead of a rate intended to accurately reflect the value of expected future investment credits.

63.     Any argument by Defendants that the Plan's purported use of a fictitious "normal retirement age" saves the RBAP from a violation of ERISA and *Esden* – on the grounds that the fictitious age effectively excuses the RBAP from performing the projection calculation altogether – is unavailing.  Defendants cannot rely on creative plan drafting to avoid the statutory requirement that lump sum payments can never be less than the present value of a participant's *lawfully defined* normal retirement benefit.

ERISA is quite explicit that plan terms governing the calculation of lump sums are circumscribed by statutory requirements and restrictions. The Plan cannot contract around the statute. *E.g.,* ERISA § 404(a)(1)(D).

64.    In any event, the normal retirement age under the RBAP is in fact age 65, not the date the RBAP formal plan document purports to state as the normal retirement age.

65.    If lump sum benefits had been calculated in the manner required under ERISA and the Tax Code, Plaintiffs and other members of the proposed Lump Sum Class would have received a larger distribution than the amounts in fact paid to them.

## COUNT TWO

### UNLAWFUL CONDITIONING OF ACCRUED BENEFITS

66.    Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

67.    Plaintiffs bring this claim on behalf of themselves and the proposed Class.

68.    Under ERISA § 203(a)(2), 29 U.S.C. § 1053(a)(2), and Tax Code § 411(a)(2), once a participant has satisfied a plan's vesting standards, the participant's accrued benefit cannot be made conditional upon a subsequent event or "subsequent forbearance." Treas. Reg. § 1.411(a)-4. For example, the benefit may not be made conditional on the distribution option chosen. Nor can the benefit be made conditional on the participant electing to leave her balance in the Plan.

69. Section 2.1 of the RBAP purports to define a participant's Accrued Benefit as the participant's hypothetical current account balance. This is an incomplete and therefore inaccurate definition because it does not reflect a participant's total "accrued benefit" within the meaning of ERISA and the Tax Code. *See* ERISA § 3(23)(A), 29 U.S.C. § 1002(3)(23), and Tax Code § 411(a)(7)(A)(i).

70. Under the terms of the RBAP, in return for performing services for PwC, a participant earns ("accrues") a pay credit based on the period of service *plus* the right to be credited with subsequent investment credits related to that pay credit through at least April 1 of the year following attainment of age 70½. The right to future investment credits accrues at the same time as the underlying pay credits because the investments credits are not conditioned on the performance of future services by the participant – the benefits are attributable to services the participant has already performed. Accordingly, a participant's "accrued benefit" under the Plan at any point includes not only his current nominal account balance but also the stream of future investment credits payable with respect to that account balance.

71. As a result, future investment credits promised under the Plan to a participant (on his existing account balance) cannot lawfully be made conditional on the distribution option chosen or on the participant electing to leave his balance in the Plan. *E.g.*, Treas. Reg. § 1.411(a)-4.

72. Yet that is precisely what the RBAP does. Future investment credits are expressly conditioned on a participant's forbearance from removing his benefits from the Plan. RBAP § 2.13(b). Investment credits also are conditional on the particular distribution option chosen: credits cease if distributions are paid in the form of an

21

annuity, but not, for example, if paid in the form of a partial lump distribution pursuant to Section 5.4(a) of the RBAP.  *Id.*  Section RBAP § 6.1(b) confirms the Plan's unlawful treatment of future investment credits, providing that only the Plan-defined "Accrued Benefit" (which excludes future investment credits) become vested under the Plan.

73.     The terms of the RBAP therefore directly contravene ERISA § 203(a)(2), Tax Code § 411(a)(2), and Treas. Reg. § 1.411(a)-4, as interpreted by the Second Circuit in *Esden.*  When Plaintiffs and other members of the Class commenced distribution of their RBAP benefit and were paid only the nominal balances in their hypothetical "accounts," they were forced to unlawfully forfeit the future investment credits that would have been credited to their cash balance accounts had they left their benefits in the plan until they attained age 70½.  *Id.*

74.     The RBAP's only possible defense is that participants received exactly what the Plan promised – that participants voluntarily withdrew their benefits before age 70½ and thereby voluntarily elected to forgo the receipt of future investment credits. This argument may sound appealing, but it is incorrect as a matter of law.  Whether RBAP participants received what the Plan promised is not the issue here.  The issue is whether the Plan's terms comply with the law.  They do not:  ERISA does not provide for an exception allowing a plan to offer an employee the voluntary choice of a partial forfeiture in exchange for a particular form of payment.  *E.g.,* Treas. Reg. § 1.411(a)-4(a).

