# Guide to Cash Balance Plans

*Hubert V. Forcier*

*A Panel Publication*

ASPEN PUBLISHERS

**1185 Avenue of the Americas, New York, NY 10036**
***www.aspenpublishers.com***

# 11

# NationsBank-Style Plans

*Hubert V. Forcier*

This book generally assumes that the normal retirement age for a plan is age 65. NationsBank-style plans are based on specifying a low normal retirement age. A low normal retirement age (if recognized as proper) permits a number of design features that would otherwise violate minimum standards under the Internal Revenue Code and the Employee Retirement Income Security Act of 1974. This chapter discusses the use of this technique.

¶ 11.1 Potential Advantages of Using a NationsBank-Style Plan

11.1[a] Age and Service Weighting of Hypothetical Pay Credits

11.1[b] Use of 401(k)-Like Investment Options to Measure Hypothetical Interest Credits

¶ 11.2 Justification for Use of Low Normal Retirement Age

¶ 11.3 Rumored IRS Action

## ¶ 11.1 POTENTIAL ADVANTAGES OF USING A NATIONSBANK-STYLE PLAN

Under the NationsBank plan, normal retirement age is defined as the earlier of age 65 or five years of vesting service. If the Internal Revenue Service (IRS), Department of Labor (DOL), and Equal Employment Opportunity Commission (EEOC) and the courts continue to recognize the use of this type of low normal retirement age, employers can realize two advantages:

1. Use of an age- and/or service-weighted hypothetical pay credit schedule under which the spread between the highest hypothetical pay credit rate and the lowest hypothetical pay credit rate is any amount without violating the 133⅓ percent antibackloading rule (see ¶ 11.1[a]); and
2. Use of hypothetical interest crediting rate that can be expected to produce future values in excess of the future current yields on 30-year Treasuries without creating losses due to interest rate whipsaws (see ¶ 11.1[b]).

## ¶ 11.1[a] Age and Service Weighting of Hypothetical Pay Credits

Under the NationsBank Plan, an age- and service-weighted formula is applied to establish the rate of the hypothetical pay credits. The NationsBank formula based on points goes from 1 percent to 10 percent of compensation:

| *Age + Years of Pension Benefit Service* | *Hypothetical Pay Credit (as percentage of compensation)* |
|---|---|
| 0–29 | 1% |
| 30–39 | 2% |
| 40–49 | 3% |
| 50–59 | 4% |
| 60–69 | 6% |
| 70–79 | 8% |
| 80 and over | 10% |

If the 133⅓ percent antibackloading rule (see chapter 9) applied to such a formula on the assumption that normal retirement age was age 65, the rule would be failed, as shown in Figure 11-1.

The view taken by the NationsBank Plan is that the 133⅓ percent antibackloading rule does not apply to hypothetical pay credits awarded after a participant attains the normal retirement age specified in the plan but only applies to credits awarded before a participant attains the normal retirement age set out in the plan. To avoid a violation of the 133⅓ percent antibackloading rule before a participant's attainment of the low normal retirement age specified in the NationsBank plan (earlier of age 65 or five years of vesting service), the participant receives level percentage of compensation hypothetical pay credits. The level rate of hypothetical pay credits is determined on a participant-by-participant basis. Specifically, it is determined by averaging the credits the participant would have received during his or her pre-normal retirement age years of service under the age- and service-weighted formula that applies to the participants who have attained the normal retirement age specified in the plan. An example provided in a NationsBank employee handout assumes that an individual entered the plan on January 1, 1998, at age 37 with one year of vesting service. Had he been under the formula applicable to employees who had more than five years of vesting service, those points would have been as follows:

| *Year* | *Points* | *Hypothetical Pay Credit* |
|---|---|---|
| 1998 | 37 | 2% |
| 1999 | 39 | 2 |
| 2000 | 41 | 3 |
| 2001 | 43 | 3 |
| | | Total 10% |

The total 10 percent is divided by 4 to establish a 2.5 percent hypothetical pay credit.

**Figure 11-1. NationsBank-Style Plan**

| | |
|---|---|
| Display: | Portion of projected age 65 annuity attributable to each year of service (with the annuity being shown as a percentage of pay). The 133⅓% test line is shown. |
| Valuation Method: | Traditional accrued benefit valuation method (annual basis). |
| Assumptions: | Age- and service-weighted hypothetical pay credits (from 1% to 10%; see ¶11.1[a]). 5% hypothetical interest credits: future credits not conditioned on future service (i.e., future credits are guaranteed). |
| Observation: | The plan violates the 133⅓% antibackloading rate. |




*Source:* Faegre & Benson LLP. With permission.

By averaging the pre-normal retirement age hypothetical pay credits, the NationsBank plan complies with the 133⅓ percent antibackloading rule (provided that the plan can properly use the low normal retirement age that it has specified).

## 11.1[b] Use of 401(k)-Like Investment Options to Measure Hypothetical Interest Credits

Several funds similar to funds offered under 401(k) plans are offered under the NationsBank plan. The participant can choose which fund to be used to measure the hypothetical interest credits added to his or her hypothetical account balance. They are virtual replications of the investment choices offered under the NationsBank 401(k) plan, including equity-style funds and even an employer stock fund.

> **Note.** A reasonable estimate of the return that these funds could produce in the future could be very much higher than the current rate on 30-year Treasuries, which is the rate used under the minimum lump sum rule of Sections 411(a) and 417(e) of the Internal Revenue Code (Code). The use of relatively high projection rates for the step 1 calculation under the two-step calculation required by IRS Notice 96-8 [1996-1 CB 359] produces very large interest rate whipsaws (see chapter 8).

