UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
TIMOTHY D. LAURENT                                         :
                                    Plaintiff,             :
                                                           :              06 Civ. 2280 (JPO)
                 -against-                                 :
                                                           :              OPINION AND ORDER
PRICEWATERHOUSECOOPERS LLP, et al.,                        :
                                    Defendants.            :
                                                           :
----------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

        This case involves claims against Defendant PricewaterhouseCoopers ("PWC") under the

Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* (2000) ("ERISA"),

relating to PWC's Retirement Benefit Accumulation Plan for Employees of

PriceWaterhouseCoopers LLP ("the RBAP").  Plaintiffs Timothy Laurent and Smeeta Sharon

allege that the RBAP violates ERISA's vesting and accrual standards by defining its "normal

retirement age" as five years of service.  They also allege that the summary plan description

("SPD") is defective and that it violates ERISA's general fiduciary standards provision.  These

claims, most of which were addressed and held to survive a previous motion to dismiss in an

opinion issued by Judge Mukasey on September 5, 2006, *Laurent v. PriceWaterhouseCoopers

LLP*, 448 F. Supp. 2d 537 (S.D.N.Y. 2006) ("*Laurent I*"), are alleged in Plaintiffs' Second

Amended Complaint ("SAC").  Seven years after Judge Mukasey issued his ruling, PWC has

filed a motion to dismiss the SAC, pointing to intervening decisions from other circuits and

reiterating its objections to *Laurent I*.  For the reasons that follow, PWC's motion to dismiss is denied.[1]

# I.    Applicable Legal Standards

## A.    Rule 12(b)(6)

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw [ ] all inferences in the plaintiff's favor."  *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006) (internal quotations omitted).  That said, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  In a summary of the plausibility standard, the Second Circuit explained that:

> [*Twombly*] stated that a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, but mere labels and conclusions or formulaic recitations of the elements of a cause of action will not do; rather, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, i.e., enough to make the claim plausible.

---

[1] The Court held argument on this motion on March 14, 2013 and on July 19, 2013.  In a separate order, the Court withdraws its reference to Magistrate Judge Fox for general pretrial supervision and directs the parties to provide a status update and proposals for the remaining phase of the case.

*Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (quotation marks and internal citations omitted).

**B.      Law of the Case Doctrine**

Any questions of law ruled upon earlier in this litigation are revisited through the lens of law of the case doctrine, which provides that "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991) (citing *Arizona v. California*, 460 U.S. 605, 618 (1983)).  This doctrine serves the purpose of "maintain[ing] consistency and avoid[ing] reconsideration of matters once decided during the course of a single continuing lawsuit."  18 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4478 at 788.  It thus plays an important role in the administration of the federal courts, though "unlike the doctrines of *res judicata* and collateral estoppel, which a court cannot ignore where they apply, the law of the case, as Justice Holmes remarked, 'merely expresses the practice of the courts generally to refuse to reopen what has been decided.'"  *Devilla v. Schriver*, 245 F.3d 192, 197 (2d Cir. 2001) (quoting *Messinger v. Anderson*, 225 U.S. 436, 444 (1912)).

Law of the case doctrine is prudential and discretionary in character, *see United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000), and courts "always [have] the power to change a ruling" in light of "further reflection," *Corporacion de Mercadeo Agricola v. Mellon Bank Int'l*, 608 F.2d 43, 48 (2d Cir. 1979); *see also United States v. Birney*, 686 F.2d 102, 107 (2d Cir. 1982) ("The doctrine of the law of the case is not an inviolate rule.").  That rule holds true even where a case has been reassigned to a new judge.  *See In re U.S.*, 733 F.2d 10, 13 (2d Cir. 1984). Under law of the case doctrine, the principal bases for departure from a prior ruling include "an intervening change of controlling law, the availability of new evidence, or the need to correct a

clear error or prevent manifest injustice." *Doe v. New York City Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir. 1983).  Courts remain sensitive in this context to the potential for prejudice that can result from a lack of notice or "a lack of sufficient opportunity to prepare armed with the knowledge that the prior ruling is not deemed controlling." *Uccio*, 940 F.2d at 758 (quotation marks, citation, and alterations omitted).

## II.     Discussion[2]

### A.     Count One:  Defining Normal Retirement Age As A Term of Years

Count One alleges that the RBAP-defined "normal retirement age" ("the RBAP NRA") of five years of service is invalid under ERISA.  The parties' dispute over the validity of the RBAP NRA is subject to law of the case doctrine.  In September 2006, relying principally on *Duchow v. New York State Teamsters Conference Pension and Ret. Fund*, 691 F.2d 74 (2d Cir. 1982), Judge Mukasey concluded that the RBAP NRA is invalid.  *See Laurent v. PriceWaterhouseCoopers LLP*, 448 F. Supp. 2d 537, 545 (S.D.N.Y. 2006) (*Laurent I*); *see also id.* ("The RBAP does not specify one consistent age as the normal retirement age . . . each employee will be a different age at the time he reaches the normal retirement age.  Such a normal retirement age is invalid under the Second Circuit's interpretation of ERISA.").  Nearly one year later, after a reassignment from Judge Mukasey, Judge Daniels denied a motion for reconsideration of *Laurent I*, but certified Judge Mukasey's opinion for interlocutory appeal.  *See Laurent v. PriceWaterhouseCooper LLP*, No. 06 Civ. 2280, 2007 WL 2363616, at *1 (S.D.N.Y. Aug. 17, 2007) (*Laurent II*).  Ultimately, the Second Circuit refused to hear an interlocutory appeal.  In December 2010, Judge Daniels denied Defendants' request for reconsideration of his opinion denying their original motion for reconsideration of Judge Mukasey's ruling.  *See*

---

[2] Familiarity with the facts and background of this case is assumed.

*Laurent v. PriceWaterHouseCoopers LLP*, No. 06 Civ. 2280, 2010 WL 5396089, at *1 (S.D.N.Y. Dec. 22, 2010) (*Laurent III*).

Upon an independent examination of the merits, the Court reaffirms *Laurent I*'s result, though it departs somewhat from *Laurent I*'s reasoning.  *Laurent I* relied on *Duchow* to conclude that the RBAP NRA violated ERISA, but upon careful reflection it is clear that *Duchow* and the other sources cited in *Laurent I* lend only modest support to that conclusion.  Of course, the conclusion that *Laurent I*'s reasoning cannot control does not end the inquiry.  Rather, a decision must be reached as to whether the RBAP NRA is invalid for some other reason.  Considering the positions advanced by the parties, as well as the logic of recent Fourth and Seventh Circuit cases, the Court identifies another such basis in ERISA's plain text and embraces *Laurent I*'s result.

### 1.    Relevant ERISA Provisions

ERISA § 3(24) defines normal retirement age as follows:

> The term "normal retirement age" means the earlier of—
>
>> (A) the time a plan participant attains normal retirement age under the plan, or
>>
>> (B) the later of—
>>
>>> (i) the time a plan participant attains age 65, or
>>>
>>> (ii) the 10th anniversary of the time a plan participant commenced participation in the plan.

29 U.S.C.A. § 1002(24).  Section § 203 of ERISA, in turn, creates minimum vesting standards:

> (a) Nonforfeitability requirements
>
> Each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age and in addition shall satisfy the requirements of paragraphs (1) and (2) of this subsection.

(1) A plan satisfies the requirements of this paragraph if an employee's rights in his accrued benefit derived from his own contributions are nonforfeitable.

(2) A plan satisfies the requirements of this paragraph if it satisfies the requirements of subparagraph (A), (B), or (C).

(A) A plan satisfies the requirements of this subparagraph if an employee who has at least 10 years of service has a nonforfeitable right to 100 percent of his accrued benefit derived from employer contributions.

(B) A plan satisfies the requirements of this subparagraph if an employee who has completed at least 5 years of service has a nonforfeitable right to a percentage of his accrued benefit derived from employer contributions which percentage is not less than the percentage determined under the following table: (table omitted).

(C)

(i) A plan satisfies the requirements of this subparagraph if a participant who is not separated from the service, who has completed at least 5 years of service, and with respect to whom the sum of his age and years of service equals or exceeds 45, has a nonforfeitable right to a percentage of his accrued benefit derived from employer contributions determined under the following table: [omitted] …

29 U.S.C. § 1053(a).

## 2.   *Duchow* **and the RBAP NRA**

In *Duchow*, the Second Circuit held that a plan must provide that pension benefits vest either when a participant reaches normal retirement age or when he satisfies one of the three service-based requirements set forth in 29 U.S.C. § 1053(a)(2).  691 F.2d at 75.

