UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TIMOTHY LAURENT, *et al.*,

                      Plaintiffs,

-v-

PRICEWATERHOUSECOOPERS LLP, *et al.*,

                      Defendants.

06-CV-2280 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

      This action is brought by Plaintiffs Timothy Laurent and Smeeta Sharon, on behalf of themselves and all others similarly situated, against Defendants PricewaterhouseCoopers LLP, the Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP, and the Administrative Committee to the Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP (collectively, "PWC") under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et. seq*. The Court previously granted PWC's motion for judgment on the pleadings, and denied Plaintiffs' motion for summary judgment, on the grounds that Sections 502(a)(1)(B) and 502(a)(3) of ERISA did not provide the relief that Plaintiffs sought. (*See* Dkt. No. 236.)

      On appeal, the Second Circuit vacated this Court's decision, concluding that ERISA authorizes the relief sought by Plaintiffs. (*See* Dkt. No. 254.) Following that decision, PWC moved to decertify the class under Federal Rule of Civil Procedure 23(b)(2). (Dkt. No. 260.) This Opinion first considers PWC's decertification motion and then reconsiders Plaintiffs' motion for summary judgment in light of the Second Circuit's opinion. For the reasons that follow, PWC's motion to decertify the class is denied and Plaintiffs' motion for summary judgment is granted as to liability.

1

I.      **Motion to Decertify the Class**

    A.      **Background**

The Court presumes familiarity with this case, as set forth in the Court's prior opinions. *See Laurent v. PricewaterhouseCoopers, LLP*, No. 06 Civ. 2280, 2017 WL 3142067, at *1–*2 (S.D.N.Y. July 24, 2017); *Laurent v. PricewaterhouseCoopers, LLP*, No. 06 Civ. 2280, 2014 WL 2893303, at *1 (S.D.N.Y. June 26, 2014). In its June 26, 2014 Opinion and Order, the Court determined that Plaintiffs had satisfied the requirements of Rule 23(b)(2) and demonstrated that each member of the Plaintiff class would be entitled to identical declaratory relief if Plaintiffs prevailed. (Dkt. No. 175.) PWC now moves to decertify the class primarily based on the Second Circuit's vacatur, *see Laurent v. PricewaterhouseCoopers LLP*, 945 F.3d 739 (2d Cir. 2019) ("*Laurent 2019*"), of the Court's July 24, 2017 Opinion and Order granting PWC's motion for judgment on the pleadings and denying Plaintiffs' motion for summary judgment (*see* Dkt. No. 236.) The Second Circuit concluded that ERISA authorized Plaintiffs to recover under a two-step remedy — reformation of the Plan under § 502(a)(3) and then enforcement of the reformed Plan under § 502(a)(1)(B) — and remanded the action to this Court. (*See* Dkt. No. 236 at 17.) PWC argues that a 23(b)(2) class cannot be maintained for the two-step remedy endorsed by the Second Circuit. (Dkt. No. 261.)

    B.      **Legal Standard**

Once a class is certified, "Rule 23 provides district courts with broad authority at various stages in the litigation to revisit class certification determinations and to redefine or decertify classes as appropriate." *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 594 (S.D.N.Y. 2013) (quoting *Wang v. Chinese Daily News, Inc.*, 709 F.3d 829, 836 (9th Cir.), *superseded on other grounds by* 737 F.3d 538 (9th Cir. 2013)); *see* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). While "[a]

2

court may decertify a class if it appears that the requirements of Rule 23 are not in fact met . . . [it] may not disturb its prior findings absent some significant intervening event or a showing of compelling reasons to reexamine the question." *Mazzei v. Money Store*, 308 F.R.D. 92, 106 (S.D.N.Y. 2015) (internal quotation marks and citations omitted). Such a compelling reason includes "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Id.* (quoting *Gulino v. Bd. of Educ.*, 907 F. Supp. 2d 492, 504 (S.D.N.Y. 2012), *aff'd*, 555 Fed. Appx. 37 (2d Cir. 2014) (summary order)); *see also Stinson v. City of New York*, No. 10 Civ. 4228, 2014 WL 4742231, at *1 (S.D.N.Y. Sept. 23, 2014) (collecting cases). Absent such a showing, "the factual underpinnings of a court's prior certification order are deemed to be law of the case." *Id.* at *2 (internal quotation marks and citation omitted).