75.     If benefits had been calculated in the manner required under ERISA and the Tax Code and future investment credits not forfeited under unlawful provisions of the Plan, Plaintiffs and other members of the proposed Class who were paid a benefit from the Plan would have received a larger distribution than the amounts in fact paid to them.

## COUNT THREE

## AGE DISCRIMINATION UNDER ERISA § 204(b)(1)(H)

76.     Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

77.     Plaintiffs bring this claim on behalf of themselves and the proposed Class.

78.     The benefit formula used to compute participants' benefits under the RBAP violated and violates the age discrimination rules contained in ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and Tax Code § 411(b)(1)(H), because RBAP benefits accrue at a rate that is reduced because of age or the attainment of any age.

79.     This result follows inescapably when investment credits are taken into account for purposes of testing the Plan for age discrimination, as the Second Circuit has instructed is required.  Taking investment credits into account, the Plan fails to comply with ERISA § 204(b)(1)(H) and Tax Code § 411(b)(1)(H) whether benefits are tested based on the projected life annuity commencing at normal retirement age or the present value of benefits that accrue under the Plan.  This problem is systematic, and affects Plaintiffs and all other members of the proposed Class.

80.     As a result of the RBAP's discriminatory design, Plaintiffs and other participants in the RBAP accrued benefits under the Plan that were less than the benefits they would have accrued had the Plan complied with ERISA and Tax Code nondiscrimination standards.

**COUNT FOUR**

**FAILURE TO PRESERVE ACTUARIAL VALUE OF
NORMAL RETIREMENT BENEFITS**

81.     Plaintiffs repeat and re-allege the allegations contained in the foregoing

paragraphs of this Complaint as if fully set forth herein.

82.     Plaintiffs bring this claim on behalf of themselves and the proposed

Class.

83.     A participant's "normal retirement benefit" under a cash balance or other

defined benefit pension plan generally is his accrued benefit under the plan commencing

as of normal retirement age.  ERISA § 3(22), 29 U.S.C. § 1002(22), and IRC § 411(a)(9).

Under ERISA, any benefit paid *after* normal retirement age must have an actuarial value

that is at least as large as the value of this normal retirement benefit and any larger

benefit accrued as of any date after normal retirement age.  In other words, the actuarial

value of a participant's largest accrued benefit payable on or after his normal retirement

age must be "locked in" as a minimum benefit – no benefit paid after the normal

retirement age can have an actuarial value of less than this benefit, absent an applicable

exception.  *See* ERISA §§ 203 and 204(c)(3), IRC §§ 411(a) and 411(c)(3), and Proposed

Treasury Regulations §§ 1.411(b)-2 and 1.411(c)-1.

84.     The RBAP failed and fails on its face, and in actual administration, to

satisfy this requirement because it did not and does not actuarially increase a participant's

benefit after normal retirement age.  This is the case regardless of whether the normal

retirement age under the RBAP is the date a participant completes 5 years of service, as

the RBAP Plan document purportedly defines it, or age 65, as Plaintiffs assert, or some other age.

85.    The RBAP does continue to provide investment credits after normal retirement age.  But the RBAP's *investment* credits are not a substitute or an adequate substitute for the actuarial adjustment required under ERISA §§ 203 and 204(c)(3) and Tax Code §§ 411(c)(3) and 401(a)(25) because they do not maintain the actuarial value of a participant's normal retirement benefit or any larger benefit accrued as of a date after normal retirement age.

86.    As a result of this flaw in the RBAP, Plaintiffs' and other participants' vested normal retirement benefits under the RBAP were unlawfully reduced during periods over which investment returns actually credited (or debited) to their accounts were less than the actuarial adjustment required to maintain the value of their normal retirement benefits.

87.    Neither the Plaintiffs nor any other affected participant received a "suspension of benefits" notice within the meaning of ERISA § 203(a)(3)(B) and the regulations thereunder.  Therefore, no exception applies that would excuse such forfeitures.  *Id.*; Tax Code § 411(a)(3)(B).