In a letter to the IRS Ira Cohen (who was then with Pricewaterhouse-Coopers and who is generally recognized as the inventor of the NationsBank-style plan) described how the use of a low normal retirement age such as that used in the NationsBank plan would avoid the interest rate whipsaw:

> The Whipsaw Effect, however, disappears once a participant reaches his or her normal retirement age (because there is no longer a need to project into the future—the minimum lump sum rules require projection only until normal retirement age). Interestingly, the logical reaction to the IRS's action [IRS Notice 96-8] is to reduce the normal retirement age . . . because the Whipsaw Effect would disappear at that point. Indeed, most cash balance plans with a low normal retirement age do provide [hypothetical] earnings credits based on equity indices.

[Letter from Ira Cohen to the IRS National Office, Sept 30, 1999]

> **Note.** Under the NationsBank approach there is an interest rate whipsaw before the completion of five years of vesting service. This is not material in the NationsBank situation because the plan provides for five-year deferred vesting. It makes no difference what the lump-sum benefit might be for a participant who is not vested.

ASPA has noted that if a plan provided full and immediate vesting, the normal retirement age under a NationsBank-style plan could be established as the date that each participant becomes a participant. [See Burrows, "Cash Balance Plans for Professional Firms," presented at the 2000 ASPA Annual Conference, Oct 30 and 31, 2000, slide 176.]

## ¶ 11.2 JUSTIFICATION FOR USE OF LOW NORMAL RETIREMENT AGE

In his letter to the IRS, Ira Cohen defended the practice of using a low normal retirement age:

> Any [future IRS] rules [precluding the use of low normal retirement age] would, in our opinion, require legislation. The IRS simply does not have the authority to eliminate the low normal retirement age.
>
> Section 411(a)(8) of the code as added by ERISA defines the normal retirement age as the earlier of (1) the time a plan participant attains the normal retirement age under the plan and (2) the later of age 65 or the 5th anniversary of plan participation. Clearly, Clause 1 permits a plan to define the normal retirement age as low as it pleases.
>
> Revenue Ruling 78-120 permitting unrestricted use of low normal retirement ages was adopted contemporaneously with the ERISA regulations. It clearly permits the use of a low normal retirement age, based on section 411(a)(8) of the code.

[Letter from Ira Cohen to the IRS National Office, Sept 30, 1999]

## ¶ 11.3 RUMORED IRS ACTION

In his letter to the IRS, Ira Cohen wrote that "rumors abound that the IRS is contemplating adopting rules that will preclude low normal retirement ages." It had previously been reported that some practitioners might have complained to the IRS about the NationsBank approach. [*Lee Shepard, Pension Downsizing, Continued,* 83 Tax Notes 1107, May 24, 1999]

Because of these rumors, it is a relatively common practice for plan sponsors that want to use NationsBank-style design features to condition the effectiveness of these features on the receipt of a favorable IRS determination letter.

> **Note.** A favorable IRS determination letter might not protect against a participant lawsuit under the Employee Retirement Income Security Act of 1974 (ERISA) (see ¶ 8.5[c](4)(iii)).

The IRS was scheduled to issue a notice of proposed rule making addressing the use of low normal retirement ages in December 2001. As of the date this book went to press, the IRS had not published such a notice.

# Guide to Cash Balance Plans

## *2005 Cumulative Supplement*

*Hubert V. Forcier*

ASPEN
PUBLISHERS

111 Eighth Avenue, New York, NY 10011
www.aspenpublishers.com

# 11

# NationsBank-Style Plans

*Hubert V. Forcier*

## ¶ 11.4 PROPOSED REGULATIONS WOULD RE-IMPOSE THE PRE-ERISA MINIMUM NORMAL RETIREMENT AGE RULE

On November 10, 2004, Treasury published proposed regulations that (if adopted as proposed) would impose a minimum normal retirement age. The proposed regulations would amend Treas. Reg. Section 1.401(a)-1(b) as follows:

> Par. 2. In § 1.401(a)-1, paragraph (b)(1)(i) is amended by adding text before the period at the end of the current sentence and a new second sentence, . . . is added to read as follows:
>
> **§ 1.401(a)-1 Post-ERISA qualified plans and qualified trusts; in general.**
>
> * * *
>
> (b) * * *
>
> (1) * * *
>
> (i) . . . or attainment of normal retirement age. However, normal retirement age cannot be set so low as to be a subterfuge to avoid the requirements of section 401(a), and, accordingly, normal retirement age cannot be earlier than the earliest age that is reasonably representative of a typical retirement age for the covered workforce.

The proposed regulations would not be effective until adopted in final form. See Preamble to the proposed regulations.

The focus of the proposed regulations was phased retirement. The preamble did not discuss the change to Treas. Reg. Section 1.401(a)-1(b)(1)(i).

The proposed regulations contained no transition rules. This is troubling to plan sponsors that had relied on Rev. Rul. 78-120. But at the hearing on the proposed regulations corporate America requested transition rules, and the IRS has expressed an intention to provide Code Section 411(d)(6) relief.

## ¶ 11.5 PARTICIPANT LAWSUITS

In 2004, participant litigation was begun against the NationsBank Plan (since renamed the Bank of America Pension Plan) [Pothier v. Bank of America Corp., U.S. D. Ct. S.D. Ill. 04-458 CPM]. In the litigation, the plaintiffs claim that they could sue based on the allegation that it was improper to use a young normal retirement age.