*Duchow* is readily summarized.  Herman Duchow became a member of a pension plan on February 1, 1969, was denied pension benefits at the age of 69 in February 1977, and terminated

6

his employment in May 1977.  *Id.*  He then returned to work at the same company for two months in 1979, during which time he once again applied for benefits and was once again denied.  *Id.*  The Trustees justified their denials on the undisputed ground that Duchow had not fulfilled the plan's service requirements.  *Id.*  Duchow's estate sued and argued that his pension benefits had vested by February 1979, explaining that the plan's purely service-based rules violated ERISA's vesting provisions.  *Id.* at 75-76.  The Second Circuit agreed and held that "pension benefits become vested upon an employee's attainment of 'normal retirement age,' as defined in [ERISA]."  *Id.* at 75.  Because Duchow had joined the pension plan in February 1969, and sought benefits upon reaching normal retirement age in February 1979 (his 10-year anniversary of commencing participation in the plan), the Circuit concluded that Duchow had vested and was entitled to pension benefits.  *Id.* at 80.  As part of that analysis, it held that "anniversary" means "a date rather than the years between the date and the past event."  691 F.2d at 79.

Duchow's holding that pension benefits must vest by the time a plan member reaches normal retirement age hinged on a determination that § 203 imposes two distinct kinds of vesting requirements.  In reaching that result, the Circuit disagreed with the pension plan, which had argued that § 203 requires nothing more than satisfaction of the requirements set forth in §203(a)(2), all of which are linked to an employee's years of service.  *Id.* at 77.

Reasoning from statutory text and structure, *Duchow* noted that § 203 "indicate[s] that two discrete vesting requirements are imposed, the first linked to age and the second depending on length of service without regard to age."  *Id.* at 77.  *Duchow* also looked to legislative history, which revealed a clear intent to impose the requirement that an employee must be fully vested by the time he reaches normal or stated retirement age.  *Id.* at 77-78.  The Second Circuit thus

7

concluded that, whereas § 203(a)(2) imposes vesting standards linked to an employee's years of service, § 203(a) imposes a vesting standard keyed to normal retirement age.  *Id.* at 77; *see also id.* ("Each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age." (quoting § 203(a))).

As a result, *Duchow* explained that "§ 203(a)'s provisions with regard to employer contributions are properly interpreted as imposing two distinct types of minimum vesting requirements, one of which is independent of years of service."  *Id.* at 77.

*Laurent I*'s invalidation of the RBAP NRA was based almost entirely on the foregoing line from *Duchow*.  448 F. Supp. 2d at 545.  *Laurent I* also recited *Duchow*'s other formulation of this point: "'[B]oth the format of § 203(a) and the disparate contents of its conjoined parts indicate that two discrete vesting requirements are imposed, the first *linked* to *age without regard* to *length* of *service* and the second depending on the length of service without regard to age.'"  *Id.* (quoting *Duchow*, 691 F.2d at 77) (emphasis in original).  *Laurent I* reasoned that any service-based definition of normal retirement age would violate the vesting rules set forth in § 203(a), as interpreted by *Duchow*, by impermissibly rendering *both* of the discrete vesting requirements dependant on length of service without regard to age.  *Id.*

This interpretation, however, reads more into *Duchow*'s holding than it can bear.

When *Duchow* drew a sharp line between age- and service-based requirements, and referred to age-based requirements "independent" of length of service, it did not consider the possibility of a service-based normal retirement age.  Rather, *Duchow* concerned itself with the existence of a discrete requirement under § 203(a) that pension benefits vest no later than normal retirement age.  Thus, when *Duchow* referred to "age," it used that word as a shorthand for "normal retirement age" under § 203(a) and in contradistinction to the three service-based

8

vesting rules set forth in § 203(a)(2).  Normal retirement age, in turn, is defined under ERISA as
the earlier of a plan's definition of normal retirement age or a statutory default (the later of
attaining age 65 or the tenth anniversary of commencing participation).  *Duchow* interpreted and
applied only the anniversary provision of the statutory default.

In light of ERISA's text and contemporary business practice, *Duchow* presumed that
normal retirement age would generally be defined in terms of age.  In *dictum*, *Duchow* then
relied on that assumption to describe as "independent of years of service" the statutory
requirement that pension benefits vest by normal retirement age.  691 F.2d at 77.  Understood in
context, and standing alone, that *dictum* is too slender a reed to bear the weight it is assigned in
*Laurent I*.  Though it may gesture in that direction, *Duchow* did not create an anticipatory
prohibition on service-based definitions like the RBAP NRA.  Rather, it recognized that § 203(a)
imposes two requirements, one based on service and the other on normal retirement age.[3]

---

[3] In 2007, Judge Hart offered a similar interpretation of *Duchow*:

> In *Duchow,* the Second Circuit followed the plain language of 29
> U.S.C. § 1053(a) in holding that a plan must provide that pension
> benefits can vest either by reaching normal retirement age or by
> satisfying one of the three service requirements then set forth in §
> 1053(a)(2).  In emphasizing that normal retirement age and these
> vesting requirements are distinct, the Second Circuit made the
> point that the former is an age requirement independent of service
> time while the latter requirements were all based on service time.
> Whether, consistent with § 1002(24)(A), normal retirement age
> could be measured by service time was not an issue before the
> court. The statement that normal retirement age is independent of
> service time was *dictum;* the court otherwise held that the plain
> language of the statute (as well as its purpose and legislative
> history) required that either reaching normal retirement age or
> satisfying a provision of § 1053(a)(2) be sufficient for vesting …

> While the *dictum* in *Duchow* provides some support for the holding
> in *Laurent [I]*, it is weak support since the *Duchow* case did not

In further support of its conclusion, *Laurent I* also invoked *Duchow*'s interpretation of "10th anniversary" as used in the statutory default definition of normal retirement age. Though that part of *Duchow* lends some support to *Laurent I*'s result, it does not control the analysis.

In relevant part, *Duchow* held that "10th anniversary" referred to a date occurring ten years after commencing participation in a plan, not ten statutorily defined "years of service." 691 F.2d at 79. It based this result primarily on plain meaning analysis and the fact that Congress had elsewhere shown a sharp eye for detail with such important terms in ERISA's statutory scheme. *Id. Duchow* added that "had Congress intended 'normal retirement age' to be dependent on ten years of service, it would hardly have selected such convoluted and imprecise (for defendant's purposes) language." *Id.* at 80. The Second Circuit thus sharply distinguished anniversary-based definitions from service-based definitions.

*Laurent I* referenced this *dictum* to explain why its holding was compatible with the statutory reference to anniversaries: although the statutory default allows for normal retirement ages that are not defined as a precise age, the statute creates certainty by using the unmovable anniversary date rather than the variable year-of-service metric. *See* 448 F. Supp. 2d 545-46 ("[*Duchow*] explained that the use of the phrase '10th anniversary' in ERISA's definition of the default normal retirement age does not impose a service requirement such that years of service can be used to define a normal retirement age." (citing *Duchow*, 691 F.2d at 80)). That part of the reasoning in *Laurent I* is sound and applies to this Court's conclusion as well.

---

actually address the issue of a normal retirement date based on service time.

*Fry v. Exelon Corp. Cash Balance Pension Fund*, No. 06 Civ.3723, 2007 WL 2608524, at *4 (N.D. Ill. Aug. 31, 2007), *amended on reconsideration in part*, No. 06 Civ. 3723, 2007 WL 4569872 (N.D. Ill. Dec. 21, 2007), *aff'd sub nom. Fry v. Exelon Corp. Cash Balance Pension Plan*, 571 F.3d 644 (7th Cir. 2009) (internal citations omitted).

*Laurent I* misstepped, however, when it summarized *Duchow*'s holding in terms that controlled analysis of the RBAP NRA:  "'Congress intended that an employee's pension rights would vest, irrespective of the length of his service' at a certain age."  *Id.* at 546 (quoting *Duchow*, 691 F.2d at 80).  On close inspection, *Duchow*'s discussion of the statutory default is silent on what limits plans must follow when defining normal retirement age.  Thus, whereas *Laurent I* quotes *Duchow* to show that "'Congress intended that an employee's pension rights would vest, irrespective of the length of his service' at a certain age," *id.* (quoting *Duchow*, 691 F.2d at 80), the full quote from *Duchow* does not support this conclusion: "Congress intended that an employee's pension rights would vest, irrespective of the length of his service, *either on his 65th birthday or on the tenth anniversary of his joining the plan, whichever occurred later, unless the plan itself allowed earlier vesting*."  *Duchow*, 691 F.2d at 80 (emphasis added).  To be sure, *Duchow* suggested that it would be inconsistent with certain legislative purposes to construe "anniversary" as a service-based term—but as described in *Duchow*, those purposes mainly involved Congress's desire to create a ceiling on when benefits would vest distinct from the particular service-based requirements set forth in § 203(a)(2).  Thus, *Duchow* offers only a measure of support for a prohibition on definitions like the RBAP NRA.