"Decertification is an 'extreme step,' particularly at a late stage in the litigation, 'where a potentially proper class exists and can easily be created.'" *Gulino*, 907 F. Supp. 2d at 504 (quoting *Woe v. Cuomo*, 729 F.2d 96, 107 (2d Cir.1984) (internal quotation omitted)). "A defendant seeking to decertify a class 'bear[s] a heavy burden to prove the necessity of either the drastic step of decertification or the less draconian but still serious step of limiting the scope of the class.'" *Id.* (quoting *Gordon v. Hunt*, 117 F.R.D. 58, 61 (S.D.N.Y.1987)).

C.   **Discussion**

PWC argues that the Court must evaluate class certification separately for each "step" of the two-step remedy that the Second Circuit has endorsed in this case. Neither step, in PWC's view, is appropriate for Rule 23(b)(2) class certification. PWC asserts that the first step of the remedy — reformation of the Plan under § 502(a)(3) — is inappropriate because it is a "preparatory" step for the "ultimate relief" of the recalculated benefits that Plaintiffs seek, not "*final* injunctive relief" as Rule 23(b)(2) requires. (Dkt. No. 261 at 2.) For this first step, PWC

also raises a separate standing issue: Since the Class comprises only former Plan participants who have cashed out of the Plan, PWC argues that no Class member has standing to reform a Plan that no longer applies to them. *Id.* PWC further contends that the second step of the remedy — enforcement of the reformed Plan under § 502(a)(1)(B) — would provide only money damages and therefore would also not provide "final injunctive relief." (Dkt. No. 261 at 3.) Here, too, PWC makes an additional argument: Allowing class certification for the enforcement of the reformed Plan would impermissibly preclude PWC from asserting individualized defenses. *Id.* None of these arguments presents a persuasive reason to decertify the Class.

> 1. **Rule 23(b)(2) Class Certification for Reformation**

PWC's position that reforming the Plan under § 502(a)(3) of ERISA is not "final relief" available under Rule 23(b)(2) is foreclosed by precedent. "[R]eformation is consistent with Rule 23's requirement[s]" when it is a "precursor" to injunctive relief. *Amara v. CIGNA Corp.*, 775 F.3d 510, 523 (2d Cir. 2014) ("*Amara V*") (internal quotation marks omitted). The ultimate relief requested here is injunctive. An order "requiring defendants to enforce a [reformed] plan," which in turn requires the defendants to provide certain benefits, is "injunctive" because "reformation can be properly understood as a declaration of the plaintiffs' rights under the plan and an injunction order the plan to be reformed to reflect that declaration." *Id.* That the Second Circuit referred to reforming the Plan here as "preparatory," *Laurent 2019*, 945 F.3d at 749, does not make it incompatible with Rule 23(b)(2)'s requirements.

Instead, the key question is whether reforming the contract here would be a precursor to appropriate final injunctive relief under Rule 23(b)(2). The answer to that question is yes. *Amara V*, relying on *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011), confirms that an order "requiring defendants to enforce a [reformed] plan," which in turn required the defendants in that case to provide certain benefits, is proper "injunctive" relief. *Amara V*, 775 F.3d at 523. This is

4

because "reformation can be properly understood as a declaration of the plaintiffs' rights under the plan and an injunction ordering the plan to be reformed to reflect that declaration." *Id.*

PWC's attempts to distinguish this case from *Amara V* are unpersuasive. *Amara V* and the Second Circuit in this case endorsed the same remedy: reforming a pension plan to conform with ERISA's requirements and enforcing the reformed pension plan. PWC points out that *Amara V* permitted this remedy to come entirely under § 502(a)(3), while the full relief here would flow in part from § 502(a)(3) and in part from § 502(a)(1)(B). (*See* Dkt. No. 265 at 3.) Yet PWC does not make a case for why this distinction matters. Nor does PWC explain why *Amara V*'s evaluation of reformation as an appropriate remedy under Rule 23(b)(2) should not apply here. The Second Circuit's opinion in *Laurent* suggests that there is little daylight between the remedy it endorsed here and the remedy in *Amara V*. *See Laurent 2019*, at 749 ("[W]e have already expressly affirmed a two-step remedy of reformation-and-enforcement.")