88.    As a result of the violations described in this Count, Plaintiffs and other members of the proposed Class accrued benefits under the Plan that were less than the benefits they would have accrued had the Plan complied with ERISA and Tax Code standards.

## CLASS ACTION ALLEGATIONS

89.     Plaintiffs brings suit on behalf of themselves and on behalf of all other

participants and beneficiaries similarly situated under the provisions of Rule 23 of the

Federal Rules of Civil Procedure with respect to violations alleged herein.

90.     The proposed Class is defined as:

> All persons who participated in the Retirement Benefit Accumulation Plan
> for Employees of PricewaterhouseCoopers LLP at any time after June 30,
> 1994, and the beneficiaries and estates of such persons, who at any point
> became vested or may become vested in their benefits under the Plan.

91.     Within this proposed Class is a proposed Lump Sum Subclass established

solely for purposes of Count One, defined as follows:

> All persons who participated in the Retirement Benefit Accumulation Plan
> for Employees of PricewaterhouseCoopers LLP at any time after June 30,
> 1994, and the beneficiaries and estates of such persons, who at any point
> became vested or may become vested in their benefits under the Plan, and
> who received or may in the future receive a lump sum distribution of all or
> any portion of their accrued benefit under the Plan.

92.     The requirements for maintaining this action as a class action under Fed.

R. Civ. P. 23(a) are satisfied in that there are too many Class and Subclass members for

joinder of all of them to be practicable.  There are tens of thousands of members of the

proposed Class and Subclass dispersed among many states.

93.     The claims of the Class and Subclass members raise numerous common

questions of fact and law, thereby satisfying the requirements of Fed. R. Civ. P. 23(a)(2).

Every issue concerning liability is common to all Class and Subclass members because

all such issues concern their entitlement to benefits calculated in a manner other than that

calculated thus far and their or the Plan's entitlement to relief from harm caused by the

violations of law and/or plan terms, rather than any action taken by Plaintiffs or any Class

or Subclass member.  In addition, every issue concerning relief is also common to the Class and Subclass for the same reason.

94.     Plaintiffs' claims are typical of the claims of the Class and Subclass members, and therefore satisfy the requirements of Fed. R. Civ. P. 23(a)(3).  They do not assert any claims in addition to or different than those of the Class or Subclass.

95.     Plaintiffs are adequate representatives of the Class and Subclass, and therefore satisfy the requirements of Fed. R. Civ. P. 23(a)(4).  The interests of Plaintiffs are identical to those of the Class and Subclass.  Defendants have no unique defenses against them that would interfere with their representation of the Class and Subclass. Plaintiffs have engaged counsel with considerable ERISA class action litigation experience.

96.     Additionally, all of the requirements of Fed. R. Civ. P. 23(b)(1) are satisfied in that the prosecution of separate actions by individual members of the Class or Subclass would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants and individual adjudications present a risk of adjudications which, as a practical matter, would be dispositive of the interests of other members who are not parties.

97.     Alternatively, all of the requirements of Fed. R. Civ. P. 23(b)(2) also are satisfied in that Defendants' actions affected all Class and Subclass members in the same manner making appropriate final declaratory and injunctive relief with respect to the Class and Subclass as a whole.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that

A.      An order be entered certifying this action a class action and undersigned counsel as class counsel pursuant to Fed. R. Civ. P. 23;

B.      Judgment be entered against Defendants and on behalf of Plaintiffs and the Class and Subclass; and

C.      An order be entered awarding, declaring or otherwise providing Plaintiffs and the Class and Subclass all other such relief to which Plaintiffs and the Class and Subclass are or may be entitled whether or not specified herein.

The relief Plaintiffs seek includes but is not limited to:

D.      An order declaring that Defendants violated and are violating ERISA's benefit calculation and accrued benefit standards in the specific manners alleged in Counts One through Four and otherwise;

E.      An order enjoining Defendants from continuing to violate the law and the terms of the Plan in the manners alleged or referenced in this Complaint, reforming the Plan, and compelling Defendants to bring the terms and administration of the Plan into compliance with ERISA or the lawful provisions of the Plan, in all cases effective as of the date the alleged violations first occurred;

F.      An order requiring Defendants to re-calculate the benefits accrued and/or due under the terms of the Plan in accordance with the requirements of ERISA, and for the Plan to pay these amounts, plus interest, to or on behalf of all Class and Subclass members who received less in benefits or benefit accruals than the amount to which they are entitled;

G.     An order awarding pre- and post-judgment interest;

H.     An order awarding attorney's fees on the basis of the common fund doctrine (and/or other applicable law, at Plaintiffs' election), along with the reimbursement of the expenses incurred in connection with this action.