The general allegations relating to the use of a young normal retirement age were as follows [Pothier v. Bank of America Corp., U.S.D. Ct. S.D. Ill. 04-458 GPM Second Amended Class Action Complaint]:

> 45. Under ERISA, a participant's "accrued benefit" under a defined benefit plan is the benefit defined under the terms of the plan, but expressed in the form of a life annuity beginning at "normal retirement age" (subject to some limited exceptions not relevant here). ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A); *accord* IRC § 411(a)(7)(A)(i), 26 U.S.C. § 411(a)(7)(A)(i). Paying a lump sum requires determining the present value of that life annuity for the particular participant.
>
> 46. In general, present value is determined by using a mortality table to predict how long the participant would be expected to receive annual benefits beginning at normal retirement age and ending at his or her death, and an interest rate to discount for the time value of money if the participant instead receives his or her projected annual benefit in the form of a single lump sum payment. *See* IRC § 417(e), 26 U.S.C. § 417(e) (setting forth the minimum mortality table and interest rates that may be used). The higher the interest/discount rate used in this calculation, the lower the lump sum.
>
> 47. Under ERISA §§ 203(e), 205(g), 29 U.S.C. §§ 1053(e) and 1055(g), IRC § 417(e), IRS Notice 96-8, 1996-1 CB 359 (1996), and other provisions of law and guidance issued by the Treasury Department, a cash balance plan must calculate lump-sum payments by first projecting the account balance into an annuity at the normal retirement age, usually 65, using a rate based on the plan's interest crediting rate (or "investment" crediting rate under certain plan designs) and then figuring out the present value of that projected annuity by discounting back. The present value of the projected retirement benefit is the least that the plan must pay out as a lump sum. The Pension Plans (including the BankAmerica Pension Plan) did not properly comply with this requirement.
>
> 48. Specifically, in determining the amount of a participant's lump sum payment, the Pension Plans did not: (i) project—or if they did project, did not accurately project—the participant's hypothetical account balance to age 65 or the appropriate normal retirement age using an appropriate rate based on the Pension Plans' interest crediting rates (or the Plans' "investment" crediting rates), and/or (ii) properly calculate the annual benefit that would be available at normal retirement age based on the projected account balance, and/or (iii) then properly calculate a lump sum with the same actuarial present value as the projected annual benefit. Instead, the Pension Plan only

paid participants the balance in their hypothetical account or some other amount that did not reflect an accurate and correct computation of the projected annuity at normal retirement age and/or the present value of such annuity.

* * *

52. As a cash balance plan, the NationsBank Plan maintained a hypothetical account in each participant's name. These accounts were increased each pay period by pay credits in an amount equal to 1–10% of each participant's pay for the period. For participants who had five years of service, referred to as the "normal retirement date" under the Plan, the pay credits were age- and service weighted, so that the youngest participants (those whose age + service = 0–29) received a pay credit equal to 1% of pay; participants whose age + service = 30–39 received a pay credit of 2%; participants whose age + service = 40–49 received a pay credit of 3%; participants whose age + service = 50–59 received a pay credit of 4%; participants whose age + service = 60–69 received a pay credit of 6%; participants whose age + service = 70–79 received a pay credit of 8%; and the oldest participants (age + service = 80 and over) received pay credits equal to 10% of pay.

* * *

*Attempted Manipulation of the Statutory Normal Retirement Age*

53. The first "innovation" PwC recommended and NationsBank adopted involved an attempt to manipulate the ERISA definition of "normal retirement age."

54. The statutory concept of a "normal retirement age" is central to the operation of ERISA and its key protections. For example, as noted above, ERISA requires a defined benefit plan to calculate benefits by reference to each participant's accrued benefit expressed as an annual amount commencing at normal retirement age. Under ERISA § 3(24), 29 U.S.C.§ 1002(24), and IRC § 411(a)(8), the normal retirement age that must be used for this purpose is the "normal retirement age under the plan" or age 65, whichever is earlier.[3]

55. While almost all large defined benefit plans (including almost all cash balance plans) define the "normal retirement age under the plan" as age 65, the same as the statutory default, ERISA provides some flexibility to accommodate specialized industries such as the airlines, where pilots typically retire at age 60 or younger. But the flexibility is strictly limited: ERISA permits a plan sponsor to adopt a normal retirement age younger than age 65 only if that age is reasonably representative of the typical retirement age of the covered workforce.

56. Nevertheless, relying on an approach characteristic of the corporate tax shelter schemes PwC "regrettably" devised and sold other clients at about the same time (the late 1990's),[4] PwC urged NationsBank to take the limited flexibility allowed under the statute to a ridiculous and patently

impermissible extreme: PwC told NationsBank to ignore the inconvenient, real-world, statutory definition of "normal retirement age" and replace it with the made-up concept of a "normal retirement *date*" which would be defined not by reference to any *age* (let alone an age, as the statute requires, that is reasonably representative of the typical retirement age of the covered workforce) but the first day of the month following the *date* that each participant completes *five (5) years of service* with the Company.[5]

57. The strategy was supposed to work as follows. Five years of service with the Company is the time after which each participant becomes vested under the Pension Plan. PwC's theory was that if every participant with a vested benefit could be deemed, via the "normal retirement *date*" definition, to have already attained normal retirement age for purposes of ERISA, the Company could, for example, effectively override the ERISA requirement that a participant's "accrued benefit" under the Pension Plan be defined in terms of the annual amount the participant could expect at retirement. Instead, the Pension Plan could effectively define the accrued benefit as "the current account balance"—a formulation the 7th Circuit recently rejected in *Berger v. Xerox Corporation Retirement Income Guarantee Plan*, 338 F.3d 755 (7th Cir. 2003). Just as important to Defendants (including PwC which did and does employ the same sleight of hand in its own plan, *see Laurent, supra*), an abnormally low normal retirement *age*—accomplished entirely through the backdoor via the definition of a "normal retirement *date*"—also would effectively exempt the Pension Plan from, among other key participant protections, ERISA's age discrimination and backloading prohibitions. *See* ERISA §§ 204(b)(1)(A)–(C) and (G)–(H), 29 U.S.C. §§ 1054(b)(1)(A)–(C) and (G)–(H), and IRC § 411(b)(1).