In sum, *Duchow* does not dictate—and affords only modest support for—*Laurent I*'s holding that plan-defined normal retirement ages cannot be defined by years of service.[4]

---

[4] *Laurent I* also relied on *Deak v. Masters, Mates & Pilots Pension Plan*, 821 F.2d 572, 575 (11th Cir. 1987).  *See Laurent I*, 448 F. Supp. 2d at 545 ("The Eleventh Circuit takes this view also, finding that normal retirement age is a term of art under ERISA that was incorporated into the Act in 1976 to differentiate it from the vesting period limitations of a pension, which are based upon years of service as opposed to a set age." (citing *Deak*, 821 F.2d at 575 n.5)).  *Deak*'s distinction between the MM&P Pension Plan's vesting rules and plan-defined normal retirement age, however, has no bearing on whether it is permissible as a general matter to define normal retirement age through reference to years of service.

This conclusion, however, does not end the inquiry and require departure from *Laurent I*. Rather, it calls for consideration of the parties' remaining arguments to see whether *Laurent I* nonetheless reached the right result.  That inquiry, in turn, directs attention to firmer ground for invalidation of the RBAP NRA: ERISA's text.

### 3.    The Validity of the RBAP NRA

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009).  "[E]ffect should be given to every word of a statute whenever possible." *Leocal v. Ashcroft*, 543 U.S. 1, 3 (2004).  Thus, as Chief Judge Easterbrook noted in 2009, "[h]ow much discretion employers enjoy when selecting a 'normal retirement age' depends on the language of ERISA, for the phrase is a defined term." *Fry v. Exelon Corp. Cash Balance Pension Plan*, 571 F.3d 644, 647 (7th Cir. 2009).

Specifically, ERISA § 3(24) provides that "normal retirement age" can mean "the time a plan participant attains normal retirement age under the plan," at least when the plan's definition results in a normal retirement age earlier than the statutory default.  As Defendant observes, this language "grants [pension plans] broad discretion to define 'normal retirement age.'"  But, contrary to Defendant's argument that "ERISA expressly gives a plan sponsor flexibility to define 'normal retirement age' as it likes," § 3(24) does not confer limitless discretion.  *See Fry*, 571 F.3d at 646 (noting that "employers are entitled to vary by contract *those aspects* of pension plans ERISA makes variable" (emphasis added)).  For instance, a plan could not say that an employee reaches "normal retirement age" on the first occasion that a double rainbow appears over Tokyo, or when Meryl Streep wins her next Emmy, or when the plan participant consumes

his fiftieth cupcake. *See Fry*, 571 F.3d at 647 (suggesting that it would be impermissible for a plan to provide that "an employee reaches normal retirement age when he owns ten umbrellas.").

The reason is simple: plans are given flexibility to create something that ERISA calls "normal retirement age." Presumably, Congress did not choose these words by happenstance. If Congress wanted to confer *complete* discretion on pension plans, it could easily have said that "normal retirement age" is the earlier of the statutory default or "whatever age a plan member has reached when conditions set forth in the plan for this requirement are satisfied." Instead, Congress decided to require that a participant "attain[] normal retirement age under the plan." This decision, in a "complex statute replete with defined terms," *Duchow*, 691 F.2d at 79, must not be rendered null and void by an interpretation that strips the statutory terms of all meaning.

In *Fry*, Chief Judge Easterbrook examined a similar plan and concluded that it satisfied these requirements. Focusing on "normal" and "retirement," he explained:

> [ERISA] does not compel a pension plan's retirement age to track the actuarial tables. If it did, then instead of granting discretion to the plan's sponsor the statute would read something like: "The term 'normal retirement age' means the median age at which participants in the plan retire." But the statute does not say this, nor does it say that the "normal retirement age" must be at least 62 but cannot exceed 65. Some industries have much younger retirement ages-under 30 for football and under 40 for futures commission merchants. The statutory cap at age 65 itself requires some departure from normal practices at law firms, universities, and other employers where people work past the time when they can start drawing full Social Security benefits (which for those approaching retirement today is 66 rather than 65).
>
> Under [ERISA] an age is the "normal retirement age" because the plan's text makes it so. The age in the plan is "normal" in the sense that it applies across the board, to every participant in the plan. (It is important to understand that a "normal retirement age" in a pension plan does not control when employees must retire, but only when certain rights vest and how benefits are adjusted. That's

> why it makes sense to speak of an age being "normal" to the plan's
> operation rather than to anyone's retirement prospects.)

*Fry*, 571 F.3d at 647.  This analysis is persuasive and the Court adopts it here.  The RBAP NRA

is "normal" and satisfies the "retirement" requirement for the reasons set forth in *Fry*.

This still leaves the critical question whether the RBAP NRA defines an "age," as ERISA

requires.  *Fry* involved a pension plan in which employees reached normal retirement age upon

their fifth anniversary of commencing participation.  *Id.*  When an employee joined that plan, she

could know with certainty the date and age at which she would reach normal retirement age

under the plan.  Chief Judge Easterbrook concluded that this plan accorded with ERISA because

"the Plan's formula—the participant's age when beginning work, plus five years—is an 'age.'"

*Id.*  "It is employee specific," he admitted, but "'age + 5'" remains an age."  *Id.*  In support of

this reasoning, he relied on the anniversary rule in the statutory default as proof that "ERISA

does not require the 'normal retirement age' to be the same for every employee."  *Id.*

This reasoning undoubtedly rests at the outermost periphery of the meanings that "age"

can support.  *The Oxford English Dictionary* provides more familiar definitions of "age" when it

reports that "age" means "time that any animal or vegetable has lived," "a period of existence,"

"a period of time," and "a lifetime taken as a measure of time."  *Oxford English Dictionary* (2d

ed. 1989).  As a matter of ordinary usage, the query "what's your age?" should not be met with

the response, "the first time I went to work, as modified by an algorithm that I'll now describe,"

or the euphemistic rejoinder, "it's the third anniversary of my 49th birthday."  Rather, the usual

answer would take the form of a discrete chronological age, such as "30" or, if the interlocutor is

a pre-teen and eager to show his maturity, "seven and a half."  Congress, of course, is ordinarily

thought to speak with plain language, not euphemisms or intricate circumlocutions.

14

As evidenced by its reliance on the default's "anniversary" provision, and its disavowal of "when he owns ten umbrellas" as an "age," *Fry*'s holding that "'age + 5'" remains an age" for purposes of ERISA appears to rest on two related considerations.  First, setting aside death, the age at which a participant will reach normal retirement age and vest in an "age + 5" plan can be known with certainty at the outset of participation in the plan.  Second, this certainty is assured by the fact that the "age" in an "age + 5" plan is defined through units of time that accumulate without regard to any particular feature of the world.  It does not matter whether Meryl Streep once again offers a dazzling performance or whether cupcakes suddenly fall out of favor.  We can rest assured that the inevitable passage of time will unfold toward the vesting of benefits.

Unlike *Fry*, this case involves the RBAP NRA, which defines normal retirement age by reference to five "years of service."  ERISA defines a "year of service" as 1000 hours of service. 29 U.S.C. § 1053(b)(2)(A).  As should be apparent from this definition, a "year of service" is not the same thing as an "anniversary."  Observing that only a "strained construction" would lead a reader to equate these terms, *Duchow* confirmed that they bear distinct meanings—and that those differences are significant for purposes of ERISA's statutory scheme.  691 F.2d at 79.

Thus, even accepting *Fry*'s holding that "'age + 5' remains an age" for purposes of ERISA, it does not follow that "*age + five years of service*" is an "age" of the sort that plans are given discretion to define under ERISA.  Nor can it follow.  *Duchow* may not have anticipated and prohibited definitions like the RBAP NRA, but its explication of the difference between years of service and anniversaries bears directly on why this case is unlike *Fry*.  Notably, Defendant has failed to propose any ground for distinguishing years of service from the cupcake, rainbow, and Streep examples.  While five years of service will presumably cluster around employees' fifth anniversaries, that clustering will likely take the form of a wide probability

15

band distributed around the fifth anniversary mark.  Yet once the *ex ante* certainty of an

anniversary date is abandoned in favor of the supposed high probability that five years of service

will often land in the same ballpark—a fact, in any event, that is not alleged in the Complaint and

has no business controlling a motion to dismiss—it is unclear where to draw the line between

plan-defined conditions that are similar enough to anniversaries to qualify as "ages" and

conditions that fail this nebulous test.  Defendant's argument essentially boils down to its

suggestion that years of service are close enough to anniversaries, a position that rests on facts

beyond the scope of this motion and on a legal standard that would almost certainly prove

unworkable in practice.  Simply put, as a matter of plain text and ordinary language, the RBAP

NRA is *not* an "age."

This textual reading, moreover, may well accord with Congress's employee-protective

purposes in drafting ERISA.  If pension plans were free to define normal retirement age without

any meaningful limitation based on the "age" requirement, whether by reference to cupcakes and

rainbows or by use of more devious definitions, the role of normal retirement age as a robust

participant-protective mechanism in ERISA's vesting rules might be compromised.  Employees

could have a harder time comprehending how the normal retirement age works and employers

could condition normal retirement age on aspects of an employee's service (or other factors) that

circumvent the role that the normal retirement age requirement is meant to play.  *Cf. Esden v.

Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000) (noting, in a different context, that "[f]or the

purposes of this rule, the regulations do not leave a plan free to choose its own methodology for

determining the actuarial equivalent of the accrued benefit expressed as an annuity payable at

normal retirement age," because "[i]f plans were free to determine their own assumptions and

methodology, they could effectively eviscerate the protections provided by ERISA's requirement

16

of 'actuarial equivalence'").  Such limits on employer discretion are hardly unique to the ERISA

context; to the contrary, they permeate the statutory regime.  *See id.* ("ERISA was enacted to

restrict employers' and employees' freedom of contract when bargaining over pensions.

Employers do not have to provide pension plans, but when they do, those plans must comply

with Title I of ERISA.").  While "[e]mployers are entitled to vary by contract those aspects of

pension plans ERISA makes variable, and [] may act in their own interest when doing so," *Fry*,

571 F.3d at 646, they may not vary by contract the statutory rules imposed by ERISA.[5]

    Because it violates ERISA, the RBAP NRA must be excised as the mechanism for

determining "the time a plan participant attains normal retirement age under the plan."

### B.    Motion to Dismiss Count Five

    Count Five of the SAC alleges violations of ERISA's vesting and anti-backloading rules;

the heart of this claim, however, involves backloading.  In 2009, the Second Circuit explained in

general terms how the backloading regulations function and what purposes they serve:

> All defined benefit plans must comply with ERISA's minimum
> benefit accrual rules, which are primarily designed to minimize
> "backloading."  *Langman v. Laub*, 328 F.3d 68, 71 (2d Cir. 2003);
> H.R. Rep. No. 93-807 (1974), reprinted in 1974 U.S.C.C.A.N.
> 4639, 4688.  Backloading occurs when a plan awards a covered
> employee disproportionately higher benefit accruals for later years
> of service.  *Langman*, 328 F.3d at 71.  Thus, while ERISA does not

---

[5] In *dictum*, the Fourth Circuit reached the contrary conclusion when presented with a pension plan that, like Defendant's plan, employed a "years of service" definition of normal retirement age.  *See McCorkle*, 688 F.3d at 171-172.  *McCorkle* reached this issue only after emphasizing that the plaintiff in that case had largely abandoned this contention.  *See id.* at 171.  In a few short paragraphs of discussion, it then relied on *Fry* and some IRS regulations permitting plans to define normal retirement age as less than 65, all without any consideration of the difference between years of service and anniversaries.  *See id.*  In that regard, *McCorkle* is distinguishable because this Court is bound by *Duchow*'s entirely sensible explanation of the difference between anniversaries and years of service.  Regardless, *McCorkle* is at best persuasive authority.  By virtue of the fact that it apparently did not consider (and certainly did not discuss) the central arguments presented here, its persuasive power is limited and is not enough to control this case.

> require pension plans to pay out any specific dollar amount, it does regulate the rate at which benefits accrue.  29 U.S.C. § 1054(b)(1); *see Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004).  Toward that end, ERISA sets forth three alternative minimum benefit accrual tests; pension plans are required to pass one.  29 U.S.C. § 1054(b)(1)(A)-(C).

*Lonecke v. Citigroup Pension Plan*, 584 F.3d 457, 464 (2d Cir. 2009).[6]  The gravamen of the Plaintiffs' fifth count is that the RBAP NRA violates ERISA by impermissibly altering the rate at which benefits accrue; in other words, even if the RBAP NRA is valid under § 3(24), it may be invalid on the alternative ground that it runs afoul of ERISA's backloading rules.  Plaintiffs style this count as an independent legal basis for the same relief sought under the first count.

The parties focus virtually all of their energy on IRS Notice 2007-69.  *See* IRS Notice, *Relief Related to Plan Amendment of Definition of Normal Retirement Age*, Published Aug. 27, 2007, 2007 WL 2285348 ("the Notice").  Two sections of the Notice are relevant to this case:

### I. Purpose

> This notice provides temporary relief, until the first day of the first plan year that begins after June 30, 2008, for certain pension plans under which the definition of normal retirement age may be required to be changed to comply with the regulations relating to a plan's normal retirement age that were recently issued under § 401(a) of the Internal Revenue Code.  This notice also identifies

---

[6] The purpose of the anti-backloading provision, which is also contained in the Internal Revenue Code, was explained in a House Report from the Committee on Ways and Means:

> The primary purpose of [minimum accrual rates] is to prevent attempts to defeat the objectives of the minimum vesting provisions by providing undue "backloading," *i.e.*, by providing inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and by concentrating the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement.

H.R. Rep. No. 93–807 (Feb. 21, 1974), 1974 U.S.C.C.A.N. 4670, 4688.

potential violations of the vesting and accrued benefit requirements for defined benefit plans under § 411 that may arise from a definition of normal retirement age based on a minimum period of service.  Finally, this notice requests comments from sponsors of governmental plans as defined in § 414(d) and other plans not subject to the requirements of § 411 on whether such a plan may define normal retirement age based on years of service . . .

**V. Application of Accrual Rules in the Case of Normal Retirement Age Based on Years of Service**

The 2007 regulations do not provide a safe harbor or other guidance with respect to a normal retirement age that is conditioned (directly or indirectly) on the completion of a stated number of years of service.  The Service and Treasury expect that a plan under which a participant's normal retirement age changes to an earlier date upon completion of a stated number of years of service typically will not satisfy the vesting or accrual rules of § 411.  *See, e.g.*, § 1.411(b)-1(b)(2)(ii)(F).  The relief described in Part III of this notice is limited to compliance with the 2007 regulations and thus, for example, does not extend to any violation of § 411(a)(1) or 411(b)(1) that may arise from a plan's definition of normal retirement age as other than a stated age.

*Id.*  At bottom, the parties disagree on four critical points: (1) whether Plaintiffs have alleged an "injury" and therefore have standing to assert this claim; (2) whether the 2007 Notice applies only prospectively; (3) whether the Notice merits judicial deference; and (4) if the Notice does apply, whether the RBAP NRA falls within the scope of its statement that "a plan under which a participant's normal retirement age changes to an earlier date upon completion of a stated number of years of service typically will not satisfy the vesting or accrual rules of § 411."

### 1.    Whether Plaintiffs Have a Basis for Seeking Relief

In a single paragraph, Defendant asks the Court to dismiss this count on the ground that Plaintiffs were fully vested when they left PWC and therefore suffered no "injury," since "Plaintiffs do not allege that the Plan's definition of normal retirement age changed the time at which they vested, or that they would have vested earlier had the RBAP conformed to their

19

proffered interpretation of ERISA's vesting requirements."  Particularly in light of the Court's conclusion that the RBAP NRA is invalid as a definitional matter, this argument cannot succeed. As alleged in the Complaint, by accepting lump-sum cash-outs when the RBAP illegally defined normal retirement age as five years of service, Plaintiffs unwittingly forfeited a portion of their accrued benefits—namely, the portion of those benefits attributable to future interest credits through an otherwise-valid normal retirement age.  Alternatively, it is also possible that Plaintiffs would have a basis for seeking relief for a violation of the accrual rules if the remedy for such a violation would mirror the remedy for liability on Count One—namely, a whipsaw calculation.

### 2. Whether the Notice Applies Only Prospectively

Defendant argues that the Notice has no bearing on this case and characterizes Plaintiffs' argument to the contrary as an unsupported assertion "that the IRS retroactively changed the vesting rules when it issued Notice 2007-69."  Both of these arguments miss the mark.

First, Plaintiffs do not claim that the IRS changed the law in 2007.  Rather, they argue that the Notice afforded the IRS an opportunity to indicate how it interprets an ERISA regulation dating back to 1977.  In other words, Plaintiffs argue that the Notice provides an authoritative interpretation of existing law, not an announcement of how the law will be applied in the future. In that regard, the Notice is relevant as an aid to interpretation, not as a source of new law.

Second, the plain text of the Notice is incompatible with Defendant's claim that the IRS said nothing about application of preexisting accrual rules.  Defendant relies heavily on the undisputed fact that the Notice is focused principally on a Treasury regulation promulgated after the time period relevant to this case.  To be sure, the Purpose section of the Notice leads with this very concern:  "This notice provides temporary relief, until the first day of the first plan year that begins after June 30, 2008, for certain pension plans under which the definition of normal

20

retirement age may be required to be changed to comply with the regulations relating to a plan's normal retirement age that were recently issued under § 401(a) of the Internal Revenue Code."