### 2. Article III Standing for Reformation

PWC's argument that Plaintiffs lack Article III standing is equally unpersuasive. PWC notes that the Class comprises only "cashed-out former Plan participants." (Dkt. No. 261 at 13.) So, it is PWC's view that Plaintiffs lack standing to pursue an injunction since only retrospective relief, *i.e.,* money damages, could compensate Plaintiffs for not receiving full benefits. This argument is also foreclosed by *Amara V*. The class in *Amara V* sought "prospective injunctive relief," and the Second Circuit found that the class "would benefit from such a decree," *Amara V*, 775 F.3d at 524 n.9, even though the majority of the members of the class were former participants under the plan in that case, *see* Br. of Defendants-Appellees at 25, *Amara V*, 775 F.3d 510 (2d Cir. 2014) (No. 13-447). The Second Circuit then upheld the district court's denial of the motion to decertify the class. *Id.* at 520.

That the Class here is composed exclusively of former Plan participants, unlike the majority-former-participant class in *Amara V*, makes no difference.  PWC argues that *Amara V* is distinguishable because its plaintiff class had some current plan participants.  But this argument ignores that the Second Circuit upheld the denial to decertify the *Amara V* class for *all* its members, both current and past plan participants.  This decision necessarily means that the Second Circuit concluded that *all* the class members had standing to seek prospective injunctive relief; as Plaintiffs rightly assert, "no class may be certified that contains members lacking Article III standing."  *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006).  In any event, the Second Circuit has explicitly rejected the argument that "the only beneficiaries with standing to pursue reformation [of an ERISA-governed plan] are those that can *prospectively* benefit from a modification of plan terms, which does not include former employees."  *Osberg v. Foot Locker, Inc.*, 555 Fed. App'x. 77, 81 (2d Cir. 2014) (summary order).

### 3. Rule 23(b)(2) Class Certification for Enforcing a Reformed Plan

PWC also contends that the second "step" of the remedy here – enforcing the reformed Plan under § 502(a)(1)(B) — is in fact just a "claim for monetary damages," making it not "appropriate final injunctive relief" as Rule 23(b)(2) requires.  (Dkt. No. 261 at 16-17.)  This position is untenable given that PWC simultaneously recognizes that *Amara V* endorsed a "reformation-and-enforcement remedy" for a 23(b)(2) class (Dkt. No. 265 at 8), the same remedy the Second Circuit approved for this case.  PWC again tries to contrast *Amara V* from this case by making a mountain out of a "two-step" molehill:  The remedy in *Amara V* proceeded under § 502(a)(3) while the remedy here proceeds in two steps under § 502(a)(3) and § 502(a)(1)(B).  *Id.*  PWC asserts that this necessitates analyzing this second step here as "a separate 'form of relief,'" something it asserts the *Amara V* court did not need to do.  (Dkt. No. 261 at 16-17 (citing *Hunter v. Time Warner Cable Inc.*, No. 15 Civ. 6445, 2019 WL 3812063, at *17 (S.D.N.Y. Aug. 14,

6

2019)).  Even if the Court accepts the dubious position that the same "reformation-and-enforcement remedy" from *Amara V* is distinguishable here because it flows from two different ERISA subsections instead of one, the argument that the remedy transgresses Rule 23(b)(2) is still unconvincing.  The *Amara V* court separately upheld both "the district court's reformation remedy *and* award of monetary damages . . . under Rule 23(b)(2)," the latter of which was a consequence of the district court's enforcing the reformed plan.  *Amara V*, 775 F.3d at 522 (emphasis added).

### 4. Individualized Defenses to Enforcing a Reformed Plan

PWC also argues that allowing Rule 23(b)(2) certification here would violate its due process rights because it would "preclude [PWC] from asserting its individual defenses." (Dkt. No. 261 at 18.)  PWC discusses three individualized defenses in its briefing: (1) recovery for partners and principals under the Plan would be a "windfall" because PWC contributed to their pensions; (2) a whipsaw remedy for some Plan participants would "operate differently" because they were former personnel of Coopers & Lybrand ("C&L") before that company merged with PWC and received in whole or in part a lump sum calculated from a C&L formula and not the Plan formula; and (3) legacy C&L personnel in the Class who were staff members during 1998-99 do not have "a viable whipsaw claim" for this portion of time since their contributions that year "receive[d] interest credits at the 30-Year Treasury securities rate."  (Dkt. No. 261 at 18–20.)  For its argument to decertify the Class, PWC primarily relies on *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).  The Supreme Court in *Dukes* reversed the certification of a Rule 23(b)(2) class, in part because the defendant would not be able to "litigate its statutory defenses to individual claims" under Title VII.  *Id.* at 367.  Interpreting Rule 23(b)(2) in *Dukes* to allow a class action would thus violate the Rules Enabling Act, the Court held, because the Act prohibited interpreting Rule 23(b)(2) to "abridge . . . any substantive

7

right." *Id.* (internal quotation marks omitted). Here, PWC raises no statutory defenses — in fact, it acknowledges that its three individualized defenses are "equitable." (Dkt. No. 265 at 9.) But PWC contends that the Rules Enabling Act would also be violated here because PWC's substantive rights to assert equitable defenses would be abridged if the Class is not decertified. (Dkt. No. 261 at 18.)