I.     An order awarding, declaring or otherwise providing Plaintiffs all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law that Plaintiffs may subsequently specify and/or that the Court may deem appropriate.


By:

_____
Eli Gottesdiener  [EG 0111]

**GOTTESDIENER LAW FIRM, PLLC**
498 7th Street
Brooklyn, NY  11215
(718) 788-1500
(718) 788-1650
eli@gottesdienerlaw.com

Attorney for the Plaintiffs
and the proposed Class and Subclass


Dated:  May 4, 2006

Exhibit 1 to May 4, 2006 First Amended Class Action Complaint

*Laurent v. PricewaterhouseCoopers LLP et al.,* 06-2880-MBM (S.D.N.Y.)

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

LEXSTAT 1999 TNT 222-20

Copyright © 1999 Tax Analysts
Tax Notes Today

NOVEMBER 18, 1999 THURSDAY

**DEPARTMENT:** Official Announcements, Notices, and News Releases; Treasury Tax Correspondence

**CITE:** *1999 TNT 222-20*

**LENGTH:** 3843 words

**HEADLINE:** 1999 TNT 222-20 BLAME FOR CASH BALANCE PLAN CONTROVERSY BELONGS WITH IRS GUIDANCE, PricewaterhouseCOOPERS SAYS. (Section 411 -- Minimum Vesting;) (Release Date: SEPTEMBER 30, 1999) (Doc 1999-36542 (8 original pages))

**CODE:** *Section 411* -- Minimum Vesting;
*Section 414(j)* -- Defined Benefit Plans

**ABSTRACT:** Ira Cohen of PricewaterhouseCoopers LLP, Teaneck, N.J., has placed the blame for the controversy over cash balance plans on pension guidance issued by the IRS and Treasury.

**SUMMARY:** Ira Cohen of PricewaterhouseCoopers LLP, Teaneck, N.J., has placed the blame for the controversy over cash balance plans on pension guidance issued by the IRS and Treasury. Cohen argues that IRS guidance has created a "whipsaw effect" that "perversely" causes cash balance participants to receive earnings credits below market rates. To avoid that effect, cash balance plans use a retirement age that is below the actual typical retirement age to determine plan benefits. If the IRS and Treasury want to eliminate the controversy over cash balance plans, he says, they should eliminate the "whipsaw effect."

**AUTHOR:** Cohen, Ira
PricewaterhouseCoopers LLP

**GEOGRAPHIC:** United States

**INDEX:** pension plans, vesting standards, minimum;
pension plans, benefits, defined

**REFERENCES:** Subject Area:
  Individual income taxation;
  Benefits and pensions
Cross Reference:
  For a summary of IR-1999-79, see Tax Notes, Oct. 25, 1999, p. 449;
  for the full text, see *1999 TNT 202-17*, Doc 1999-33676 (1 original
  page), or H&D, Oct. 20, 1999, p. 707.

**TEXT:**

Release Date: SEPTEMBER 30, 1999

September 30, 1999

Mr. Charles O. Rossotti
Commissioner

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

Internal Revenue Service
1111 Constitution Avenue, N.W.,
Room 3000
Washington, D.C. 20224

Mr. Jonathan Talisman
Deputy Assistant Secretary for Tax Policy
U.S. Department of The Treasury
Main Treasury, Office of the Assistant Secretary for Tax Policy
1500 Pennsylvania Avenue, N.W.
Room 1334
Washington, D.C. 20020

   Dear Commissioner Rossotti and Mr. Talisman:

   [1] I am writing to you to explain why one element of the current controversy over cash balance plans -- a low normal retirement age in a qualified defined benefit plan, -- has been a necessary result of poor rulemaking by the Treasury Department and is not a devious attempt by taxpayers to circumvent reasonable rules. (By a low normal retirement age, I mean a retirement age that is defined in the plan document that is well below that actual typical retirement age -- the low retirement age might be as low as the age at five years of participation in the plan.) I urge you to consider the merits of the low normal retirement age in this context -- as a hero rather than a villain. If the IRS eliminates the use of the low normal retirement age, the IRS should also revise Notice 96-8 to correct the pension policy disaster fostered by that Notice.