58. The Company eagerly adopted PwC's proposal but its attempt (like PwC's) to circumvent ERISA in the manner its consultant urged failed and continues to fail for numerous reasons.

59. First, Defendants were too clever by half (or perhaps simply too "aggressive," *see supra* n. 4) because by failing to include *any* "normal retirement *age*" in the Pension Plan—not merely failing to include a normal retirement age that was reasonably representative of the typical retirement age of the covered workforce—by operation of law the Pension Plan's normal retirement age is the statutory normal retirement age of age 65. *See* ERISA § 3(24), 29 U.S.C. § 1002(24) and IRC § 411(a)(8); Treasury Regulation ("Treas. Reg.") § 1.411(a)-7(b)(1) and example 2 thereunder ("if *an age is* not specified by a plan," the normal retirement age under the plan is age 65) (emphasis added). Surely, *a date* is not an *age*—as the Company tacitly admits by showing itself forced to employ the different terminology ("normal retirement *date*")—and the definition of "normal retirement date" itself is tellingly not keyed to participants' age at all but rather that date immediately following the completion by participants, no matter what their age, of exactly the period of time of service it takes for them to vest under the plan (another "date"), be they age 25, 30, or 35 at the time of this supposed "retirement."[6]

60. To ensure, however, that the date-for-age swap would go unnoticed by regulators, the Company affirmatively misled the IRS, going so far as to state in, and/or at the time of the submission of, its original determination letter request that the Plan was governed by a normal retirement age of 65 when the entire thrust was entirely contrary.[7]

61. But the Company's attempt to game the statute also fails because, ironically, other provisions of the Pension Plan implicitly use a normal retirement age of age 65. For example, § 6.3(a) of the Pension Plan provides that unless a participant elects otherwise, benefits under the Pension Plan will commence not later than the 60th day after the later of (A) the close of the plan year in which the participant attains age 65 or (B) the close of the plan year in which the employee terminates employment. This provision is intended to satisfy the requirement under ERISA § 206(a), 29 U.S.C. § 1056(a), and IRC § 401(a)(14) that benefits generally commence not later than the 60th day after the later of (A) the close of the plan year in which the participant attains "the earlier of age 65 or the normal retirement age specified under the plan" or (B) the close of the plan year in which the employee terminates employment. By referring only to age 65 in clause (A) of the distribution rule, the Pension Plan signals that the normal retirement age under the Plan is age 65. Otherwise, the provision would not satisfy the distribution requirement under ERISA § 206(a), 29 U.S.C. § 1056(a), and IRC § 401(a)(14).

62. Even had the Company implemented PwC's proposed scheme in a way that somehow defined "normal retirement *age*" as five years of service, the Pension Plan's definition would not have been valid. The Company did not inform participants that the normal retirement age under the Pension Plan was five years of service—in fact, the opposite is true.

63. Nor would a normal retirement age as low as age 25 (or even younger) for many participants, and probably under age 35 for most participants, have been consistent with the stated purpose of the Pension Plan, which was and is to provide "retirement" income to Company employees. Employees do not normally "retire" after five years of employment with the Company. Thus, even had the Company amended the Pension Plan to define "normal retirement age" as five years of service, PwC's gimmick would have caused the Pension Plan by its terms to violate the requirement that a qualified pension plan be intended to primarily provide "retirement income" to employees. As such, the definition would have been invalid.[8]

64. More generally but no less crucially, a completely fictitious normal retirement age (really, "date") of the type recommended by PwC cannot be permissible because it would, if allowed, permit employers through the simple expedient of plan drafting to override a number of central provisions of ERISA and the Internal Revenue Code that are designed to protect the interests of plan participants. As noted above, the statutory concept of a "normal retirement age" is central to the operation of ERISA and its key protections. These protections include the prohibitions against age discrimination, backloading

of benefit accruals, and benefit forfeitures addressed in this Complaint. ERISA does not permit a plan sponsor to sidestep these protections by adopting its own definition of normal retirement that meshes more comfortably with the sponsor's business strategy. As one cash balance expert reportedly explained, "[a] short retirement age 'guts' the Employee Retirement Income Security Act."[9]. IRS officials are reported, with good reason, to have expressed similar concerns.

65. In any event, the Pension Plan's adoption of a five-year normal retirement date (even if read as a five-year normal retirement "age") is ineffective to avoid the Plan's clear obligations under ERISA to pay departing participants an amount no less than their "accrued benefit *determined under the plan*" ERISA § 3(23), 29 U.S.C. § 1002(23) (emphasis added). This requirement applies regardless of a plan's normal retirement age (or "date"). Under the terms of the Pension Plan, a participant accrues two types of benefits for each period of service with the Company: (1) a pay credit based on the participant's compensation during the period *plus* (2) the right to receive tax-deferred investment credits on those pay credits (at the rate promised at the time the related pay credits accrue) for as long as the participant leaves his or her account balance in the Pension Plan, through age 65 and beyond—with a floor stop-loss guarantee. ERISA requires that this right to continue to receive investment credits with limited downside risk be recognized as part of a participant's "accrued benefit" under the Pension Plan. As a result, any lump sum cash-out of a participant's benefit under the Pension Plan must include the value of this right as part of a participant's accrued benefit.