In the very next sentence of its Purpose section, however, the Notice adds that it "*also* identifies potential violations of the vesting and accrued benefit requirements for defined benefit plans under § 411 that may arise from a definition of normal retirement age based on a minimum period of service." (emphasis added). As used here, "also" means exactly what one would expect: *in addition to the thing just mentioned*. The structure of the Notice then confirms what the plain language of the Purpose section strongly suggests: Parts II, III, and IV all focus on the new Treasury regulation, while a separate section—Part V—addresses the distinct accrual issue. If that were not confirmation enough, Part V of the Notice expressly cites a 1977 regulation as an example of the sort of accrual rule whose meaning it is addressing—a citation that points firmly toward Plaintiffs' interpretation. Furthermore, the Notice fails to include an effective date or any transition relief—steps that would at least suggest an awareness on the part of the IRS that it is promulgating a new, prospective rule. Defendant cites no authority for the proposition that a Notice cannot simultaneously address prospective matters and preexisting issues—and for good reason, since no such authority exists. Moreover, the Second Circuit has confirmed that Notices of this sort are not subject to "retroactivity" doctrines of the sort advanced by Defendant. *See, e.g.*, *Esden*, 229 F.3d at 171 ("The Plan contends that following Notice 96-8 improperly subjects the Plan to a retrospective application of a subsequent interpretation. We disagree. Because Notice 96-8 is an authoritative interpretation of existing statutes and regulations, we hold that it is valid guidance on the law as it applied at the time of Esden's lump-sum distribution." (citing *Chock Full O' Nuts Corp. v. United States*, 453 F.2d 300, 303 (2d Cir. 1971) ("To the extent that

a regulation interprets or elucidates the meaning of a statute, it is merely explanatory or

confirmatory rather than retroactive.”))).[7]

### 3.     Whether the Notice Merits Deference

Defendant argues in the alternative that the Notice should be disregarded because it was

not created through formal adjudication or notice-and-comment rulemaking, the statute is clear,

and the Notice offers a qualified conclusion without any evident reasoning.  There is some force

to this argument: the Notice is no model of thorough legal analysis and offers only the skeleton

of an explanation for the correctness of its conclusion.  Nonetheless, it would be inappropriate to

set the Notice entirely aside—both because the Notice reflects the IRS's guidance as to its own

view and because the Notice does not contradict any prior IRS statements.  *See Esden*, 229 F.3d

at 169 (affording deference to an IRS Notice and describing some of the relevant grounds for

---

[7] In *dictum* in *McCorkle*, the Fourth Circuit reached the opposite conclusion.  It reached this
question, however, only after concluding that the plaintiff had effectively abandoned this claim
by conceding—as Plaintiffs here do not—that the accrual and "definitional" questions about the
validity of a service-based normal retirement age overlap.  *McCorkle*, 688 F.3d at 172.  "[O]ut of
an abundance of caution," *McCorkle* nonetheless decided to "briefly address" this accrual theory.
*Id.*  As will become clear, *McCorkle*'s discussion of this issue—set forth as brief *dictum*—is
unpersuasive.  With respect to the prospective application issue, *McCorkle* concluded that
"[w]hen read in context, the language cited by Plaintiffs is simply a warning that the safe harbors
described in the Notice for future plan years are not available to a plan wherein 'a participant's
normal retirement age changes to an earlier date upon completion of a stated number of years of
service.'  The safe harbors, in turn, are related to the implementation of the new Treasury
regulations that, the parties agree, are prospective in nature only."  *Id.* at 174.  This reading does
not account for many of the considerations described *supra* and is unpersuasive on those grounds
alone.  In any event, *McCorkle* misreads the Notice.  When the Notice indicates that the 2007
regulations do not address a normal retirement age defined by years of service, it is not
cautioning that the following statements are prospective in nature.  Rather, it is acknowledging
that the new regulations are silent on this matter and then using the opportunity to indicate the
IRS's belief that, separate from those new Treasury rules, some preexisting accrual rules—
notably including the 1977 change-the-base regulation—already imperil such plans.  Given that
the IRS does not indicate that these violations of the accrual rules are the result of the new
regulations, it would be particularly odd to adopt such a cramped view of this statement.

doing so).  Justice Breyer's recent statements about deference, offered in a case where the

relevant federal agency had produced "skimpy" reasoning for its position, best capture the point:

> [E]ven though this case does not fall directly within a case-defined category, such as "*Chevron* deference," "*Skidmore* deference," "*Beth Israel* deference," "*Seminole Rock* deference," or deference as defined by some other case, I believe the agency, in taking a position, nonetheless retains some small but special "power to persuade."  And I would consequently to some degree take account of, and respect, the agency's judgment.

*Wos v. E.M.A. ex rel. Johnson*, 133 S. Ct. 1391, 1403-04 (2013) (Breyer, J., concurring); *see also*

*id.* ("I cannot measure the degree of deference with the precision of a mariner measuring a

degree of latitude.  But it is still worth noting that the agency's determination has played some

role in my own decision.").  Accordingly, the Notice warrants a measure—though only a modest

measure—of deference when it states that plans like the RBAP typically will violate ERISA's

accrual and vesting rules.  At the very least, it suggests the plausibility of Plaintiffs' argument

and, by citing the change-the-base regulation, indicates how such a violation would occur.

> ### 4.    Whether the Notice Bears on the Question Whether the RBAP Violates ERISA's Accrual Rules

The Notice states that "a plan under which a participant's normal retirement age changes

to an earlier date upon completion of a stated number of years of service typically will not satisfy

the vesting or accrual rules of § 411.  *See, e.g.*, § 1.411(b)-1(b)(2)(ii)(F)."  The regulation that the

Notice cites in support of this proposition—§ 1.411(b)-1(b)(2)(ii)(F)—provides as follows:

> (F) Computation of benefit.  *A plan shall not satisfy the requirements of this subparagraph if the base for the computation of retirement benefits changes solely by reason of an increase in the number of years of participation.*  Thus, for example, a plan will not satisfy the requirements of this subparagraph if it provides a benefit, commencing at normal retirement age, of the sum of (1) 1 percent of average compensation for a participant's first 3 years of participation multiplied by his first 10 years of participation (or,

> if less than 10 his total years of participation) and (2) 1 percent of
> average compensation for a participant's 3 highest years of
> participation multiplied by each year of participation subsequent to
> the 10th year.

(emphasis added).  This regulation, also known as the "change-the-base regulation," illustrates

the sort of backloading rule that a normal retirement age defined through years of service might

violate.  By citing the change-the-base regulation, the Notice plainly suggests that a definition

like the RBAP NRA is impermissible for two related reasons: (1) normal retirement age is a key

component of a plan's benefit formula and is thus part of the "base"; and (2) normal retirement

age "changes" within the meaning of § 1.411(b) when a participant reaches the requisite number

of years of service.  The question then arises: does this interpretation withstand scrutiny?  And

the answer quickly follows: yes, it does.  Indeed, the Notice's implicit argument represents the

best view of the law and must therefore govern separate and apart from the matter of deference.

This argument starts from the familiar proposition that the change-the-base regulation

serves a critical purpose.  ERISA's regulations governing how employers may change accrual

rates over time could be eviscerated if employers were also free to change the "base" on which

those rates operate, so ERISA prevents any changes to the "base" in relation to which the rate-

focused regulations are defined.  In the ordinary course, the relevant "base" consists of an

employee's salary.  *See Carollo v. Cement And Concrete Workers Dist. Council Pension Plan*,

964 F. Supp. 677, 681-82 (E.D.N.Y. 1997) ("The regulations under the Act provide that a Plan

may not circumvent this 'rate' requirement simply by changing the 'base' used in the calculation.

Under many pension plans, employees accrue benefits at a percentage of their average monthly

pay.  The percentage is considered the 'rate'; the average monthly pay constitutes the 'base.' . . .

[A] pension plan may not change the base in the accrual formula—e.g. from average monthly

24

pay to highest monthly pay—solely because a participant has worked more years than other participants.").  In light of the rule's purpose, however, and the fact that the plain text does not offer a fuller definition of "base," this provision is best understood as encompassing all non-rate variables—including salary—that are assumed by the rate-focused regulations, such as the 133-1/3% rule, to remain constant in future years.