PWC is mistaken. Unlike statutory defenses, equitable defenses are "'beside the point'" in enforcing a valid ERISA plan. *See U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 97 (2013) (quoting Restatement (Third) of Restitution and Unjust Enrichment § 2(2) (2010)). In *McCutchen*, the Supreme Court refused to override the terms of an ERISA plan, even if it would give the petitioner a "windfall," *id.* at 94, because the petitioner was owed "what [it] bargained for in a valid agreement," *id.* at 98. Once the Court reforms the Plan to fully comply with ERISA, the same will be true here.[1]

Accordingly, PWC's motion to decertify the class is denied.

---

[1] For PWC's second and third individualized defenses, Plaintiffs do not contest that some former C&L personnel received lump sums not fully derived from the Plan's formula, or that "former C&L personnel *have no whipsaw claim* for account balances earned during the 1-year transition period when the interest crediting rate was the 30-year Treasury rate." (Dkt. No. 264 at 24–25.) Plaintiffs just argue that neither of these facts warrants decertifying the Class because "ministerial" adjustments can be made before granting relief: only the portion of C&L personnel's lump sums derived from the Plan formula would need to be recalculated, and the 1998-99 transition year would be excluded from any recalculated benefits for C&L personnel. *Id.* The Court agrees. These adjustments are the kind that are "mechanical, formulaic, a task not for a trier of fact but for a computer program," so class certification is still appropriate here. *Johnson v. Meriter Health Servs. Employee Retirement Plan*, 702 F.3d 364, 372 (7th Cir. 2012) (Posner, J.).

## II. Motion for Summary Judgment

### A. Background

The Court again presumes familiarity with this case, as set forth in the Court's prior opinions. *See Laurent v. PricewaterhouseCoopers*, LLP, No. 06 Civ. 2280, 2017 WL 3142067, at *1–*2 (S.D.N.Y. July 24, 2017); *Laurent v. PricewaterhouseCoopers*, LLP, No. 06 Civ. 2280, 2014 WL 2893303, at *1 (S.D.N.Y. June 26, 2014). Plaintiffs renew their motion for summary judgment, arguing that the Court should interpret the Plan's normal retirement age to be 65 and conclude that the Plan unlawfully used the 30-year Treasury interest rate as a projection rate in whipsaw calculations. (*See* Dkt. No. 217.) For this latter claim, Plaintiffs also seek relief: reforming the Plan so its projection rate equals a 20-year average annualized return PWC reported in model portfolios it gave to Plan participants. (*See* Dkt. No. 217 at 20; Dkt. No. 221-3.) The relevant facts for this motion are detailed with greater particularity below.

#### 1. Normal Retirement Age in the Plan

The Plan defined its normal retirement age ("NRA") as "[t]he earlier of the date a Participant attains age 65 or completes (5) Years of Service." (Dkt. No. 225 ¶ 1.) The Court determined that this definition of NRA violated ERISA; the Second Circuit reached the same conclusion albeit on different grounds. *See Laurent v. PriceWaterhouseCoopers LLP*, 963 F. Supp. 2d 310, 322 (S.D.N.Y. 2013), *aff'd on other grounds*, 794 F.3d 272 (2d Cir. 2015) ("*Laurent V*"). The Second Circuit held that the five years of service clause was unlawful because it bore "no plausible relation to 'normal retirement.'" *Laurent V*, 794 F.3d at 273.

#### 2. Projection Rate in the Plan

The Plan allowed some participants to "elect a lump sum payment, [and] such payment was 'calculated by projecting the Deemed Account Balance to Normal Retirement Age using the Deemed Plan Interest Rate[] of his or her Deemed Account Balance" (Dkt. No. 228-1 § 5.1),

9

"and discounting back to the date of distribution using [the] 30-year Treasury rate [(Dkt. No. 228-1 § 2.2)]." (Dkt. No. 225 ¶ 7.) The Plan's "Deemed Plan Interest Rate" was the "interest rate on 30-Year Treasury securities." (Dkt. No. 228-1 § 2.16.) The interest rate for participants' accounts, however, was not the interest rate on 30-year Treasury securities. Instead, the Plan credited interest to participants' accounts based on the investment decisions that participants made. (Dkt. No. 228-1 § 2.14.)