   I. The Whipsaw Effect

   [2] The policy problem created by the Treasury Department and IRS regulations has to do with the dreaded "whipsaw effect" and rules requiring payment of minimum lump sums from qualified defined benefit plans that offer the lump sum form of distribution. Review of the minimum lump sum rules under *section 417(e) of the Internal Revenue Code* of 1986, as amended (the "Code") and the guidance relating to the "whipsaw effect" will be helpful in fully understanding the problem.

   A. IRS Rules Regarding Minimum Lump Sums

   [3] Let's briefly review the economic conditions prevailing when the minimum lump sum rules were first created. In the late 1970's and early 1980's, interest rates were at an all time high, often as high as 15%. In this time of high interest rates, employers frequently terminated qualified defined benefit plans with surplus assets to gain access to the surplus. The high interest rates had the effect of inflating the amount available for reversion, because pension liabilities are generally calculated as if the liability were due when the plan participants retire -- some time in the future. If a plan terminates today, the present value of that future liability in a high interest rate environment is relatively small. Therefore, when plans terminate in a high interest rate environment, plan assets required to satisfy liabilities to plan participants are relatively smaller, increasing the plan assets available for reversion.

   [4] On plan termination, benefits may be settled either by purchasing an annuity contract or paying a lump sum. In the era of abnormally high interest rates, like 15% per annum, the surplus reverting to the employer upon plan termination was significantly larger if lump sums were paid than if annuities were purchased. (This resulted because the price of annuity contracts reflected the fact that annuity payments commence some time in the future, so the present value discounting required when lump sums were paid would not occur or would be performed over a shorter period of time.) Indeed, some oversight committee testimony in that era showed that some companies wanted to maximize their surplus badly enough to provide their executives with an additional bonus depending on the percentage of the executives' subordinate employees who could be induced to take a lump sum on plan termination. Plan participants, like most small investors, were typically unable to obtain those high interest rates in savings accounts or purchases of debt instruments. Consequently, participants electing lump sums received less long-term economic value than those electing annuities.

   [5] Congress sought to change this result by defining minimum lump sums in terms of a maximum. interest rate, so that the effect of present valuing the pension due at retirement age would be regulated by adding *Section 417(e) of the Code*. *Section 417(e)* was modified several times. At present, *Section 417(e)* states:

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

. . . . "(3) Determination of present value.

(A)  In general.

(i)  Present Value. Except as provided in subparagraph

(B), for purposes of paragraphs (1) and (2), the
present value shall not be less than the present
value calculated by using the applicable
mortality table and the applicable interest rate.

(ii) Definitions. For purposes of clause (i) --

(I)  Applicable mortality table. The term "applicable
mortality table" means the table prescribed by
the Secretary. Such table shall be based on the
prevailing commissioners' standard table
(described in *section 807(d)(5)(A)*) used to
determine reserves for group annuity contracts
issued on the date as of which present value is
being determined (without regard to any other
subparagraph of *section 807(d)(5)*).

(II) Applicable interest rate. The term "applicable
interest rate" means the annual rate of interest
on 30 year Treasury securities for the month
before the date of distribution or such other
time as the Secretary may by regulations
prescribe."

[6] The Treasury Regulations (the "Regulations") implementing the minimum lump sum legislation state that that lump sum may never be less than the present value of the annuity payable at a participant's normal retirement date at a mandated interest rate. *Section 1.417(e)-1(d)(I) of the Regulations* states:

. . . . "The present value of any optional form of benefit
cannot be less than the present value of the normal retirement
benefit determined in accordance with the preceding
sentence". . . .

[7] This regulatory requirement is neither mandated nor suggested by the law or the legislative history. In fact, it ignores a key element of the problem the rule was designed to address. Participants in terminating plans are allowed to take annuities or lump sums IMMEDIATELY UPON PLAN TERMINATION, even if they are still employed (if the plan design allows). The rule does, however, represent a vital regulatory step hurling cash balance plans into the jaws of the dreaded "whipsaw effect." As we will see, absent this requirement, the "whipsaw effect" would be eliminated because a plan could define the lump sum as the present value of the immediate annuity -- a more accurate reflection of the design options available to plan sponsors in terminating and ongoing plans.