*Participant Directed "Investments"*

66. Perhaps even more radical than the artificially (and unlawfully) low normal retirement age, PwC proposed and NationsBank adopted (and now Bank of America continues to maintain) a cash balance structure specifically designed to create for the Company a massive leveraged arbitrage opportunity that cynically depends on the Company, by way of the Pension Plan, profiting from its employees' investment mistakes and presumed naivety [sic].

67. Whereas almost all other cash balance programs automatically credit employees' account balances with a pre-set interest formula (such as the one-year Treasury bill rate plus one or two percentage points), the NationsBank Cash Balance Plan, as proposed by PwC and adopted by NationsBank, provided participants with no guaranteed growth in principal. Instead of crediting participants' hypothetical accounts with a fixed rate as is usually done in cash balance plans, the NationsBank Cash Balance Plan only credited a participant's account with the returns of one of a limited number of hypothetical investment options—or "Investment Measures"—that the participant was required to select among or be defaulted into a very low return stable value fund. The "Investment Measures" selected by Company Directors (and/or other high ranking executives) acting, as specified in the Pension Plan, as fiduciaries on behalf of the Company, were and are the

same Company "proprietary" mutual fund options that the Company offered participants in the Company 401(k) Plan.

68. Whether they wanted it or not, participants were and are forced to invest their defined benefit "money" as well as their defined contribution money and bear the risk that these returns will not be adequate for a comfortable retirement. As designed by PwC and adopted by the Company, the Pension Plan does not permit participants to opt-out from this forced investment scenario.

69. While the Pension Plan does guarantee that the nominal amount of the participants' hypothetical opening account balance plus the value of certain pay credits is not subject to forfeiture, it does not provide any guarantee that the value of the opening balance will not erode as a result of inflation.

70. Plaintiffs allege that it is imprudent to force or let participants "invest" the "account" balance in the Pension Plan. While ERISA anticipates permitting participants in a 401(k) savings-type plan to invest assets on their own, it is not anticipated under ERISA, and imprudent to require, that participants self-direct their pension assets. ERISA § 404(c), 29 U.S.C. 1104(c), which allows 401(k) plan fiduciaries to turn over some investment responsibility to participants, is not available to defined benefit plans such as the Pension Plan. The 401(k) Plan and the Pension Plan fiduciaries made no inquiry into participants' knowledge, ability, or time to handle these investment responsibilities. And, as a matter of fact, Plaintiffs and the Class are not well-equipped, at least on the scanty information and assistance they were given, to invest pension plan assets like professionals.

71. Moreover, the cash balance "investment" funds effectively charge participants fees and expenses wholly inappropriate when compared to the fees and expenses that would ordinarily be directly or indirectly assessed against participant benefits accruing under a defined benefit formula and/or against plan assets of the enormous scale of the Pension Plan. The majority of investment options underlying the "investment" funds were and are mutual funds managed by Company affiliates. These funds, and hence the "investment" funds, assess fees and expenses several times the going rate for plans the size of the Pension Plan (unfairly reducing participants' benefits accordingly). For the Plan fiduciaries to countenance the use of Investment Measures any more expensive or any less professionally managed than those they used and use to invest the pooled assets of the Plan was and is a breach of faith of the most basic kind, particularly where, as here, those Investment Measures were Company-managed, proprietary mutual funds that in many cases depended heavily for their continued existence or profitability on the captive Plan which also gave the funds the additional critical mass helpful in marketing such funds to third-parties.

72. As further regards the "Investment Measures," it is clear that, perhaps as a consequence of the experimental nature of this Plan, the way the Plan was drafted (in 1998, and restated in 2000) and has been implemented since that time, has caused the Company necessarily to violate the "definitely determinable" rule applicable to all defined benefit plans. ERISA § 402(b)(4),

29 U.S.C. § 1102(b)(4), provides that a retirement plan must be written and must "specify the basis on which payments are made to and from the plan." This is the ERISA counterpart to the requirement under § 401(a) of the Internal Revenue Code that a pension plan must "provide systematically for the payment of definitely determinable benefits." Treas. Reg. § 1.401(a)-l(b)(1)(i).

73. IRS Revenue Ruling 79-90 explains that a plan will not be considered to provide definitely determinable benefits if the benefit formula depends on actuarial or other factors that are within the control of the employer. By analogy, a plan formula that includes factors that are subject to the discretion of the employer does not "specify the basis on which payments are made to and from the plan" within the meaning of ERISA § 402(b)(4), 29 U.S.C. § 1102(b)(4). Here, benefits payable under the Pension Plan are based on each participant's "account balance" at the time of termination or retirement. A participant's account balance consists of the annual "contributions" or credits to the account made by the plan sponsor, plus imputed "investment" returns. Investment returns are based on participant investments in the "Investment Measures" offered to participants.

74. The menu of "Investment Measures" is not fixed by the terms of the Pension Plan, but is chosen by the Company or other Defendants acting on behalf of the Company as fiduciaries based on vague guidelines set forth in the Plan. The menu is changed from time to time at the discretion of the Company or those acting on its behalf. Moreover, the options that are selected—mutual funds managed by the Company—have such malleable standards themselves, and give such complete discretionary control to the manager, as to be a further way in which the Company retains continuous discretion and control over participants' "returns."[10] As a result, in violation of ERISA and the Internal Revenue Code, the Company is improperly left with discretion over a critical piece of the pension formula: the menu of Investment Measures that determines the investment crediting rate under the Plan.

75. Meanwhile, banking on participants receiving low notional rates of return, the Company has exploited the arbitrage opportunity to the fullest. The Company continues to invest the Pension Plan's assets using the very best investment professionals whose services are purchased at the very lowest possible cost using the economies of scale and economic bargaining power in the marketplace for financial services that the Pension Plan's huge asset base gives it. (As noted above, however, the Company's strategy has not always been successful, causing compensable losses resulting from actual losses, losses through missed investment opportunity or both).