Defendant pushes back against this position by suggesting that "base" means only "compensation," but this argument is unsupported by text and purpose.  If the regulation's drafters intended to clarify that only salary must be held constant, they could easily have done so by using words like "salary" or "compensation" instead of "base."  Their decision to speak of a "base" connotes a broader view of the textual object and militates against a reduction of this word's meaning to a narrow term that was certainly within the drafters' linguistic toolkit.  More importantly, it would have been nonsensical for the drafters to describe a base in so narrow a fashion.  The point of requiring the base to be held constant is to test for improper manipulations of rates; if employers could sneak under and around this rule by tinkering with the value of the accrued benefits through other means, the drafters' objectives in forging accrual rules could be readily thwarted.  And this is precisely what might happen when normal retirement age is expressed unconventionally, for instance through reference to years of service rather than as a chronological age, since the value of a retirement benefit must be understood in relation to both its dollar amount and the age of the participant at which the benefit becomes payable.  The intuition here is simple: $10,000 today is not worth the same amount as $10,000 after five years of service or $10,000 at age 65.  Because normal retirement age can dramatically affect the value of an employee's retirement benefit—as occurs when an employee's retirement age drops from 65 to, say, 35 and that employee loses a portion of her benefits attributable to future investment

credits—it would be irrational to restrict the definition of "base" solely to the dollar value of an employee's annual compensation.  Thus, when the change-the-base regulation refers to average "compensation," it does so in an exemplary rather than definitional manner.  Judge Siragusa impliedly acknowledged this point in 2002, when he noted that in *Carollo*, "[t]he Eastern District found that by changing the 'base,' *in that case the average monthly pay*, 'solely' by reason of a participant's increased service, [a plan] violated 26 C.F.R. § 1.411(b)–1(b)(2)(ii)(F)."  *Melvin v. UA Local 13 Pension Plan*, 204 F. Supp. 2d 564, 572 (W.D.N.Y. 2002) (emphasis added).  Just as the "base" can consist of "average monthly pay," it may also consist of other non-rate variables.  The fact that the IRS appears to have interpreted "base" this way in the Notice only adds further support to this understanding of the accrual rules.[8]

Concluding that normal retirement age is part of the "base," at least under the unique circumstances of the RBAP NRA, prompts the question whether this base "changes" within the meaning of the change-the-base regulation when a participant reaches five years of service.  This is a close and difficult question.  On the one hand, the base obviously does change: an employee who starts work at age 25 has a normal retirement age of age 65 until the day she completes five years of service, at which point her normal retirement age drops to whatever age she happens to have reached at that point.  On the other hand, on the assumption that employees do not leave the

---

[8] *McCorkle*'s *dicta* reached the opposite result.  After an abbreviated discussion of the change-the-base regulation, that court concluded that the "base" consists only of the "amount upon which benefits were to be calculated," a view it then reformulated as "[the] 'base' means just that: the amount of compensation that, when multiplied by the benefit computation formula, becomes the benefit payable under the plan."  *McCorkle*, 688 F.3d at 175.  However, *McCorkle* did not offer any explanation of how this interpretation of "base" accorded with the regulation's undisputed purpose, did not indicate why its narrow interpretation was required as a matter of textual analysis, and cited only a single district court case as authority for its result—an opinion that, on close inspection, does not stand for so narrow a view.  As a result, *McCorkle*'s brief and incomplete *dictum* on this point—*dictum* that did not take into account the IRS Notice, which *McCorkle* had already dismissed as irrelevant—does not persuade.

26

plan before attaining normal retirement age and vesting, the RBAP NRA never changes in the sense that it is always the earlier of the date on which an employee completes five years of vesting service or reaches age 65.[9]  In other words, while the RBAP's definition of normal retirement age never changes, that unchanging definition contains a built-in trigger that moves a participant's normal retirement age to an earlier moment in time upon satisfaction of a condition. While philosophers may puzzle over the notion of change within stasis, such metaphysical questions are beyond the scope of this opinion.  Presented with the RBAP NRA, the Court must come down in favor of the conclusion that the "base" does, in fact, "change" within the meaning of the regulation.

This result is based on two considerations.  First, the Notice suggests that the IRS prefers this understanding of what it means for a base to change under § 1.411(b)-1(b)(2)(ii)(F).  Given the closeness of the question, the Notice serves as a tiebreaker.  Second, this interpretation best secures the purpose of the change-the-base regulation.  If plans were free to test for backloading

---

[9] In *dictum*, *McCorkle* comes down on this side of the dispute:

> [A] participant's employment is "treated as remaining constant" for the year of his initial employment and "for all years after the current year."  *Id.*  Thus, ERISA would assume the participant's employment continues until actual termination causes a change and would not indulge an artificial assumption the employee would move on within five years of starting.

> When employment is viewed as a constant, Plaintiffs' theory that the NRA *changes* after five years of service falls apart.  Viewing employment as a constant, as 29 U.S.C. § 1054 says we should, an individual who becomes a Plan participant (before age 60) will reach NRA upon five years of vesting service.  Because the Plan does not use an NRA that changes after five years of service, neither 26 C.F.R. § 1.411(b)–1(b)(2)(ii)(F) nor Notice 2007–69 are inapplicable [*sic*].

688 F.3d at 176.

by assuming that any time-of-service conditions that affect the base have already happened—on the theory that employment must be viewed as a constant and all employees will ultimately reach that condition—then the accrual rules could be rendered blind to the very sort of backloading that the regulation exists to prohibit.  After all, if backloading could be expressed as a change in the base that applies to all employees after they reach a certain year of service, and if that kind of change in the base did not qualify as a "change" under § 1.411(b)-1(b)(2)(ii)(F), then employers might too readily thwart the regulation's goal.  In other words, the regulation is undermined if pension plans can assume away any jumps in the *de facto* accrual rate that occur by virtue of additional years of service—e.g., by assuming that all employees will reach normal retirement age and that any retirement benefit accrued by that point has been accrued ratably.

For example, in *Carollo*, Judge Nickerson addressed a plan that changed the base after 25 years and applied that change retroactively.  He explained that a plan "may not change the base because of length of service," adding that "the Plan does exactly that.  It raises the base in the 25th year of service, restricts that raise to the few who have had no break in service longer than two years and at least one year of service after 1980, and gives those favored few a bonanza by making the raise retroactive over their whole careers."  964 F. Supp. 683.  The fact that some employees reached that 25th year and had been subject throughout their employment to that condition did not mean that there was no "change" as to those employees' bases, since the result of retroactive application of this benefit was to massively backload benefits.  *See id.*

Accordingly, the RBAP does violate § 1.411(b)-1(b)(2)(ii)(F).  This interpretation is aided, but not controlled, by the Notice.  While it may seem odd to apply an anti-backloading provision to a plan like the RBAP, which Plaintiffs accuse of *frontloading* rather than *backloading* (since the value of the accrued benefits decreases when an employee hits his fifth

28

year of service, vests, and loses the whipsaw calculation), the text of the regulation does not make this distinction.  It provides only that "[a] plan shall not satisfy the requirements of this subparagraph if the base for the computation of retirement benefits changes solely by reason of an increase in the number of years of participation."  § 1.411(b)-1(b)(2)(ii)(F).  In that regard, it does not operate as a one-way ratchet and its plain text encompasses the RBAP NRA.

In any event, ERISA's change-the-base regulation is not the only source of statutory and regulatory protection for employees.  Section 411(b)(1)(G) further provides that once a benefit has accrued, it may not be reduced solely because an employee continues to work.  *See* 26 U.S.C. § 411(b)(1)(G) ("Notwithstanding the preceding subparagraphs, a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if the participant's accrued benefit is reduced on account of any increase in his age or service.").  For reasons similar to those set forth above with respect to § 1.411(b)-1(b)(2)(ii)(F), the RBAP runs afoul of this accrual provision.[10]

### C.   Motion to Dismiss Count Six

In *Laurent I*, Judge Mukasey held that Plaintiffs had alleged adequately that Defendant's misleading descriptions of the RBAP NRA in SPDs and other documents violated ERISA.  In Count Six of the Second Amended Complaint, Plaintiffs allege two distinct ERISA claims: (1) a claim for equitable relief on the ground that misleading descriptions of the RBAP NRA in SPDs violated regulations requiring SPDs to include "a statement describing the plan's normal retirement age, as that term is defined in section 3(24) of the Act," 29 C.F.R. § 2520.102-3(j)(1); and (2) a claim that Defendant's misleading descriptions of the RBAP NRA in SPDs and other

---

[10] On a phone conference held on July 19, 2013, Defendant suggested that Plaintiffs have waived this argument.  Plaintiffs have not done so, as evidenced by the fact that Defendant squarely addressed this argument—without any suggestion of waiver—in pages 21 and 22 of its brief in support of its motion to dismiss the Second Amended Complaint.

class-wide communications distributed to participants violated ERISA's general fiduciary standards provision, § 404(a).  Defendant seeks dismissal of each of these claims.

As to the first claim, Defendant argues that normal retirement age is a term of art that need not be specifically defined in SPDs, there is no conflict between the RBAP and the SPD, and Plaintiffs fail adequately to allege "actual harm" susceptible to remedy under *CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011).  Because they were addressed and decided in *Laurent I*, the first and second of these arguments are subject to law of the case doctrine.  Judge Mukasey's reasoning in that opinion bears repetition here, as it persuasively controls the analysis:

> Employers are required to distribute SPDs describing pension plan benefits to employees and the SPD "must be sufficiently accurate and comprehensive to apprise participants and beneficiaries of their rights and obligations under the plan."  *Burke v. Kodak Ret. Income Plan*, 336 F.3d 103, 110 (2d Cir. 2003); ERISA § 102 ("[T]he summary plan description . . . shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.").  Specifically, 29 C.F.R. § 2520.102-3(j)(1) states "[f]or employee pension benefit plans, [the SPD] shall also include a statement describing the plan's normal retirement age, as that term is defined in section 3(24) of the Act, and a statement describing any other conditions which must be met before a participant will be eligible to receive benefits."  The SPD may be relied on by employees as the "'primary source of information regarding employment benefits,'" and it controls over conflicting provisions of the pension plan itself.  *Frommert v. Conkright*, 433 F.3d 254, 268-69 (2d Cir. 2006) (quoting *Layaou v. Xerox Corp.*, 238 F.3d 205, 209 (2d Cir. 2001)); *Burke,* 336 F.3d at 110 ("Where the terms of a plan and the SPD conflict, the SPD controls.") . . .
>
> Thus, the normal retirement age provided in the RBAP is invalid, because it was not clearly stated in the SPD and plaintiffs were likely to have been harmed by their reliance on the faulty SPD. Because the SPD, which stated no normal retirement age, controls, the normal retirement age for purposes of the RBAP is the statutory default of age 65.