In 2014, the IRS issued a Technical Advice Memorandum ("TAM") on the Plan. (*See* Dkt. No. 228-2.) One issue the memorandum explored was "[w]hether the Plan's definition of the Accrued Benefit causes the Plan to fail any requirements of sections 411 and 417(e)(3) of the Internal Revenue Code." (Dkt. No. 228-2 at 5037.) The IRS concluded that the Plan failed to "satisfy the requirements of sections 411 and 417(e)" of the Internal Revenue Code. (Dkt. No. 228-2 at 5045.) According to the TAM, the law required PWC's "projected interest crediting rate used to determine the accrued benefit [to be] the same interest rate used to provide credits to the cash balance account." (Dkt. No. 228-2 at 5042.) The TAM noted that there was a "mismatch" of these two rates within the Plan: the Plan's "Deemed Plan Interest Rate," which it used to project accrued benefits, was the 30-year Treasury securities rate but the Plan credited interest on accounts based on "equity rates of return." (Dkt. No. 228-2 at 5044.)

### B.   Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense." *Cohen Lans LLP v. Naseman*, No. 14 Civ. 4045, 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017)

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence." *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12 Civ. 5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014). The Court must view all evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in its favor," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation marks and citations omitted).

### C. Discussion

There is no genuine dispute that the Plan unlawfully defined NRA. The parties dispute only whether the Court can appropriately grant relief for this claim at the summary judgment stage. For the Plan's use of the interest rate on 30-year Treasury securities as a projection rate, the parties dispute both whether this was lawful, and if not, whether the Court can appropriately grant relief for this claim at the summary judgment stage. The Court, for the reasons that follow, concludes that: (1) the Plan's normal retirement age is 65; (2) the Plan unlawfully used the 30-year Treasury interest rate as a projection rate; but (3) there remains a genuine dispute over what the proper projection rate should be.

#### 1. Reforming the Plan's Normal Retirement Age

Because the Court held, and the Second Circuit agreed, that the Plan's definition of normal retirement age violates ERISA, the Court must now determine whether there is a genuine dispute over what the Plan's lawful NRA should be. Plaintiffs argue that there is not a genuine dispute: Since the Court and the Second Circuit held only the "(5) Years of Service" clause unlawful from the full NRA definition in the Plan of "[t]he earlier of the date a Participant attains

11

age 65 or completes (5) Years of Service" (Dkt. No. 225 ¶ 1), the NRA should be "age 65" as set out in the first clause of the Plan section. (Dkt. No. 217 at 13.) The Court agrees. As the Second Circuit noted, defining NRA as 65 is not only lawful under ERISA, but "it is also the default normal retirement age under the plan" here. *Laurent V*, 794 F.3d at 289 n.19. The Court can compel PWC to "act in accordance with the documents and instruments governing the plan *insofar as they accord with the statute*." *Id.* (internal quotation marks and citation omitted) (emphasis added). And the Court does so here — the remaining lawful Plan clause defining NRA as 65 shall govern.

Even if the Court accepted PWC's argument to the contrary — that the provision defining NRA is a single, unified provision, meaning the "age 65" clause would not survive the striking of the "(5) Years of Service" clause — the Court would arrive at the same conclusion. This is because ERISA defines NRA as age 65, "unless otherwise provided by the [Plan]." *Esden v. Bank of Bos.*, 229 F.3d 154, 162 (2d Cir. 2000) (citing ERISA § 3(24)). So, if the Plan has a gap for its definition of NRA because the unlawful "(5) Years of Service" clause requires striking the *entire* NRA provision, the NRA would still be age 65.

PWC's reliance on *McDonald v. Pension Plan of NYSA-ILA Pension Tr. Fund*, 320 F.3d 151 (2d Cir. 2003), to argue against applying this "statutory default" has no merit. *McDonald* did not reject, let alone address, applying ERISA's statutory default for NRA, or make any broader holding prohibiting the application of an ERISA statutory default after "any related provision pertinent to calculating benefits has been held unenforceable," as PWC argues. (Dkt. No. 224 at 25.) The relevant issue in *McDonald* was how to interpret "years of service" in a benefits provision after the Second Circuit had invalidated a separate, related benefits provision. Further, the *McDonald* court remanded that question to the district court only because the district

12

court had to resolve a conflict between the "statutory default" and a "contractual default." *McDonald*, 320 F.3d at 161. In *McDonald*, the plan's definition of "years of service," while materially different from how ERISA defined the term, was lawful. *Id.* at 160. That is not the case here for the Plan's definition of NRA, leaving no conflict between a "contractual default" and a "statutory default" for the Court to resolve.