D. Cash Balance Plans and the "Whipsaw Effect"

[8] In simple economic terms, a cash balance plan provides a benefit in the form of an account. This notional account is credited with pay credits each year and is adjusted periodically according to an earnings index. This earnings rate is usually a predetermined independent index (such as 5-year Treasury bills or the S&P 500), or the earnings rate may be a fixed interest rate such as 5%; in some designs, participants may choose among different earnings indices which mimic actual investments such as those available in the plan sponsor's 401(k) plan. Cash balance plans generally offer a lump sum and an immediate annuity upon termination of employment, and our experience with cash balance plans suggests that nearly all participants will take the lump sum form of distribution.

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

[9] Because the fundamental benefit is an account balance, these plans -- unlike traditional defined benefit plans -- should not save the employer money (at times of higher interest rates) when the employee takes a lump sum. After all, the account should be the account regardless of the interest rate. However, that elegant equation -- the account equals the account -- is not in the IRS's current mathematical repertoire.

[10] The IRS has created the "whipsaw problem," on the basis of its regulations relating to minimum lump sums. Because these regulations mandate that the minimum lump sum relates to the benefit at normal retirement age, the IRS required cash balance plans develop a normal retirement age annuity benefit by projecting the account balance to normal retirement age using an interest rate reflective of the investment adjustments (the "Projection Rate"), then converting that amount to an annuity. Then, in order to comply with the minimum lump sum rules, that benefit at normal retirement age needs to be discounted to the benefit commencement date. If the projection rate is greater than the discount rate, the plan could be "whipsawed" into paying a lump sum that is greater than a participant's account. Although seemingly reasonable when viewed separately, the minimum lump sum rate and the Projection Rate therefore combine to create the "Whipsaw Effect." This phenomenon was described in Notice 96-8.

[11] However, under that Notice, the Projection Rate to be used is not defined, nor is it defined elsewhere in any applicable IRS authority. Reasonable people can differ as to what Projection Rate is appropriate -- particularly for those that are adjusted according to an equity-based index, such as the Dow Jones Industrial Average. The example below illustrates the Whipsaw Effect. Consider two participants A and B, both age 40, whose accounts earn 4%, a sub- market rate, and 8%, a market rate, respectively. Also assume that the discount rate for minimum lump sums under *section 417(e)* is 6%. Assume A and B each have $ 1,000 in their accounts.

|  | A | B |
| --- | --- | --- |
| 1) Account Balance -- Beginning of year | $ 1,000 | $ 1,000 |
| 2) Investment Credit | 4% | 8% |
| 3) Account Balance -- End of Year | $ 1,040 | $ 1,080 |
| 4) Years to age 65 | 24 | 24 |
| 5) Line 3 projected to age 65 | $ 2,666 | $ 6,848 |
| 6) Present Value of (5) at | $ 658 | $ 1,691 |
| 7) Lump sum Greater of (3/or/6) | $ 1,040 | $ 1,691 |

C. Impact of the Whipsaw Effect

[12] In the above example, the employer would like to provide the account balance as improved for earnings ($ 1,040 for A and $ 1,080 for B). Because the employer had the audacity to provide B with an earnings rate that better reflected the market, the minimum lump sum increased from $ 1,080, which was all that was promised, to $ 1,691 (a 57% increase). Consequently, employers, unwilling to be gouged by the relentless teeth of the Whipsaw, provide less than a market rate of return to employee accounts. Do these rules benefit anyone? The IRS rules go out of their way to severely punish employers who credit true market related investment adjustments. These IRS rules truly assure that no good deed goes unpunished.

D. Some Conclusions Regarding the Whipsaw Effect

[13] This discussion is meant to suggest that because cash balance plans do not benefit in high interest rate environments by offering lump sums in the form of accounts, the law requiring minimum lump sums has no meaning in cash balance plans. Application of the minimum lump sum rate to lump sum distributions from cash balance plans therefore makes no sense in light of the legislative background. The IRS rules are like a solution hunting for a problem.