76. Moreover, the Company has not made these investment professionals' services available to participants on the same terms that the Company, through the Pension Plan, enjoys. The Company has not even disclosed to participants its investment philosophy, strategy and/or tactics or give participants any opportunity to profit from the Company's money management strategy even if only by example. Nor has the Company expanded the range

of "investment" options to participants in case someone might somehow discover and wish to mirror the Company's investment philosophy.

---

[3] The statute provides that the "normal retirement age" means the earlier of either (A) "the time a plan participant attains normal retirement age under the plan" or (B) "the later of—(i) the time a plan participant attains age 65, or (ii) the 5th anniversary of the time a plan participant commenced participation in the plan." ERISA § 3(24), 29 U.S.C. § 1002(34) and IRC § 411(a)(8). Therefore, except for participants hired after their 60th birthday, the ERISA-defined normal retirement age is the earlier of the normal retirement age under the plan or age 65.

[4] "In the 1990's there was increasing pressure in the marketplace for firms to develop aggressive tax shelters that could be marketed to large numbers of taxpayers. This had not been a traditional part of our tax practice, but regrettably our firm became involved" in these transactions. Testimony of Richard J. Berry, Senior Tax Partner, PricewaterhouseCoopers LLP, before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs, November 18, 2003.

[5] The term "normal retirement date" is defined under the Plan to be "the first day of the calendar month following the earlier of (i) the date the Participant attains age sixty-five (65) or (ii) the date the Participant completes sixty (60) months of Vesting Service." Under this definition, every participant would reach the "normal retirement date" in five years, unless he or she joined the Company after age 60.

[6] While a pension plan can define a "date" as the date participants vest under the plan, it cannot not define an "age" in this manner, because the date participants vest is not a chronological "age." In fact, many pension plans use both terms, with each term having a distinct meaning. The IRS has even issued a ruling that cautions plans not to confuse the two concepts, explaining that a pension plan does not satisfy the requirement of section 411 of the Code if the plan substitutes "normal retirement date" for "normal retirement age." *See* IRS Revenue Ruling 81-211, 1981-2 C.B. 98 (1981).

[7] Recall that the Plan's actuary Towers Perrin expressed concern that "[w]e do not know whether the IRS agent reviewing the determination letter request understood the transaction and the applicable rules adequately." *See Pensions & Investments*, "Bank Plan Blurs Line Between DB, DC," September 21, 1998. One reason for this posited failure of understanding may be because the agent was told untruths.

[8] *See* ERISA § 3(2)(A)(i), 29 U.S.C. § 1002(2)(A)(i); Treas. Reg. § 1.401-1(a)(2)(i) (A qualified pension plan is an arrangement which is established and maintained by an employer "to provide for the livelihood of the employees or their beneficiaries after the retirement of such employees."); Treas. Reg. § 1.401-1(b)(1)(i) ("A pension plan within the meaning of section 401(a) is a plan established and maintained by an employer primarily to provide systematically for the payment of definitely determinable benefits to his employees over a period of years, usually for life, after retirement."); Treas. Reg. § 1.401(a)-1 (pre-ERISA regulations cited above continue to apply).

[9] *Pensions and Investments*, "Cash Balance: Trouble for Bank Plans? IRS Scrutinizes Shortened Retirement Ages," May 31, 1999. The article goes on to explain that "[o]fficials from the Treasury Department and IRS have been scrutinizing plans . . . that have defined 'normal' retirement as occurring . . . after 5 years' tenure. . . . Such shortened retirement ages short-circuit various pension rules pegged to the more conventional retirement ages of 60 and 65."

[10] Under the prospectuses governing the mutual funds in question, the Company and/or its affiliates can change both the fees and expenses and even the nature of the funds' investments without notice and effectively on a whim, so broadly worded are those prospectuses and so great is the fund managers' discretion and control.

The plaintiff's allegations related to the transfers from the 401(k) plan to the cash balance plan were as follows:

*Asset Transfers from 401(k) Plans to the Pension Plan*

77. To maximize their client's arbitrage opportunity, PwC advocated a yet more radical move: it designed into its proposal to NationsBank an account removal/asset transfer from the NationsBank 401(k) Plan. The strategy was to maximize the arbitrage opportunity available with the new cash balance plan design. PwC convinced NationsBank that it could transfer assets from individual accounts in the 401(k) Plan to the Pension Plan, commingle the assets with other Pension Plan assets (*i.e.*, no longer maintain individual accounts for each participant to hold assets that had been held in individual accounts within the 401(k) Plan), and thereby maximize the arbitrage opportunity.[11] NationsBank agreed to proceed with this unprecedented strategy, which no other company has had the temerity to attempt before or since.

78. In order to accomplish this highly unorthodox maneuver which resulted in a shift of over $1.4 billion from the 401(k) Plan to the Pension Plan, the Company, PwC and other Defendants misled the Trustee, other Plan fiduciaries and the participants themselves about the nature and character of the proposed transactions. Notwithstanding these Defendants' material misrepresentations and/or omissions, the NationsBank 401(k) Trustee and the other Defendants (including the NationsBank Cash Balance Plan Trustee) knew or should have known that the account removal and asset transfer would violate Title I of ERISA, among other laws, and were duty-bound and should have refused to participate.