30

*Laurent I*, 448 F. Supp. 2d at 546-47.  This logic was then affirmed in *Laurent II* and *Laurent III*.

Here, Defendant does not offer any new arguments addressed to *Laurent I*'s conclusion that the SPDs were deficient; more importantly, Defendant's arguments remain unpersuasive. Plaintiffs quote a Department of Labor Regulation that plainly requires "a statement describing the plan's normal retirement age, as that term is defined in section 3(24) of the Act."  *See* 29 C.F.R. § 2520.102-3(j)(1).  Even if the SPDs accurately described certain respects in which the RBAP operates, this failure—the apparent intention of which was to disguise the unconventional and potentially controversial nature of the RBAP NRA—suffices to constitute a violation of the standards governing SPDs.[11]  It may well be sensible to require a clear statement of the normal retirement age: that piece of data is critical to the valuation of pension benefit plans and its clear communication to readers of an SPD may play an important role in shaping their understanding of how the plan works.  That is to say, "normal retirement age" is, as Defendant insists, a "term of art"—and its importance to a plan member's understanding may be so great that it must be expressed in a certain fashion.  By refusing to comply with those rules in its SPDs, Defendant violated ERISA's clear command.

Contrary to Defendant's protestation that Plaintiffs can no longer demonstrate any sound legal basis for equitable relief, the intervening change of law wrought by *Cigna* does not produce a different result.[12]  In *Cigna*, the Supreme Court noted that, although "Section 502(a)(3) invokes

---

[11] The obvious question to ask is why Defendant made the highly unusual choice to depart from clear regulations and industry practice by not including a description of the RBAP NRA.  The answer to this question might shed light on the significance that Defendant itself ascribes to including a normal retirement age in an SPD.

[12] To the extent that *Laurent I* relied on any pre-*Cigna* doctrine, law of the case deference does not apply and the intervening change of governing Supreme Court precedent controls.  *Laurent*

the equitable powers of the District Court," "[t]he relevant substantive provisions of ERISA do not set forth any particular standard for determining harm."  131 S. Ct. 1881.  As a result, the Court reasoned, "any requirement of harm must come from the law of equity."  *Id.*  Exploring the historic powers of equity courts, *Cigna* held that "under appropriate circumstances, § 502(a)(3) may authorize three possible equitable remedies: estoppel, reformation, and surcharge."  *Skinner v. Northrop Grumman Ret. Plan B*, 673 F.3d 1162, 1165 (9th Cir. 2012) (citing *Cigna*, 131 S. Ct. at 1878-80).  Each of these remedies is associated with a different harm requirement.  *See Cigna*, 131 S. Ct. at 1881 ("To the extent any such [harm] requirement arises, it is because the specific remedy being contemplated imposes such a requirement.").

Thus, whereas estoppel requires detrimental reliance, no such requirement attaches to reformation or surcharge.  *See id.*  Rather, reformation of contracts like the RBAP may be appropriate "where fraudulent suppressions, omissions, or insertions materially . . . affected the substance of the contract, even if the complaining party was negligent in not realizing its mistake, as long as its negligence did not fall below a standard of reasonable prudence and violate a legal duty."  *Id.* (citations, quotation marks, and alterations omitted).  Although the Ninth Circuit has observed that "[i]t is unclear whether we should analyze reformation in the context of trust law or contract law because retirement plan documents are similar to both trusts and contracts," that same court recognizes that "[u]nder both theories . . . reformation is proper only in cases of fraud and mistake."  *Skinner*, 673 F.3d at 1166.  In *Amara*, the Court hinted that reformation may have been warranted because the employer "intentionally misled its employees," *Cigna*, 131 S. Ct. at 1874, 1880, and Judge Arterton embraced that suggestion on

---

*I*'s analysis of this cause of action is therefore repudiated to the extent it is inconsistent with the discussion of equitable remedies and harm set forth in this opinion.

32

remand, imposing the remedy of reformation because "there was mistake on one side and fraud or inequitable conduct on the other," *Amara v. CIGNA Corp.*, 84 Fed. R. Serv. 3d 422, at *8 (D. Conn. 2012) (quotation marks and citation omitted).[13]   At this early stage in the litigation, without the benefit of a Second Circuit assessment of *Cigna*, and in light of Plaintiffs' detailed allegations of fraud and mistake, the Court cannot conclude as a matter of law that it would be implausible for Plaintiffs to satisfy this requirement for an equitable remedy.

In the alternative, *Cigna* explains that the equitable remedy of surcharge may apply where a plaintiff can show "actual harm," which "may sometimes consist of detrimental reliance, but . . . might also come from the loss of a right protected by ERISA or its trust-law antecedents."  131 S. Ct. at 1881.  On the facts before him, Justice Breyer reasoned in *Cigna* that "it is not difficult to imagine how the failure to provide proper summary information, in violation of the statute, injured employees even if they did not themselves act in reliance on summary documents—which they might not themselves have seen—for they may have thought fellow employees, or informal workplace discussion, would have let them know if, say, plan changes would likely prove harmful."  *Id.*  Ultimately, "to obtain relief by surcharge for violations of §§ 102(a) and 104(b), a plan participant or beneficiary must show that the violation injured him or

---

[13] Judge Arterton explained:

> CIGNA's deficient notice led to its employees' misunderstanding of the content of the contract, and CIGNA did not take steps to correct their mistake.  Instead, CIGNA affirmatively misled and prevented employees from obtaining information that would have aided them in evaluating the distinctions between the old and new plans.  Furthermore, CIGNA sought and obtained an advantage from its inequitable actions.  As a result of CIGNA's fraud, its employees were mistaken as to their retirement benefits.

*Amara*, 84 Fed. R. Serv. 3d 422, at *5-6 (quotation marks and citations omitted).

her . . . [a]lthough it is not always necessary to meet the more rigorous standard implicit in the words 'detrimental reliance,' actual harm must be shown."  *Id.* at 1881-82.

In *Laurent I*, Judge Mukasey applied the Second Circuit's pre-*Cigna* standards to test for the requisite harm.  *See* 448 F. Supp. 2d at 547.  He concluded that

> Plaintiffs likely were harmed, because it was reasonable for plaintiffs to assume that they would continue to accrue interest credits until age 65 even if they terminated their employment before that point, thus grossly overestimating the value of their pension benefits.  "There is no doubt about the centrality of ERISA's object of protecting employees' justified expectations of receiving the benefits their employers promise them."  *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004).  Additionally, because plaintiffs were not informed that the normal retirement age under the RBAP was five years, they were prevented from immediately "seeking injunctive relief, altering their retirement investment strategies, or perhaps considering other employment," which is enough to meet the likely prejudice standard.  *Frommert*, 433 F.3d at 267.  An "employer may rebut a showing of likely prejudice by demonstrating that the deficiency was in fact a harmless error." *Frommert*, 433 F.3d at 267.  PWC has not made such a showing

*Id.*  Much of this logic retains vitality under *Cigna*'s "actual harm" standard.  Plaintiffs allege that, as a result of Defendant's deception and in light of the RBAP NRA's invalidity, they lost part of their accrued benefits.  As Plaintiffs allege in ¶ 83 of the Second Amended Complaint:

> Had Defendant calculated and paid lump sums using 65 as the statutory [normal retirement age], as required, participants would have received the full amount of accrued benefits to which they were legally entitled under the terms of the Plan and ERISA.  As it was, Plaintiffs . . . unwittingly forfeited a significant portion of their accrued benefits solely because they elected to receive benefits in the form of a single sum following termination of employment rather than as an annuity commencing at age 65.

Plaintiffs further allege that they lost the opportunity "to challenge [] Defendants' benefit calculation methodology" and "to timely react to, internally challenge and/or externally contest

Defendants' forfeiture of their benefits" (¶ 102), and that they were deprived of a chance to "file[] suit to seek the relief sought via this action" (¶ 104). Had the SPD complied with ERISA, it is also possible that plan members may have altered their investment strategies, sought alternative employment (either in pursuit of what they perceived to be a superior pension plan or out of disgust with Defendant's perceived machinations), or demanded government intervention. *Cf. Laurent I*, 448 F. Supp. 2d at 547. These allegations suffice to satisfy the requirement post-*Cigna* that Plaintiffs plausibly allege actual harm resulting from the alleged violation. As a result, it is plausible that Plaintiffs may be entitled to the equitable remedy of surcharge.[14]

  Accordingly, as in *Laurent I*, Defendant's motion to dismiss Plaintiffs' cause of action arising from deficient SPDs must be denied.