### 2. Reforming the Projection Rate

#### a. Liability

On whether to reform the Plan's projection rate, the Court first addresses whether Plaintiffs are entitled to summary judgment as to liability. When a "defined benefit" plan, like the Plan here, allows participants to receive a cash distribution before they reach retirement age instead of the typical annuity given at retirement age, ERISA requires that those distributions "be the actuarial equivalent of the accrued benefit expressed as an annual benefit payable at normal retirement age, that is — otherwise expressed — the normal retirement benefit." *Esden*, 229 F.3d at 164. Plans are required to do a "whipsaw" calculation to ensure that a pre-retirement cash distribution is the actuarial equivalent of this hypothetical "normal retirement benefit." *Id.* at 159. The whipsaw calculation involves "project[ing] the balance of the hypothetical account forward to normal retirement age and then pay[ing] out the present value of that projected balance." *Id.* at 165. Plaintiffs argue that PWC used an improper projection rate — the interest rate on 30-year Treasury securities — in its whipsaw calculations. (Dkt. No. 217 at 15–20.) The inquiry for liability turns, then, on whether the Plan's use of the interest rate on 30-year Treasury securities as a projection rate in whipsaw calculations was lawful.

Plaintiffs principally rely on the findings within the IRS's TAM from 2014 to assert that the Plan's use of the interest rate on 30-year Treasury securities was unlawful. (*See* Dkt. No. 221-2.) The TAM concluded that using the interest rate on 30-year Treasury securities "fail[ed]

13

to satisfy the requirements of [the Internal Revenue Code]." (Dkt. No. 221-2 at 5045.) To comply with the Internal Revenue Code, the TAM determined that the Plan needed to use a projection rate with "the same interest rate used to provide interest credits." (Dkt. No. 221-2 at 5042.) But the Plan instead provided interest credits with "equity rates of return," and used the 30-year Treasury rate as "the interest rate . . . to project the accounts" for its whipsaw calculation, creating a "mismatch" between the two. (Dkt. No. 221-2 at 5044.)

The Court agrees with the TAM's conclusion and holds that the Plan unlawfully used the 30-year Treasury rate as the projection rate in its whipsaw calculations. ERISA requires that PWC use "the [P]lan's interest rate" as the projection rate. *Laurent V*, 794 F.3d at 275. Because the Plan did not credit interest to participants' account at a guaranteed rate (*see* Dkt. No. 225 at 4–5; Dkt. No. 228-1 § 2.14), PWC was required to use "an estimate of the variable interest rate" for crediting participants' accounts, *Hirt v. Equitable Retirement Plan For Employees, Managers and Agents*, 441 F. Supp. 2d 516, 541 n.7 (S.D.N.Y. 2006). PWC failed to do so because the 30-year treasury rate did not represent an estimate of the rate at which PWC credited interest to participants' accounts. (*See* Dkt. No. 228-1 §§ 2.14, 2.16.) Accordingly, PWC is liable to Plaintiffs under ERISA as a matter of law.

PWC's arguments to escape liability are unconvincing. PWC does not contend that the Plan credited interest to participants' accounts at the 30-year Treasury rate, nor does it contend that the 30-year Treasury rate was an estimate of the Plan's variable interest rate. PWC instead argues that it cannot be held liable for using the 30-year Treasury rate, at least at the summary judgment stage, because Plaintiffs cannot prove forfeiture — *i.e.*, that participants who opted to get a cash distribution received *less* than what their accrued benefit would have been at retirement. (*See* Dkt. No. 224 at 8.) Yet the Second Circuit in *Laurent V* emphasized that what

14

matters here is actuarial equivalence, not forfeiture. *See Laurent V*, 794 F.3d at 286. The Second Circuit held that the NRA definition was invalid because participants taking a pre-retirement cash distribution were "deprived . . . of the actuarial equivalent of what their accounts would have been worth had they later taken an annuity," a "statutory protection" to which they were entitled. *Id*. The Second Circuit reached this conclusion even though properly calculated projected benefits might "not necessarily [be] higher," meaning that some participants who opted for a pre-retirement cash distribution would be owed less money. *Id.*