[14] The major problem inherent in the Whipsaw Effect is that the IRS pigeonholes cash balance plans in a manner that is fundamentally inconsistent with their basic design or rational pension policy. In the case of a traditional pension plan, an annuity is promised. If a lump sum is provided and if the amount of the lump sum is below market equivalence, the employer or the plan realizes profit on every such lump sum election. Thus employers have a financial interest to encourage lump sums. Employees are not actuaries. They rarely seek actuarial advice. In a high interest rate environment in the absence of protective legislation, many would nonetheless take an inferior lump sum. As stated earlier, Congress passed the minimum lump sum law to avoid that situation.

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

[15] In the case of cash balance plans where a lump sum is the fundamental promise, the economics are reversed. Notice 96-8 first operates to reduce the earnings credit by applying the minimum lump sum rules in a way that does not acknowledge that the promise to employees in a cash balance plan is essentially different from the promise in a traditional defined benefit plan. Notice 96-8 also provides that a cash balance plan cannot subsidize the rates at which the account is converted to an annuity (to avoid an end-run around the rules that create the whipsaw problem). Thus rules designed to increase benefits in the traditional defined benefit plan tend to depress benefits in cash balance plans. Thus the rules tend to reduce employer costs in a cash balance plan at the expense of employee benefits. Although some employers may enjoy that result, many employers would prefer to credit a greater rate of return. What kind of policy precludes market rates of return from being applied to cash balance accounts or reducing the amount that may be paid as annuities? It is hard to explain such a policy.

[16] The IRS, however, would contend that its position is sound in that it requires the same mathematical relationship of annuity pensions to lump sum distributions in all type of defined benefit plans. Measured by that yardstick, the IRS is absolutely correct. This reasoning, however, is analogous to treating a nosebleed of a person by firmly applying a tourniquet around that person's neck. It works. The bleeding will stop. But like the IRS rules, the side effects are most unpleasant.

II. The Low Normal Retirement Age

[17] Sir Isaac Newton's third law of motion states that for every action there is an opposite and equal reaction. The IRS regulations needlessly created the Whipsaw Effect (the action). The Whipsaw Effect, however, disappears once a participant reaches his or her normal retirement age (because there is no longer a need to project into the future -- the minimum lump sum rules require projection only until normal retirement age). Interestingly, the logical reaction to the IRS's action is to reduce the normal retirement age (the reaction) because the Whipsaw Effect would disappear at that point, Indeed, most cash balance plans with a low normal retirement age do provide earnings credits based on equity indices. Our belief is that the Whipsaw Effect should not be protected by legislation or further IRS guidance because the low normal retirement age, created by ERISA, /1/ should move the ever grinding teeth of the Whipsaw Effect away from harming plans and their participants.

[18] Rumors abound that the IRS is contemplating adopting rules that will preclude low normal retirement ages. Any such rules would, in our opinion, require legislation. The IRS simply does not have the authority to eliminate the low normal retirement age.

[19] *Section 411(a)(8) of the Internal Revenue Code* as added by ERISA defines the normal retirement age as the earlier of (1) the time a plan participant attains the normal retirement age under the plan and (2) the later of age 65 or the 5th anniversary of plan participation. Clearly, Clause 1 permits a plan to define the normal retirement age as low as it pleases.

[20] *Revenue Ruling 78-120* permitting unrestricted use of low normal retirement ages was adopted contemporaneously with the ERISA regulations. It clearly permits the use of a low normal retirement age, based on *Section 411(a)(8) of the Code*.

III. Recommendation: IRS Elimination of the Whipsaw

[21] The IRS has the authority to eliminate the "Whipsaw Effect" by use of logic instead of blindly following technical rote in a model that the IRS itself created.

[22] The Congress provided an interest rate that must be used in computing minimum lump sums. What does that signify? If a participant received the lump sum, invested the distribution at the rate specified and withdrew assets ratably in equal installments, and if the participant was considerate enough to die precisely where the mortality table indicates, then the lump sum would accumulate sufficient funds to provide the precise annuity. To reach this conclusion, Congress concluded that this specified minimum lump sum interest rate is the rate of return participants are likely on average to obtain on a long-term investment of amounts received in the lump sum distribution. Otherwise, there would be no actuarial equivalence. This assumes that employees receiving lump sums would, of course, have unlimited access to investment markets.