79. As evidence of its intent to maximize its arbitrage opportunity and belying the claim that the transfer was purely "voluntary," the Company launched a major internal media campaign to pressure employees and pressure mid-level managers to pressure employees to "consent" to the transfer. Moreover, the Company made sure that as a structural matter many participants would have no option but to consent by amending the 401(k) Plan to no longer allow participants to request loans from their 401(k) accounts: The Company told participants that if they wanted to retain the ability to take loans—a feature found in most large 401(k) plans—participants would have to transfer their accounts to the Pension Plan. The Pension Plan was amended to add a loan feature, very unusual for a defined benefit plan. Thousands of Plan participants at any one time have tens of millions of dollars in loans and in many cases depend on them to make ends meet. Shifting the loan feature from the 401(k) Plan to the Pension Plan was done solely to make sure that

as much money as possible shifted from former Plan to the latter. The Company no doubt concluded that this type of arm twisting was necessary because, as Towers Perrin put it, "[from an employee's perspective, the motives for electing a transfer aren't so clear."

* * *

85. Following each of the transfers, the assets that had been held in individual accounts for each participant in the 401(k) Plans were no longer held in individual accounts within the Pension Plan. Instead, the assets were commingled with other Pension Plan assets. Before the transfers, each account in the 401(k) Plan by law was required to be, and was, fully funded—*i.e.*, the assets in each participant's account was precisely equal to the participant's accrued benefit under the 401(k) Plans. Following the transfers, there was and is no requirement that the Pension Plan be fully funded—*i.e.*, Pension Plan assets may be less than the aggregate accrued benefit liabilities under the Pension Plan, so that if it were to terminate, benefits might not be fully funded. As a result, participants' benefits became less secure following the transfers.

86. Before the transfers, net income earned on the assets in each participant's account within the 401(k) Plan was used to increase the participant's benefit under the 401(k) Plan—*i.e.*, account income "belonged" to the account. Any extraordinary income or gains accrued to the benefit of participants. Following the transfers, investment income on those same assets was used by the Pension Plan to defray the Plan's expenses and reduce the Company's funding obligation—*i.e.*, investment income "belonged" to the Pension Plan. Any extraordinary income or gains accrued to the benefit of the Pension Plan and by extension the Company.

87. For these and other reasons, it comes as no surprise that, as the Company has recently admitted, the Internal Revenue Service is auditing the Plans and challenging whether the transfers of assets from the 401(k) Plans to the Pension Plan "were in accordance with applicable law." Bank of America Corporation SEC Form 10-Q for the quarterly period ended September 30, 2004 at 22.

[11] As the Plan's actuary remarked in a contemporaneous memorandum that analyzed the asset transfer proposal: "From the employer's perspective, the motive for this arrangement is financial. If the assets of the cash balance plan can actually be invested in a manner that outperforms the crediting rates for cash balance accounts, this will produce gains for the cash balance plan. The extent of this *arbitrage opportunity* probably depends on employees' cash balance investment elections." The memorandum continues: "Given that a primary motive of an employer to engage in a transfer of this type is because of an expectation that the pension fund will out-earn the returns promised to participants, *does this constitute a breach of fiduciary duty?" See Pensions & Investments*, "Bank Plan Blurs Line Between DB, DC," September 21, 1998 (emphasis added).

[Pothier v. Bank of America Corp., No. 04-458 GPM, SD Ill (June 30, 2004)]

A similar suit was filed against the PricewaterHouse Coopers plan. [Laurent v. PricewaterhouseCoopers, No. 04-089 MJR, SD Ill (Nov 2004)] The two cases have been consolidated.

## ¶ 11.6 TRANSFERS FROM THE NATIONSBANK 401(K) PLAN ARE THE BASIS OF SEPARATE PARTICIPANT CLAIMS

At the time the NationsBank cash balance plan was established, participants who were also participants in the NationsBank 401(k) plan were offered the option of transferring their account balances to the cash balance plan. This feature has given rise to a separate set of claims.

The counts that related to the use of the young normal retirement age were as follows:

*COUNT ONE*
*UNLAWFUL LUMP SUM BENEFIT CALCULATION*

* * *

> 106. If participants' benefits had been projected to age 65 using an appropriate rate based on the Pension Plan's investment crediting rate, and if the Plan had then discounted this projected figure back to their then-current age at the interest rate(s) required by ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), and IRC § 417(e)(3), as implemented by Treasury Regulation § 1.417(e)-1(d), or if the Plans had otherwise properly taken into account the value of the right to continue to earn tax-deferred interest credits with limited downside risk, participants would have received a larger lump sum distribution than the amount paid to them.

* * *

> 114. Specifically, Plaintiffs seek to enjoin Defendants from violating ERISA and obtain appropriate relief to redress violations of ERISA and enforce the statute, see ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), by, *inter alia*, compelling the Administrator to administer the Plan in compliance with the law and, more specifically, calculate or re-calculate the amounts due, plus interest, for all past benefits due, in accordance with the requirements of the statute.

*COUNT TWO*
*AGE DISCRIMINATION*

* * *

> 118. Second, effective as of the date of the conversion of the BankAmerica Pension Plan and the NationsBank Pension Plan to cash balance plans, and at all times thereafter, benefits provided under the terms of all the Pension Plans accrued and accrue at a rate which is reduced because of age or the attainment of any age, and therefore the Pension Plans did not and do not comply with the accrual rules of subparagraph (H) of ERISA § 204(b)(1), 29

U.S.C. § 1054(b)(1)(H) and IRC § 411(b)(1)(H). This occurred and continues to occur because, among other reasons, pay credits under the Pension Plans do not increase, and/or do not increase fast enough, to offset the reduction in the value of promised future investment credits that accrue each period as participants and other participants grow older. The result is that the rate at which participants' accrued benefits under the Pension Plans was reduced because of age or the attainment of any age.