  This leaves only Plaintiffs' claim that Defendant's misleading descriptions of the RBAP NRA in SPDs and other class-wide communications distributed to participants violated ERISA's general fiduciary standards provision, § 404(a). Here, Defendant responds by identifying three grounds for dismissal: (1) the absence of any benefit forfeiture scheme; (2) the three-year statute of limitations for fiduciary duty claims under ERISA; and (3) failure to allege actual harm. The first of these responses can be set aside at the outset, since it depends on the already-rejected assumption that the RBAP NRA does not violate ERISA's vesting standards or accrual rules, and the third response falters for the reasons set forth in the discussion *supra* regarding harm under *Cigna*.

---

[14] Defendant has suggested at various points that any loss of an opportunity to contest its decision regarding the RBAP would not constitute harm because Defendant would never have changed its mind; in other words, that this actual harm was actually harmless. That claim is beyond the scope of this motion to dismiss, as the Court must take its facts from the Second Amended Complaint. In any event, "loss of opportunity to object" is not the only kind of actual harm that Plaintiffs allege in support of an equitable remedy on this cause of action.

This leaves only Defendant's second argument, which does not succeed.  The statute of limitations defense relies on 29 U.S.C. § 1113, an "enigmatic—almost chimerical—statute of limitations that applies to actions for breach of fiduciary duty under the Employee Retirement Income Security Act ("ERISA")."  *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 184 (2d Cir. 2001).  "Held together by chewing gum and baling wire," *id.* at 188, it provides:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—
>
>> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
>>
>> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

In *Caputo*, the Second Circuit held that "the six-year statute of limitations should be applied to cases in which a fiduciary: (1) breached its duty by making a knowing misrepresentation or omission of a material fact to induce an employee/beneficiary to act to his detriment; *or* (2) engaged in acts to hinder the discovery of a breach of fiduciary duty."  267 F.3d at 190.[15]  The *Caputo* court also clarified the "actual knowledge" requirement: "[A] plaintiff has 'actual knowledge of the breach or violation' within the meaning of [§ 1113(2)] when he has knowledge

---

[15] The Circuit explained that "Congress intended to provide a lengthier statute of limitations where the fiduciary breached its duty by misrepresenting or failing to disclose a material fact that ERISA required the fiduciary to disclose, most likely because such violations would be difficult to discover."  267 F.3d at 190.  The fraud, however, must be alleged with the particularity demanded in Federal Rule of Civil Procedure 9(b).  *Id.* at 191.

of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act." *Id.* at 193.  "While a plaintiff need not have knowledge of the relevant law, he must have knowledge of all facts necessary to constitute a claim . . . However, [t]he disclosure of a transaction that is not inherently a statutory breach of fiduciary duty . . . cannot communicate the existence of an underlying breach." *Id.* (citations and quotation marks omitted).  In other words, constructive knowledge does not suffice.  *See id.* at 194-95.  Thus, because the defendant's actions in *Caputo* were not "inherently suspect" and did not, standing alone, "constitute a breach of fiduciary duty or an ERISA violation," the Second Circuit did not find "actual knowledge." *Id.* at 193; *see also id.* ("Although the announcement should have (and did) give plaintiffs reason to *suspect* that Pfizer had lied to them, it is not enough that [plaintiffs] had notice that something was awry; [plaintiffs] must have had specific knowledge of the actual breach of duty upon which [they sued]." (quotation marks and citation omitted)); *Perlman v. Fid. Brokerage Servs. LLC*, No. 11 Civ. 326, 2013 WL 1201237, at *11 (E.D.N.Y. Mar. 26, 2013) ("The alleged breach of fiduciary duty at issue in *Caputo* was an employer misrepresenting facts about plaintiffs' pension benefits.  The Second Circuit explained that the plaintiffs could not have had 'actual knowledge' of the breach at the time that their employer first provided the information, for it was not until later that they learned new facts which led them to believe that their employer's prior representations had been false." (citations omitted)).

Defendant argues that Plaintiffs had actual knowledge of the basis for their claim no later than April and May 2002, at which time they did not receive any whipsaw calculation and should have been placed on notice that the RBAP was not paying them such amounts.  Relying on this premise, Defendant argues that the three-year statute of limitations applies because Plaintiffs cannot avail themselves of the "fraud or concealment" exception.  Plaintiffs dispute Defendant's

first contention: that Plaintiffs had "actual knowledge" as of 2002.  Because Plaintiffs prevail on

that point, there is no need to reach the "fraud or concealment" issue.

Based on the facts alleged in the Complaint, Plaintiffs knew in April and May 2002 that

their lump sum payment was equal to their account balances.  But they knew little more about

the alleged breach of fiduciary duty.  As they allege in ¶ 112 of the Second Amended Complaint:

> Plaintiffs and other Plan participants did not independently
> discover that the Plan document defined the RBAP-defined NRA
> as the earlier of 5 years of service or age 65.  Defendants kept the
> formal Plan document closely held and did not distribute it to
> Plaintiffs or virtually any other participant outside a small group
> charged with drafting and administering the Plan.  The only time
> Defendants provided a participant not involved with Plan
> administration access to or a copy of the formal plan document
> was if a participant made a formal request in writing for a copy of
> or for the right to inspect the formal plan document.  But
> Defendants' communications did not give ordinary participants
> any reason to believe they might need to inspect the formal plan
> document to protect themselves. Consequently, from 1994 to 2006,
> only a small handful of participants not involved with Plan
> administration ever asked for a copy of or for the right to inspect
> the formal plan document.

Plaintiffs further allege in ¶ 136 that "Defendants' disclosure violations delayed the discovery of

their benefit forfeiture scheme until 2004 when Mr. Laurent learned of it only through counsel

who independently discovered and informed Plaintiff of it."

In 2002, Plaintiffs allegedly did not know how the RBAP defined normal retirement age,

did not know that the SPD violated applicable standards by failing to describe normal retirement

age, and did not know that the RBAP NRA violated any law.  They did not know about any of

the alleged actions taken by Defendant to conceal the RBAP NRA from its employees—even as

it admittedly trumpeted this scheme to a wider world of pension specialists and regulators—and

they did not know about any of the alleged fraudulent actions taken by Defendant in relation to

the SPDs.  Receipt of a lump sum benefit equal to their account balance was not "inherently

suspect" and was not, itself, the breach of fiduciary duty relevant to the sixth cause of action.

*See Caputo*, 267 F.3d at 193.  Although *Caputo* makes clear that Plaintiffs are not required to

know the applicable law, Plaintiffs satisfactorily and plausibly allege that they were ignorant of

key *facts*—though it must be acknowledged that in a case like this one, some of the "facts"

pertinent to "actual knowledge" overlap with legal questions (*e.g.*, knowing that the SPD was

more than just sketchy or that the RBAP NRA was more than unusual).[16]  Accordingly,

Defendant's argument that the three-year statute of limitations set forth in 29 U.S.C. § 1113

controls Plaintiffs' claim for breach of fiduciary duty must be rejected.

---

[16] Defendants cite two cases for the contrary proposition.  These cases, however, do not bear
directly on this analysis.  One case involves application of the "broad" approach to "actual
knowledge" set forth by the Sixth Circuit in *Wright v. Heyne*, 349 F.3d 321 (6th Cir. 2003), to a
very different kind of manipulation by a Plan Administrator, such that receipt of a lump sum
payment in that context could be found to afford actual notice of an improper calculation of
benefits.  *See Durand v. Hanover Ins. Grp., Inc.*, No. 07 Civ. 130, 2011 WL 1302227, at *7-8
(W.D. Ky. Mar. 31, 2011).  The other case concluded that receipt of lump-sum distributions
qualified as unequivocal repudiation of any entitlement to benefits beyond the account balance
where the participants had repeatedly received accurate information from the Plan indicating that
this would be the effect of any such receipt of distributions.  *See Thompson v. Ret. Plan for
Employees of S.C. Johnson & Son, Inc.*, 651 F.3d 600, 606 (7th Cir. 2011).  In *Thompson*,
however, the circumstances offered strong reason to believe that the participants knew
everything they needed to know in order to trigger the limitations clock.  *See id.* at 606-07.  To
the extent that the issues in *Durand* and *Thompson* are analogous to the question here, the limits
of that analogy are exceeded by differences that bear on Plaintiffs' knowledge.

**III.    Conclusion**

For the foregoing reasons, Defendant's motion to dismiss is DENIED.

The Clerk of Court is directed to terminate the motion entry at Dkt. No. 137.

SO ORDERED.


Dated: New York, New York
       August 8, 2013

_____
                J. PAUL OETKEN
           United States District Judge