PWC falls back on asserting that using the 30-year Treasury rate for the projection rate in its whipsaw calculation *could* provide "actuarial equivalence between an early lump-sum distribution and the value of the accrued benefit at normal retirement age." (Dkt. No. 224 at 16.) For this point, PWC leans heavily on the fact that there was "no single rate of return for Plan participants" since participants could invest some, all, or none of their pension in equity-based funds, and some participants "invested exclusively in non-equity" funds. (Dkt. No. 224 at 18.) According to PWC, then, Plaintiffs are required to provide "uncontroverted factual evidence" that a 30-year Treasury rate projection does not produce actuarial equivalence in a whipsaw calculation. (Dkt. No. 224 at 16.) What PWC elides, however, is that the law prescribes not just the outcome for whipsaw calculations — actuarial equivalence — but also the proper methodology. *See Laurent V*, 794 F.3d at 286 ("We noted that ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit."). And when a Plan does not have a guaranteed minimum interest rate for participants' accounts, the Plan must instead use an "estimate of [its] variable interest rate." *Hirt*, 441 F. Supp. 2d at 541 n.7. Because the 30-year Treasury rate does not represent an estimate of how the Plan credited interest to accounts, Plaintiffs prevail on liability.

15

PWC also makes a handful of arguments for why the TAM should not be relied on for reaching any conclusions in this case. (Dkt. No. 224 at 11.) Two of these arguments are that the TAM does not conclude that using the 30-year Treasury rate leads to forfeiture, or that using this rate for projection does not produce actuarial equivalence. For the reasons addressed above, the Court finds neither of these arguments persuasive. PWC's remaining arguments are that the TAM is not precedent nor is it entitled to deference, and that it should not be given collateral effect. (Dkt. No. 224 at 13–14.) As Plaintiffs note, however, even if all three of these points are true, the TAM at minimum is "entitled to respect." *Esden*, 229 F.3d at 169 n.19; *see also Pender v. Bank of Am. Corp.*, 788 F.3d 354, 364 (4th Cir. 2015) (adopting the IRS's "persuasive analysis" in a TAM holding that a pension plan violated ERISA regulations). Moreover, though the Court finds the TAM persuasive, it would still reach the same conclusion without it. PWC departed from an estimate of its variable interest rate, and thus from applicable precedent on what ERISA requires, by selecting a 30-year Treasury interest rate as its projection rate.

### b. Relief

The Court now turns to whether Plaintiffs are entitled to relief at the summary judgment stage. Plaintiffs are entitled to relief if there is no genuine dispute over "the [projection] rate that reasonable persons in the position of the plan drafters would have chosen to fairly reflect the value of the plan's retirement benefit." *Ruppert v. Alliant Energy Cash Balance Pension Plan*, No. 08 Civ. 127, 2010 WL 5464196, at *2 (W.D. Wis. Dec. 29, 2010). Since the Plan does not have a fixed interest rate, or a guaranteed minimum interest rate, the proper projection rate must be a "reasonable, good-faith estimate" of its investment returns. *Ruppert v. Alliant Energy Cash Balance Pension Plan*, 726 F.3d 936, 939 (7d Cir. 2013). The method for selecting the proper projection rate must "preclude employer discretion" and be "definitely determinable." *Esden*,

16

229 F.3d at 166 n.17.  Multiple circuits have endorsed the method of using a rolling historical average of a Plan's investment returns to produce a projection rate for whipsaw calculations. *See, e.g.*, *Esden*, 229 F.3d at 166 n.17 (citing Treas. Reg. § 1.401(a)(4)–8(c)(3)(v)(B) as supporting the use of a rolling historical average to determine "the value of a variable interest rate to be used for projection of cash account balance at normal retirement age"); *Berger v. Xerox Corp. Ret. Income Guarantee Plan*, 338 F.3d 755, 760 (7d Cir. 2003) (same).