[23] Cash balance plans, however, either with or without investment choice, generally limit participants' abilities to obtain market rate earnings credits prior to the time they take a final distribution. Any limitation on rates of earnings credits available in a cash balance plan would result in lower investment returns than would otherwise be possible, not raise them. Thus as long as the available earnings credit rates do not exceed investment grade rates, the Whipsaw Effect

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

could be eliminated by assuming that the Projected Rate is equal to the minimum lump sum rate. The IRS should issue guidance updating Notice 96-8 that articulates this principle; then plan sponsors would not be required to rely on a low normal retirement age to implement what is fundamentally sound pension policy.

### IV. The Law Flaw in the Anti-Backloading Rules

[24] The IRS may be concerned about the use of low normal retirement ages for another reason. The rules against "backloading" the accrual of benefits in a defined benefit plan apply only to the accrual of benefits up to a participant's "normal retirement age." These rules are designed to prevent plans from providing for the accrual of most of a participant's benefits later in his or her career, thereby circumventing the minimum, vesting rules.

[25] The anti-backloading rules came into the law in 1974 as part of the minimum vesting standards. Under the minimum vesting standards, a participant must vest in a percentage of his or her benefit no less rapidly than under one of several statutory vesting schedules. Under the minimum vesting standards, a person's vested benefit is the product of (1) the benefit earned under the plan (the "accrued benefit") and (2) the vesting percentage. If an employer did not want to provide early vesting, the employer could provide negligible accruals until the point that employer desires to provide vesting; after all vesting 100% vesting in an accrued benefit of zero is not different from not vesting at all.

[26] The fundamental problem was accruing large amounts in later years relative to small amounts in earlier years ("Backloading"). Therefore, Congress provided a floor of protection by enacting the Anti-Backloading Rules. The floor, however, was flawed. The Anti-Backloading Rules provide protection against backloading for the period from plan entry to the normal retirement age. As a matter of law, benefits accrued subsequent to the normal retirement age are not subject to anti-backloading requirements (the "Law Flaw"). This flaw is clearly undesirable, but will not be cured by trying to eliminate the low normal retirement age. The Law Flaw will still exist as applied to benefits accruing after a "normal" normal retirement age.

[27] The Law Flaw has existed for many years, but has not received significant attention until recently. The spotlight on the Law Flaw is likely to mean that the Law Flaw will be exploited in previously unimagined ways, even if the use of the low normal retirement age is inhibited through new IRS guidance. As a result, we would recommend legislation to fix the Law Flaw. Such legislation would essentially limit post-normal retirement age accrual rates to some reasonable percentage of pre-normal retirement age accrual rates. With such legislation in place, the low normal retirement age would be incapable of manipulation as a means of avoiding the Anti-Backloading Rules.

### V. Conclusions

[28] The IRS has needlessly created the Whipsaw Effect, which perversely causes cash balance participants to receive earnings credits below market rates. The IRS could eliminate the Whipsaw Effect in several different ways, but until such time as the IRS does so, the low normal retirement age avoids the Whipsaw Effect. The IRS may be thinking about changing its position on low normal retirement ages, thereby strengthening the Whipsaw Effect. The IRS does not have authority to change the definition in the statute, If administratively, however, the IRS were to be successful, then participants in cash balance plans will receive less than a market return because of the IRS-created Whipsaw Effect. It is only through the strength and wisdom of our hero in this saga (the low normal retirement age) that the pension policy dragon (the Whipsaw Effect) created by the IRS has been foiled. If the IRS decides to kill off our hero, it should slay the dragon as well -- otherwise, it will be inhibiting the development of the only type of qualified defined benefit plan that provides a reasonable alternative to a private pension system that is dominated by the 401(k) plan.

Sincerely,

Ira Cohen
PricewaterhouseCoopers LLP
Teaneck, NJ

**************** End of Document ****************

## CERTIFICATE OF SERVICE

I hereby certify that I caused all Defendants, through their counsel listed below, to be

served by hand on May 4, 2006 with a copy of the foregoing First Amended Class Action

Complaint:

Mark W. Rasmussen
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4675

Attorney for Defendant PricewaterhouseCoopers LLP, The Retirement Benefit Accumulation
Plan for Employees of PricewaterhouseCoopers LLP, and The Administrative Committee to the
Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP.

Eli Gottesdiener