* * *

120. Specifically, Plaintiffs seek to enjoin Defendants from violating ERISA and obtain appropriate relief to redress violations of ERISA and enforce the statute, *see* ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), by, *inter alia*, compelling the Administrator to administer the Plan in compliance with the law and, more specifically, calculate or re-calculate the amounts due, plus interest, for all past benefits due, in accordance with the requirements of the statute.

The counts that related to the transfers from the 401(k) plan were as follows:

*COUNT THREE*
*ELIMINATION OF PROTECTED BENEFIT*

* * *

124. Treasury Regulation § 1.411(d)-4, Q&A-3(a)(2), which implements ERISA § 204(g)(1), 29 U.S.C. § 1054(g)(1), and IRC § 411(d)(6)(1), provides that the separate account feature of an employee's benefit under a defined contribution plan such as the above-referenced 401(k) plans is a protected benefit that may not be eliminated except as provided under Code § 411(d)(6). IRC § 411(d)(6) or the regulations do not provide an exception that allows the separate account feature to be eliminated and no other exception to ERISA § 204(g), 29 U.S.C. § 1054(g) is applicable here.

* * *

126. Pursuant to ERISA § 502, 29 U.S.C. § 1132, the Defendants should be, among other things, enjoined from continuing to violate the foregoing provision of ERISA in the manner set forth above and a constructive trust should be imposed upon all of the current and former traceable assets of the Pension Plan. In addition ordering all relief available to the Plans under ERISA § 409(a), 29 U.S.C. § 1109(a), the Court should compel Defendants to create or recreate separate participant accounts within the 401(k) Plan retroactive to the date of each of the 401(k) asset transfers, and assets transferred from each participant's 401(k) original account should then be treated as having been deposited into these reconstruction accounts. To the extent that each participant's traceable share of the Pension Plan's overall actual investment experience after the transfers was better than the performance of the notional investments credited to the participant under the Pension Plan, the participant should be entitled to an upward adjustment reflecting the difference and/or an amount equal to the amount of the Pension Plan's unjust arbitrage profit. To the extent that the participant's transferred assets or the actual investment experience of those assets

cannot be established, Defendants should be compelled to assume the assets had been put to the highest and best use available to the Pension Plan during the relevant time and adjust each participant's account upward accordingly.

* * *

139. Investment returns are based on participant investments in the "Investment Measures" offered to participants. The menu of "Investment Measures" is not fixed by the terms of the Pension Plan, but is chosen by the Company or other Defendants acting on behalf of the Company based on vague guidelines set forth in the Plan. The menu is changed from time to time at the discretion of the Company or other fiduciaries. Moreover, the options that are selected—mutual funds managed by the Company—have such malleable standards themselves, and give such complete discretionary control to the manager, as to be a further way in which the Company retains continuous discretion and control over participants' "returns."

140. As a result, the Company has discretion over a critical piece of the pension formula: The menu of Investment Measures that determines the investment crediting rate under the Plan. This violates the requirements of ERISA § 402(b)(4), 29 U.S.C. § 1102(b)(4) and Treasury Regulation §§ 1.401-1(b)(1)(i) and 1.401 (a)-1(b)(1)(i)-(ii) that benefits be "definitely determinable" and that a plan "specify the basis on which payments are made to and from the plan."

141. Among other things, Plaintiffs seek a declaration that the Company violated § 402(b)(4) of ERISA when it designed and implemented the Plan without objectively specifying the basis on which payments are made to and from the Plan. Plaintiffs also seek to enjoin Defendants from violating ERISA and to obtain other appropriate relief to redress this violation of ERISA and enforce the statute by, *inter alia*, compelling Defendants to administer the Plan in compliance with the law and, more specifically, calculate or re-calculate the amounts due, plus interest, for all past benefits due under the Plan based on an appropriate investment rate that was not subject to the discretion of the Company or the other Defendants. In addition, Plaintiffs seek an order reforming the Plan and/or compelling the Company to amend and/or administer the Plan *nunc pro tunc* to bring it into compliance with the statute.

* * *

<u>*COUNT SIX*</u>

<u>*PROHIBITED INUREMENT TO THE BENEFIT OF THE EMPLOYER*</u>

* * *

144. The ERISA's anti-inurement clause provides that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the

exclusive purpose of providing benefits to participants in the plan and their beneficiaries." ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1).

* * *

146. By causing the Plans' assets to inure to the benefit of Bank of America and holding those assets for purposes other than the exclusive purpose of providing benefits to participants in the plan and their beneficiaries, all Defendants have directly or indirectly violated ERISA's anti-inurement clause, ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1), causing injury to the Plans and the Plans' participants and improperly benefiting Defendants in the ways set forth above and to be more fully demonstrated after discovery and at trial.

* * *

*COUNT NINE*
*INTERFERENCE WITH THE ATTAINMENT OF PENSION RIGHTS*

* * *

164. Defendants intentionally discriminated against all 401(k) Plan participants who did not "consent" to the 401(k) account/asset transfer and intentionally interfered with their right under the 401(k) Plans to not transfer their separate accounts to the Pension Plan and their statutory right to keep their separate account-accrued benefit by not "consenting" to the transfer by penalizing anyone who exercised those rights with the loss of the right to take a loan against that account or those account assets and at the same time holding out to them the prospect of retaining or regaining that right if they would "consent" to transfer that account or those account assets to the Pension Plan.

165. Plaintiffs seek, *inter alia*, a declaration that Defendants violated ERISA § 510 and an order enjoining Defendants from violating ERISA and granting all other appropriate relief to redress this violation of ERISA and enforce the statute.