Plaintiffs insist that there is no genuine dispute of material fact that the Plan would have selected a rolling historical average — specifically, the "20-year average historical return on the median retirement portfolio" that PWC "calculated and reported to Participants in 1994 and then updated on a recurring basis."  (Dkt. No. 217 at 21.)  In 1994, PWC provided Plan participants with model portfolios to "provide a high level of return given [their] investment time horizon and [their] growth and risk objectives."  (Dkt. No. 221-3 at 2967.)  Each model portfolio included: a risk assessment (in the form of a meter running from "low" to "high"); an asset mix; and data on historical performance, including a "Total Average Annualized Return[]" rate for a 1-, 3-, 5-, 10-, 15-, and 20-year period ending on June 30, 1994.  (Dkt. No. 221-3 at 2968–2971.)  The third portfolio, titled "Balanced With Emphasis on Growth," contained a "fairly even mix of stocks and fixed income," and reported a total average annualized return of 12.7% over 20 years.  (Dkt. No. 221-3 at 2969.)  Plaintiffs assert that a projection rate mirroring the third portfolio's 20-year average annualized return would have been the "natural choice" for reasonable persons in the position of the Plan drafters back in 1994 since it is legal, readily administrable, and reliable.  (Dkt. No. 217 at 21–23.)  Plaintiffs further assert that the Court should grant this proposed relief at the summary judgment stage since there were no "reasonably viable alternatives" to the 20-year average annualized return rate in the third portfolio.  (Dkt. No. 217 at 23.)

17

Without addressing the appropriateness of the relief Plaintiffs request, the Court concludes that Plaintiffs fall short of proving that there were no "reasonably viable alternatives" to the third model portfolio's 20-year average annualized return.  To get the relief they seek, Plaintiffs must show that there is no genuine dispute that reasonable persons in the position of the Plan drafters would have: relied on a model portfolio's average annualized return for a projection rate, as opposed to any other possible, legal method; specifically picked the third portfolio out of the five model portfolios; and selected the 20-year return as a projection rate instead of any of the shorter multi-year returns available.

The second of these propositions — that reasonable persons in the position of the Plan drafters would have specifically picked the third portfolio out of the five total model portfolios — is where Plaintiffs' arguments are particularly unavailing.  Plaintiffs point to a couple of PWC statements describing the investment choices of Plan participants as "nothing special" and irrelevant.  (Dkt. No. 217 at 22) (internal quotation marks omitted).  Solely from these statements, and general advice PWC gave to participants about diversifying their investments, Plaintiffs extrapolate that "[t]he only rational assumption" is that PWC would have picked a projection rate from the third portfolio since it had a "balanced allocation" between equity and non-equity investments.  (Dkt. No. 232 at 7.)  Given that the law would have required PWC to select only a "reasonable, good-faith estimate" for its projection rate, *Ruppert*, 726 F.3d at 939, it is unclear why it would have been *unreasonable* for PWC to pick a slightly riskier or safer portfolio on which to base its projection rate.  Plaintiffs do not explain, for instance, why using the fourth portfolio, "Balanced With Emphasis on Preservation of Capital" (Dkt. No. 221-3 at 2970), would not have been just as legal, readily administrable, and reliable as using the third portfolio.  Nor do Plaintiffs provide any actual data that participants' investment choices most

18

closely resembled those in the third model portfolio, increasing the chances that PWC would have picked a projection rate from that portfolio's returns. Thus, even if the Court assumes the other two propositions that Plaintiffs must show — that PWC would have relied on a model portfolio at all for a projection rate and would have selected a 20-year return from a portfolio — there is still a genuine question whether PWC would have picked its projection rate from the third model portfolio. Accordingly, the Court concludes that Plaintiffs are not entitled to their proposed relief at the summary judgment stage.[2]

### III. Conclusion

For the foregoing reasons, it is hereby ORDERED that:

PWC's motion for class decertification is DENIED;

Plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part. Specifically, Plaintiffs are granted summary judgment on liability with respect to the Plan's normal retirement age and the Plan's projection rate. Summary judgment is denied as to relief.

The parties are directed to confer regarding the next phase of this litigation. Within 21 days after the date of this Opinion and Order, the parties shall file a joint letter of up to 6 single-spaced pages addressing each side's proposals for further proceedings.

The Clerk of Court is directed to close the motions at Docket Numbers 216 and 260.

SO ORDERED.

Dated: September 30, 2021
       New York, New York

_____
J. PAUL OETKEN
United States District Judge

---

[2] PWC primarily contests basing a projection rate on any of the model portfolios, arguing that they were provided to participants for educational purposes and contained disclaimers that they were "no guarantee of future performance." (Dkt. No. 224 at 21–23.) Because the Court holds there is a genuine dispute over which model portfolio PWC would have picked, if it would have picked one of them, the Court does not address PWC's arguments on this point.