# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| **TIMOTHY D. LAURENT,** *et al.,* | : | |
| | : | |
| **On behalf of themselves and all** | : | |
| **others similarly situated,** | : | |
| | : | |
| **Plaintiffs,** | : | **06 CV 2280 (JPO)** |
| **v.** | : | |
| | : | |
| **PRICEWATERHOUSECOOPERS LLP,** *et al.,* | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
AND FOR APPROVAL OF ATTORNEYS' FEES AND EXPENSES,
SETTLEMENT ADMINISTRATION COSTS, AND NAMED PLAINTIFF AWARDS**

Eli Gottesdiener
Albert Huang
Gottesdiener Law Firm, PLLC
498 7th Street
Brooklyn, New York 11215
Telephone:   (718) 788-1500
Facsimile:   (718) 788-1650
eli@gottesdienerlaw.com
albert@gottesdienerlaw.com

*Counsel for Plaintiffs and the Class*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

ARGUMENT ......................................................................................................................11

I.      THE PROPOSED SETTLEMENT SHOULD BE APPROVED .....................................11

      A.      Plaintiffs and Class Counsel Have Adequately Represented the Class ................12

      B.      The Proposed Settlement is the Result of Good-Faith,
             Arm's-Length Negotiations ..................................................................................12

      C.      The Relief Provided by the Settlement Is Adequate When Weighed
             Against the Risks of Continued Litigation.............................................................13

      D.      The Proposed Method for Distributing Relief is Effective ....................................14

      E.      Class Counsel's Fee Request Is Fair and Reasonable............................................14

      F.      All Class Members Are Treated Equitably Relative to Each Other .....................14

      G.      The *Grinnell* Factors Are Also Met ....................................................................15

             1.      The Complexity, Expense, and Likely Duration of the Litigation
                     Supports Approval of the Settlement.........................................................15

              2.      The Reaction of the Settlement Class to the Settlement ...........................15

              3.      The Stage of the Proceedings....................................................................15

              4.      The Risk of Establishing Liability and Damages .....................................15

              5.      The Risks of Maintaining the Class Action Through Trial........................16

              6.      The Ability of Defendants to Withstand a Greater Judgment....................16

              7.      The Reasonableness of the Settlement in Light of the Best Possible
                     Recovery and the Attendant Risks of Litigation........................................16

II.     CLASS COUNSEL'S REQUESTED FEE SHOULD BE APPROVED .........................16

      A.      *Ex Ante* Test:  The Fee That a Fully Informed Class Would Have Agreed to
             Pay in the Particular Circumstances of This Case is One-Third of the
             Common Fund, With No Reduction Based on the Amount of the Recovery........17

| | 1. | Sophisticated Plaintiffs Pay Their Lawyers at Least One-Third in Analogous High-Stakes, High-Risk Contingency Cases Like This One ...........................................................................18 |
| | 2. | The Contingency Risk in This Case at the Time of Filing Was at the Top of the Risk Spectrum, Warranting a One-Third Contingency Fee ........................................................................21 |
| B. | | *Ex Post* Assessment: Modification by the Court of the One-Third Fee That Would Have Been Negotiated by the Class is Not Necessary to Prevent an Unearned "Windfall" Here, Which Means That There Is No Valid Basis for a Reduction ........................................................................26 |
| | 1. | A One-Third Share of the Common Fund Is Not a "Windfall" Merely Because It Is Very Large.................................................27 |
| | 2. | The Lodestar Multiplier Is Commensurate With the Extreme Risk Faced by Counsel and the Quality of Representation.................35 |
| | 3. | "Economies of Scale" Do Not Justify a Reduction in the Fee Percentage or Lodestar Multiplier in the Particular Circumstances of This Case ........................................................................40 |
| C. | | A One-Third Fee Is Consistent With the Fee Recently Awarded in This District in a Remarkably Analogous $290 Million ERISA Class Action.............42 |
| D. | | The Three-Step Test Applied by This Court in a Recent Common Fund Case Confirms That a One-Third Percentage is Reasonable and Appropriate Here......45 |
| III. | | THE REQUESTED EXPENSE REIMBURSEMENT SHOULD BE GRANTED ..........49 |
| IV. | | THE REQUESTED SERVICE AWARDS SHOULD BE APPROVED ..........................49 |
| | | CONCLUSION...............................................................................................50 |

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Air Lines Stewards Local 550 v. American Airlines, Inc.*,
455 F.2d 101 (7th Cir. 1972) ....................................................................... 4

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018) ........................................... 50

*Amara v. Cigna Corp.*,
775 F.3d 510 (2d Cir. 2014) .......................................................... 28-31, 44

*Beckman v. KeyBank N.A.*,
293 F.R.D. 467 (S.D.N.Y. 2013) .......................................................... 38-39

*Behazadi v. International Creative Mgmt. Partners, LLC*,
2015 WL 4201906 (S.D.N.Y. July 9, 2015) ............................................ 47-48

*Bellifemine v. Sanofi-Aventis U.S. LLC*,
2010 WL 3119374 (S.D.N.Y. Aug. 6, 2010) .............................................. 50

*Blessing v. Sirius Xm Radio, Inc.*,
507 F.Appx. 1 (2d Cir. 2012) ................................................................... 13

*Blum v. Stenson*,
465 U.S. 886 (1984) ................................................................................. 36

*Cates v. Trustees of Columbia University in City of New York*,
2021 WL 4847890 (S.D.N.Y Oct. 18, 2021) ........................................ 22, 36-37

*Chicago Truck Drivers, Helpers and Warehouse Workers Union (Ind) Pension
Fund v. CPC Logistics, Inc.*,
698 F.3d 346 (7th Cir. 2012) ................................................................... 22

*Cigna Corp. v. Amara*,
563 U.S. 421 (2011) ................................................................................. 31

*City of Providence v. Aeropostale, Inc.*,
2014 WL 1883494 (S.D.N.Y. May 9, 2014),
*aff'd,* 607 F.Appx. 73 (2d Cir. 2015) ..................................................... 13

*Clem v. KeyBank, N.A.*,
2014 WL 2895918 (S.D.N.Y. June 20, 2014) ........................................... 38

*Davis v. J.P. Morgan Chase*,
827 F.Supp.2d 172 (W.D.N.Y. 2011) ...................................................... 38

*Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974) ...................................................................... 12, 15-16

*Downes v. Wisc. Energy Corp. Ret. Acct. Plan*,
    2012 WL 1410023 (E.D. Wis. Apr. 20, 2012) .......................................................23

*Fertitta v. Knoedler Gallery, LLC*,
    2018 WL 4961454 (S.D.N.Y. Oct. 15, 2018) .......................................................37

*Fields v. Kijakazi*,
    24 F.4th 845 (2d Cir. 2022) ..................................................................................9, 26

*Flournoy v. Honeywell Int'l, Inc.*,
    2007 WL 1087279 (S.D. Ga. Apr. 6, 2007) .........................................................19

*Fry v. Exelon*,
    571 F.3d 644 (7th Cir. 2009) ................................................................................29

*Galli v. PricewaterhouseCoopers LLP*,
    2020 WL 2792996 (S.D.N.Y. May 29, 2020) .......................................................32

*Goldberger v. Integrated Resources Inc.*,
    209 F.3d 43 (2d Cir. 2000)........................................................................... *passim*

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002) ...........................................................................................8, 25, 31

*Grice v. Pepsi Beverages Co.*,
    363 F.Supp.3d 401 (S.D.N.Y 2019) ...............................................................17, 46

*Hughes Aircraft Co. v. Jacobson*,
    525 U.S. 432 (1999) ..............................................................................................22

*In re AOL Time Warner, Inc. Secs. & ERISA Litig.*,
    2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006) .......................................................25

*In re Auction Houses Antitrust Litig.*,
    197 F.R.D. 71 (S.D.N.Y. 2000) ...........................................................................20

*In re Bear Stearns Companies, Inc. Sec., Deriv, and ERISA Lit.*,
    909 F.Supp.2d 259 (S.D.N.Y. 2012)....................................................................16

*In re Colgate-Palmolive Co. ERISA Litig.*,
    36 F.Supp.3d 344 (S.D.N.Y. 2014) ..............................................................22, 38, 46-48

*In re CRM Holdings, Ltd. Sec. Litig.*,
    634 F.Appx. 59 (2d Cir. 2016) ....................................................................16-17, 45

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
    2007 WL 2230177 (S.D.N.Y. July 17, 2007) ........................................................48

*In re Flag Telecom Holdings*,
    2010 WL 4537550 (S.D.N.Y. Nov. 5, 2010) ........................................................50

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ........................................................36

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
    194 F.R.D. 166 (E.D. Pa. 2000) ........................................................34

*In re Initial Pub. Offering Sec. Litig.*,
    671 F.Supp.2d 467 (S.D.N.Y. 2009) ........................................................4

*In re Interpublic Secs. Litig.*,
    2004 WL 2397190 (S.D.N.Y. Oct. 26, 2004) ........................................................24

*In re Marsh ERISA Litigation*,
    265 F.R.D. 128 (S.D.N.Y. 2010) ........................................................ 21-22

*In re Merry-Go-Round Enter., Inc.*,
    244 B.R. 327 (D. Md. 2000) ........................................................19

*In re Namenda Direct Purchaser Antitrust Litigation*,
    462 F.Supp.3d 307 (S.D.N.Y. 2020) ........................................................16

*In re Nortel Networks Corp. Sec. Litig.*,
    539 F.3d 129 (2d Cir. 2008) ........................................................5, 17, 45

*In re Prudential Sec. Ltd. P'ships Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995) ........................................................14

*In re Remeron Direct Purchaser Antitrust Litig.*,
    2005 WL 3008808 (D.N.J. Nov. 9, 2005) ........................................................19

*In re Synthroid Marketing Litig.*,
    264 F.3d 712 (7th Cir. 2001) ........................................................42

*In re Vitamins Antitrust Litig.*,
    2001 WL 34312839 (D.D.C. July 16, 2001) ........................................................11

*Kruger v. Novant Health, Inc.*,
    2016 WL 6769066 (M.D.N.C. Sept. 29, 2016) ........................................................50

*Laurent v. PricewaterhouseCoopers LLP*,
    448 F.Supp.2d 537 (S.D.N.Y. 2006) (I) ........................................................30

*Laurent v. PricewaterhouseCoopers LLP,*
   963 F.Supp.2d 310 (S.D.N.Y. 2013) (II) ...............................................30

*Laurent v. PricewaterhouseCoopers LLP,*
   794 F.3d 272 (2d Cir. 2015) (III) ........................................... 6-7, 24, 30

*Laurent v. PricewaterhouseCoopers LLP,*
   2017 WL 3142067 (S.D.N.Y. July 24, 2017) (IV) ................. 8, 25-26, 31

*Laurent v. PricewaterhouseCoopers LLP,*
   945 F.3d 739 (2d Cir. 2019) (V) ...........................................................32

*Laurent v. PricewaterhouseCoopers LLP,*
   565 F.Supp.3d 543 (S.D.N.Y. 2021) (VI)..........................................1, 33

*Martin v. Franklin Cap. Corp.,*
   546 U.S. 132 (2005)....................................................................42, 45

*Mba v. World Airways, Inc.,*
   369 F.Appx. 194 (2d Cir. 2010)..............................................................45

*McCorkle v. Bank of America Corp.,*
   688 F.3d 164 (4th Cir. 2012) ..................................................................29

*McDaniel v. County of Schenactady,*
   595 F.3d 411 (2d Cir. 2010)....................................................5, 17, 38

*Meredith Corp. v. SESAC, LLC,*
   87 F.Supp.3d 650 (S.D.N.Y. 2015)........................................................24

*Meyenburg v. Exxon Mobil Corp.,*
   2006 WL 2191422 (S.D. Ill. July 31, 2006) ..........................................19

*Montanile v. Bd. of Trustees of Nat'l Elevator Industry Health Ben. Plan,*
   577 U.S. 136 (2016)................................................................................31

*MSC Mediterranean Shipping Co. Holding S.A. v. Forsyth Kownacki, LLC,*
   2017 WL 1194372 (S.D.N.Y. Mar. 30, 2017) .......................................37

*Newman v. Stein,*
   464 F.2d 689 (2d Cir. 1972).....................................................................13

*Osberg v. Foot Locker, Inc.,*
   862 F.3d 198 (2d Cir. 2017)...............................................................44-45

*Osberg v. Footlocker, Inc.,*
   138 F.Supp.3d 517 (S.D.N.Y. 2015),
   *aff'd,* 862 F.3d 198 (2d Cir. 2017) ........................................................44

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Amer. Corp.*,
    318 F.R.D. 19 (S.D.N.Y. 2016) ......................................................................49

*Pearlstein v. BlackBerry Limited*,
    2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022) ...........................................37

*Perks v. TD Bank, N.A.*,
    2022 WL 1451753 (S.D.N.Y. May 9, 2022) ..............................................17

*PricewaterhouseCoopers LLP v Laurent*,
    141 S.Ct. 617 (Oct. 19, 2020) ...................................................................32

*Regeneron Pharmas., Inc. v. Merus N.V.*,
    2018 WL 3425013 (S.D.N.Y. June 25, 2018) ...........................................37

*Rein v. Socialist People's Libyan Arab Jamahiriya*,
    2010 WL 11627808 (E.D.N.Y. Aug. 16, 2010)..................................21, 28

*Rozell v. Ross-Holst*,
    576 F.Supp.2d 527 (S.D.N.Y. 2008).........................................................37

*Silverman v. Motorola Solutions, Inc.*,
    739 F.3d 956 (7th Cir. 2013) ......................................................2, 22, 25

*Trustees of NY State Nurses Assoc. Pension Plan v. White Oak Global Advisors LLC*,
    2022 WL 815273 (S.D.N.Y. Mar. 17, 2022) ............................................37

*Vista Outdoor Inc. v. Reeves Fam. Tr.*,
    2018 WL 3104631 (S.D.N.Y. May 24, 2018) ...........................................37

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005).........................................................12, 15, 17

*Wells v. Sullivan*,
    907 F.2d 367 (2d Cir. 1990)......................................................................26

*Wright v. Stern*,
    553 F.Supp.2d 337 (S.D.N.Y. 2008).........................................................50

*Yuzary v. HSBC Bank USA, N.A.*,
    2013 WL 5492998 (S.D.N.Y. Oct. 2, 2013) .............................................38

**STATUTES AND RULES**

ERISA § 502(a)(1)(B)..............................................................................................32

ERISA § 502(a)(3)..............................................................................................3, 32

Fed. R. Civ. P. 23(e) ................................................................................................1

Fed. R. Civ. P. 23(e)(2) ............................................................................. 11-12

Fed. R. Civ. P. 23(e)(2)(C)(i) .................................................................... 15-16

Fed. R. Civ. P. 23(h) ......................................................................................1

Fed. R. Civ. P. 54(d)(2) ..................................................................................1

Rev. Rul. 78-120, 1978-1 C.B. 117 ..............................................................24

## OTHER AUTHORITIES

5 J. Moore, et al.,
   *Moore's Fed. Practice – Civil* § 23.124 (2010)......................................20

*Awarding the Attorney's Fees in Class-Action Litigation*,
   23 J. Legal Stud. 185 (1994) ................................................................40

Brian Fitzpatrick,
   *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*,
   89 Fordham L. Rev. 1151 (2021)...............................18-20, 33-34

Charles Silver,
   *A Restitutionary Theory of Attorneys' Fees in Class Actions*,
   76 Cornell L. Rev. 656 (1991) ..............................................................17

David L. Schwartz,
   *The Rise of Contingent Fee Representation in Patent Litigation*,
   64 Ala. L. Rev. 335 (2012) ...................................................................19

Douglas Laycock,
   *Modern America Remedies* 488 (1985) ........................................ 17-18

Henry J. Friendly,
   *Indiscretion About Discretion*, 31 Emory L.J. 747 (1982) ........ 42-43, 45

*Third Circuit Task Force Rpt.*,
   208 F.R.D. 340 (2002) ...........................................................................9

Trey Cox,
   *Alternative Fee Arrangements: Partnering with Clients through Legal Risk Sharing*,
   66 The Advocate (Texas) 20 (2011 Texas Bar Litig. Section) ...............19

William Rubenstein,
   5 Newberg on Class Actions § 15.80 (6th ed. through June 2022 update)......................34, 47

**INTRODUCTION**

Pursuant to Fed. R. Civ. P. 23(e), 23(h) and 54(d)(2), and this Court's October 31, 2022 Order granting preliminary approval of the Parties' Class Action Settlement and Approving Notice to the Class (Dkt. 300), Plaintiffs Timothy Laurent and Smeeta Sharon, together with Class Counsel, respectfully submit this Memorandum of Law in Support of their Motion for Final Approval of Class Action Settlement and for Approval of Attorneys' Fees and Expenses, Settlement Administration Costs, and Named Plaintiff Service Awards. Defendant PricewaterhouseCoopers LLP ("PwC") and Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP (the "Plan") (collectively, "Defendants") join in the request that the Court give final approval to the settlement, *see* Dkt. 303, 12/13/22 Declaration of Eli Gottesdiener ¶ 2 ("12/13/22 Gottesdiener Decl."); they take no position as to the other relief requested. *Id.*

As the Court knows, Plaintiffs in this ERISA case alleged that Defendants used both an unlawful definition of "normal retirement age" and an unlawful projection rate to shortchange approximately 16,000 plan participants who elected to receive their pension benefits in a lump sum. *Laurent v. PricewaterhouseCoopers LLP*, 565 F.Supp.3d 543 (S.D.N.Y. 2021) ("*Laurent VI*"). The $267 million proposed settlement, reached in September 2022 after prior attempts at settlement had failed (including two mediations, *see* Dkt. 292 at 7-8), is an extraordinary outcome for the Class, representing **more than 90%** of the amount that in April 2022 the Plan, under oath, told the IRS was how much the Plan would likely have to pay if it were found liable after trial and appeal. *See* Dkt. 293-1 at pdf p.42 ("$250 million - $300 million"). The Plan's estimate is similar to the more precise calculation made by Plaintiffs' enrolled ERISA actuary: Using each of the 15,946 Class members' exact account balances at the time of payment and bringing the lump sum benefits owed to them forward to the present with interest at the prime

rate, Plaintiffs' enrolled ERISA actuary estimated that a judgment against the Plan would have netted the Class $289.6 million—which makes the settlement <u>more than 92%</u> of the amount that the Class could have expected to recover if litigation were to continue and Plaintiffs prevailed after trial and appeal. *See* Dkts. 294, 298.

The recovery of nearly everything that the Class has been seeking for 18 years is all the more remarkable considering the extremely long odds that Plaintiffs and Class Counsel faced of winning *anything*. As this Court knows, in most high-profile, high-stakes class actions, multiple plaintiffs' law firms file separate actions and then vie to be appointed lead counsel. But here, after Plaintiffs filed suit in 2004 (and re-filed in 2005 and again in this district in 2006) and the complaints were publicized in the *Wall Street Journal* and elsewhere, no other lawyers approached undersigned Counsel to join the case or tried to compete for control of it, *see* 12/13/22 Gottesdiener Decl. ¶ 15. Courts recognize that this means the plaintiffs' class action bar "saw this litigation as too risky for their practices," *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013)—an assessment that appeared to have been validated a few years into the case when the Seventh and Fourth Circuits ruled that there was nothing wrong with the "normal retirement age" that PwC had adopted, and again 5 years ago when this Court granted PwC's "no-remedy" motion for judgment on the pleadings and the case appeared to be over.

To put it mildly, from this case's inception all the way until the settlement agreement was reached a few months ago, any positive outcome for the Class was always highly uncertain. And even after the Court granted Plaintiffs summary judgment on liability last year, years of additional litigation would be required to finally resolve the case. The fact that the Class can now, with no further risk or delay, immediately receive practically everything that they could have achieved through continued litigation, makes the proposed $267 million settlement worthy

of final approval and also strongly supports Class Counsel's request for a one-third common fund fee.

Absent settlement, still to be worked out was the novel and complicated question of precisely how the Plan should be reformed to bring its investment projection rate or algorithm into compliance with ERISA and to what extent that would result in additional benefits being paid to each member of the Class. PwC argued that a trial was necessary on the projection rate (or "damages") issue and would result in little, if any, recovery for the Class. Plaintiffs argued that the Court could exercise its equitable discretion to impose an appropriate projection rate that would fairly reflect the Plan's market-based investment structure. Six years ago, the Court suggested that to break the logjam, once there "has been a liability determination… I think you guys should go get [the projection formula] resolved by an arbitrator or mediator," 2/3/16 Hrg., Dkt. 202 at 3, 21. That is what the parties have now done, with an exceptionally favorable outcome for the Class: again, the total settlement amount is more than 90% of the amount that both sides agree the Class would likely receive if Plaintiffs were to prevail after trial and appeal.

An 8-10% discount from the amount that the Class would recover if Plaintiffs were to prevail after trial and appeal is a very small price to pay for insurance against a lesser litigated recovery, including the possibility of no recovery at all. *See* Dkt. 293 ¶¶ 15-22. Accordingly, and as shown in detail below, the Court should grant final approval of the proposed settlement agreement as fair, reasonable, and adequate. It should also approve Class Counsel's requested one-third attorneys' fee, expense recoupment, and service awards for the two named Plaintiffs.

Plaintiffs respectfully submit the following:

1.      The settlement, reached after 18 years of hard-fought litigation, endorsed by both named Plaintiffs and thus far not opposed by any member of the approximately 16,000 member

Class, is eminently fair, reasonable, and adequate.[1]  The extent of the recovery under the proposed settlement—*i.e.*, more than 90% of the amount that the Class claims it is owed—dramatically exceeds the typical percentage recovery in class action settlements that courts find fair, reasonable, adequate, and worthy of approval.  *See, e.g., In re Initial Pub. Offering Sec. Litig.*, 671 F.Supp.2d 467, 510 (S.D.N.Y. 2009) (approving settlement where investors recouped an estimated 2% of losses).  Indeed, even after deductions for proposed attorneys' fees, expenses, and named plaintiff service awards, the settlement would yield each of the 16,000 Class members an average net additional $11,000, payable on the same tax-favored basis as the payments they originally received between 16 and 22 years ago.  *See* Dkt. 294, Declaration of Lawrence Deutsch, E.A. ("Deutsch Decl.") ¶ 5; Dkt. 293, 9/19/22 Declaration of Eli Gottesdiener ("9/19/22 Gottesdiener Decl.") ¶¶ 12-13.

2.      The notice plan was effectively implemented.  In accordance with the Court's preliminary approval order, the Notice Administrator, Continental DataLogix, mailed an individualized notice to each Class member on November 29, 2022 (more than 8 weeks prior to the January 27, 2023 fairness hearing) and caused a general notice to be published in *USA Today* on November 21, 2022.  *See* Dkt. 304, Declaration of Frank Barkan ("Barkan Decl.") ¶¶ 4, 6.  The Notice Administrator reports that the mailing was highly successful, with thus far only 22 notices requiring follow-up.  *Id.* ¶ 5.  There is thus ample evidence that class members received timely notice consistent with the requirements of the law.  *See, e.g., Air Lines Stewards Local 550 v. American Airlines, Inc.*, 455 F.2d 101, 108 (7th Cir. 1972).

---

[1] A detailed description of this lawsuit, including the procedural history, settlement negotiations, and settlement terms, was set out in Plaintiffs' Preliminary Approval Memorandum, Dkt. 292, at pages 6-11, and the accompanying declarations, Dkts. 293-296, which are incorporated by reference.

3.     The requested attorneys' fee award equal to one-third of the common fund is fair, appropriate, and well-deserved in light of the risks borne, the time and effort expended, the case's unusually long duration, and the outstanding results achieved.  It is not unusual for courts to award one-third or more in cases with very large recoveries—so-called "megafund" cases—provided that, as was the case here, the contingency risk was extraordinarily high and the size of the recovery primarily attributable to counsel's skill and tenacity—as opposed to good luck, economies of scale, or other factors for which counsel cannot claim credit.  *See infra* at 27-48. Most importantly, all of the available evidence suggests that in the "unique circumstances of [*this*] case," *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 53 (2d Cir. 2000), a one-third fee is almost certainly the rate that would have resulted from arm's-length bargaining *ex ante* between Counsel and a fully informed Class had such a negotiation been possible.

The *ex ante* bargain that would have been struck is the critical question here because, while the traditional criteria in determining a reasonable common fund fee still apply, in the Second Circuit this Court's primary goal should be to determine the market rate for counsel's services that "a fully informed group of plaintiffs able to negotiate collectively" would have agreed to pay in the particular circumstances of this case "as of when the case [was] filed."  *Id.* at 52 ("market rates, where available, are the ideal proxy for [class counsel's] compensation"). *Accord McDaniel v. County of Schenactady*, 595 F.3d 411, 420, 422 (2d Cir. 2010) (district court should "approximate the reasonable fee that a competitive market would bear," "assess[ing] case-specific considerations at the outset"; focus should be "on mimicking a market"); *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008) (goal is to use the "market rate").

Once a court determines the *ex ante* bargain the informed Class and Counsel would have struck, *Goldberger* instructs that, in a second step, the court should conduct an *ex post* "windfall"

assessment—which in the Court's discretion may include a lodestar cross check—to see whether a reduction in fees is necessary to prevent an unwarranted boondoggle to the attorneys because of the way that the litigation actually unfolded—for example, because a fortuitous ruling in another proceeding paved the way to an easy win that counsel cannot claim full credit for. *Goldberger*, 209 F.3d at 49-50, 52.

Both tests confirm the reasonableness of the requested one-third fee here. To determine the *ex ante* fee agreement that the parties would have reached, *Goldberger* instructs courts to look to "'hard data' on … the fees sophisticated corporate plaintiffs typically agree to pay their attorneys" in analogous high-stakes contingency cases. *Id.* at 52. As demonstrated below, the hard data shows that sophisticated clients and sophisticated class representatives regularly agree to pay one-third or more in risky, complex litigation, even when potential rewards are very large—*i.e.*, the market routinely produces fee agreements at or above the percentage Class Counsel request here. *See infra* at 17-26. The evidence further shows that undersigned Counsel would have declined the representation here if the Class would not have agreed to a one-third fee, *id.*, and that the Class would have agreed to that fee (as did both named Plaintiffs in their *ex ante* retention agreements with Class Counsel, *see* Dkts. 295-1, 296-1), because Class members would have known of the exceptional complexity and extreme risk that this case presented and that there were literally no other lawyers, *supra* at 2, with the relevant experience and resources who were willing to assume that risk. *See* 12/13/22 Gottesdiener Decl. ¶ 15.

The *ex ante* risk was palpable. As the Second Circuit would later acknowledge, the law on the books when this case started was that ERISA "permitted a plan to set normal retirement age ***at any age***, including lower than age 65, regardless of the age at which employees customarily retired in the particular company or industry." *Laurent v. PricewaterhouseCoopers LLP*, 794 F.3d 272, 288 (2d Cir. 2015) ("*Laurent III*") (emphasis modified). In fact, the Internal

Revenue Service, which has "primary jurisdiction and rule-making authority over" the manner in which a pension plan can define "normal retirement age," *id.* at 278, had issued two private rulings to PwC certifying that *the Defendant Plan's* 5-year retirement age—the specific Plan clause that the Class wanted Class Counsel to challenge—*complied* with ERISA standards. *See* PwC Mot. to Dismiss, Dkt. 17 at 9 ("many of plaintiff's allegations focus on the RBAP's specification of a five-year normal retirement age – a term contained in the RBAP when the IRS reviewed it and issued favorable determination letters in 1999 and 2004").

A well-informed Class would have known (and Class Counsel *did* know) that Counsel would likely have to spend tens of thousands of hours of time, expend hundreds of thousands of dollars in out-of-pocket expenses, and forego the pursuit of multiple other cases with much better prospects of recovery, on a years' long quest to convince the District Court, the Court of Appeals, and potentially the Supreme Court that the IRS was wrong about the Defendant Plan's "normal retirement age"—plus overcome multiple other defenses that Defendants and their lawyers were certain to raise (as they indeed did raise) in an effort to defeat Class members' claims. *See* 12/13/22 Gottesdiener Decl. ¶ 12.

The well-informed Class would have also known (and Class Counsel did know) that even if Counsel were to win the normal retirement age issue, the Class would be entitled to relief only if Counsel could then convince all of the same courts that in a plan with a "market based" investment crediting rate that did not guarantee participants *any* positive return and under which participants could *lose* money, it was illegal to project that crediting rate using the 30-year Treasury bond rate—another challenge for which there was at the time no precedent and no IRS support. *Id.*

The well-informed Class would have known (and Class Counsel did know) that if Counsel were somehow able to win both of these novel issues, Counsel would likely then have to

convince all of the same courts once again—in follow-on proceedings that could last another several years (as indeed they did)—that a meaningful monetary *remedy* was available for PwC's violations of ERISA, even though the Supreme Court had proclaimed in 2002 that suits seeking money damages are "'[a]lmost invariably'" unavailable under ERISA, *Laurent v. PricewaterhouseCoopers LLP*, 2017 WL 3142067, *9 (July 24, 2017) ("*Laurent IV*") (quoting *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002)). *See* 12/13/22 Gottesdiener Decl. ¶ 12.

Last but not least, the well-informed Class would have known (and Class Counsel did know) that, even if Counsel ran the table on all of these issues, members of the Class would be entitled to monetary relief—and Class Counsel to attorneys' fees and reimbursement of expenses—only if Counsel could prove by clear and convincing evidence (the standard for equitable reformation), that the Plan must be rewritten to set forth an investment-projection algorithm that produced a projection rate higher than the 30-year Treasury bond rate—the issue that was next on the agenda were this litigation to continue. *See id.*

Simply put, the Class would have known (and Class Counsel did know) that no ERISA law firm worth its salt would have touched this case with a ten-foot pole for anything less than a contingent fee of at least one-third plus expenses—and that absent a one-third fee, undersigned Counsel would have walked away and no other firm would have stepped up to fill Counsel's shoes. *See id.* ¶ 15.

Frankly, the well-informed Class here would have *wanted* to offer Counsel at least a one-third fee. Informed plaintiff-purchasers of contingent legal services know that the client and lawyer prosper together and that the contingency fee negotiation is a positive-sum game in which both plaintiffs and lawyers do better by setting fees at levels that maximize their joint wealth, rather than a zero-sum competition in which more for one party always means less for the other.

They know that a higher fee percentage can mean a larger expected net recovery for the plaintiff because it will motivate the lawyer to work harder and expend more resources. *See Third Circuit Task Force Rpt.*, 208 F.R.D. 340, 373 (2002) ("The lawyer who charges a higher fee may earn a proportionately higher recovery for the class than the lawyer who charges a lesser fee"). The well-informed Class here would have seen a one-third fee as ensuring that Counsel was sufficiently incentivized to undertake the additional work and risk-taking necessary to maximize the Class's gains, rather than effectively encouraged to settle early for a lesser recovery.

The second *Goldberger* test—the *ex post* "windfall" cross-check—shows that there is no valid basis to override the one-third fee arrangement that the Class and Counsel would have negotiated *ex ante*. "Windfall" is not a synonym for unusually large. "A windfall [occurs] where the lawyer takes on a contingency-fee representation that succeeds immediately and with minimal effort, suggesting very little risk of nonrecovery. That kind of unearned advantage is what the windfall concern really is about." *Fields v. Kijakazi*, 24 F.4th 845, 856 (2d Cir. 2022) (reversing disallowance of a requested award of fees in a Social Security case, agreed to by the client, and holding that before a court can characterize a fee as a "windfall" "it must first be **truly clear** that the fee is unearned by counsel") (emphasis added).

Not a single win in this case could be characterized as a layup or the result of unearned luck. The risk here was enormous, and the time, effort, and resources required to prosecute the action, often in the face of painful setbacks, was immense: nearly $20 million in professional time plus out-of-pocket costs, plus a delay of more than 18 years with no guarantee of ever seeing any return on this investment. A one-third fee would represent a modest lodestar "multiplier" of 4.65 which is appropriate in light of the extreme risks Counsel ran in taking on this case and well within the range of multipliers regularly approved in even megafund cases, *see infra* at 35-40—including in *Osberg v. Foot Locker, Inc.*, No. 07 Civ. 1358 (KBF) (S.D.N.Y.

June 8, 2018), Dkt. 428, an ERISA megafund case with remarkable similarities to this one.  In

that case, discussed more fully *infra* at 42-45, Judge Forrest awarded counsel <u>one-third of a $290</u>

<u>million recovery</u>, representing a 4.8 multiplier, explaining that "I have specifically considered

the fact that … 33 percent means a particular dollar amount in the context of an award this

size"—*i.e.*, a $95 million attorneys' fee—but "I am, nonetheless, persuaded under the

*Goldberger* factors that it is appropriate to approve the award in that amount."  Dkt. 428 at 11.

As discussed below, this case was at least as challenging as, if not even more challenging than,

*Osberg* (where plaintiffs followed the pre-existing *Amara v. Cigna* template; no such template

was available here), and the result for the Class equally impressive.  As shown below, a side-by-

side comparison of relevant factors establishes that there is no objective basis for awarding the

attorneys in this case less than the one-third percentage awarded in *Osberg* or for rejecting a

multiplier even lower than was approved in that case.

It is true that in garden variety securities fraud and mass tort cases where a cents-on-the-

dollar settlement has produced a large common fund, courts often find it appropriate to scale

down the attorneys' fee.  But Counsel are unaware of even a single instance in which a court

reduced the fee award based on the size of the recovery in a complex, trailblazing case like this

that, after years of intense litigation (including two rounds of summary judgment, 10 years apart)

in both the trial and appellate courts, produced so successful a result.  Obviously, this was not a

mass tort or fraud case in which mere disclosure of a government investigation all but guarantees

the creation of a megafund, notwithstanding what counsel does or does not do.

Here not only was Counsel unaided by any prior government investigation, but this case

went from zero recovery to megafund proportions solely because of Counsel's skill and effort:

the size of the fund is directly related to the efforts of Plaintiffs' counsel, who achieved a rarely

attained $17,000 per capita average recovery.  Indeed, if Counsel had merely won a more typical

class action per capita recovery of a few hundred dollars, the fund would be a mere $2-3 million dollars (and, ironically, a requested one-third fee would raise no eyebrows). Because the size of the fund in this case is not the result of unearned luck but rather Counsel's doggedness and skill, it would penalize Counsel for their success to apply the megafund "increase-decrease" approach here. *See, e.g., Osberg, supra; In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *11 (D.D.C. July 16, 2001) (awarding 34.6% of $365 million, saying "it is not fair to penalize counsel for obtaining fine results for their clients").

  4. The expense reimbursement request here of $489,484.38 should be granted. The expenses here were necessary for the prosecution of the case, were commensurate with the stakes involved, and are appropriately documented in Class Counsel's accompanying declaration. *See* 12/13/22 Gottesdiener Decl. ¶ 27; Ex. 2. Similarly, the reimbursement sought for settlement administration costs of $125,000 to pay the Notice Administrator and Enrolled Actuary is also reasonable, *see* 12/13/22 Gottesdiener Decl. ¶ 28, and should be granted.

  5. Counsel's request for service awards in the amount of $50,000 and $40,000 for Plaintiffs Laurent and Sharon, respectively, should be granted. The proposed awards are well-deserved: both Plaintiffs actively contributed to the prosecution of the case, prepared for and sat for day-long depositions, and actively participated in settlement negotiations. 12/13/22 Gottesdiener Decl. ¶ 29. Additionally, the prospect of such awards was necessary to encourage the named plaintiffs to serve, will encourage future potential named plaintiffs to step forward, and are within the range of typical awards of this kind. *Id.*

## ARGUMENT

## I. THE PROPOSED SETTLEMENT SHOULD BE APPROVED

  A court may only approve a proposed class action settlement if it determines that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In making this

determination, the court considers various factors, including whether (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account (i) the costs, risks, and delay of trial and appeal, (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, (iii) the terms of any proposed award of attorneys' fees; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2).

The Second Circuit also directs consideration of a set of factors, most of which overlap with Rule 23(e)(2). *Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). An assessment of all these factors shows that the Court should grant final approval of the proposed settlement.

## A. Plaintiffs and Class Counsel Have Adequately Represented the Class

The record demonstrates that Plaintiffs' interests in this case are aligned with those of the other Class members, and that Plaintiffs and Class Counsel have vigorously advocated for the Class's interests throughout the exceptionally long history of this case and have obtained unprecedented results. Plaintiffs' and Class Counsel's decision to settle this case was informed by a thorough investigation of the relevant claims and defenses; extensive discovery, motion practice, and repeat litigation in the Court of Appeals and the Supreme Court; consultation with actuarial and economic finance experts; and participation in extensive, hard-fought settlement negotiations over an extended period. *See* Dkt. 292 at 5-17. This weighs in favor of approval.

## B. The Proposed Settlement is the Result of Good-Faith, Arm's-Length Negotiations

Courts presume that a proposed settlement is fair and reasonable when it is the result of arm's-length negotiations between counsel. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005). As shown in detail in the motion for preliminary approval, efforts

to settle this case date back to 2008, including two failed mediations, prior to the ultimately successful 2021-22 arm's-length negotiations. *See* 9/19/22 Gottesdiener Decl. ¶¶ 24-25. "With respect to procedural fairness, a proposed settlement is presumed fair, reasonable, and adequate if it culminates from 'arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" *Blessing v. Sirius Xm Radio, Inc*., 507 F.Appx. 1, 3 (2d Cir. 2012).

## C.     The Relief Provided by the Settlement Is Adequate When Weighed Against the Risks of Continued Litigation

In assessing a settlement, courts consider "not whether the settlement represents the best possible recovery, but how the settlement relates to the strengths and weaknesses of the case." *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *9 (S.D.N.Y. May 9, 2014), *aff'd*, 607 F.Appx. 73 (2d Cir. 2015). A court need only determine whether the settlement falls within a range of reasonableness that "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

The proposed settlement plainly meets that standard, as it represents more than 90% of the amount that both the Plan and Plaintiffs' enrolled ERISA actuary estimate would be owed if Plaintiffs ultimately prevailed after trial and appeal. *See* Dkt. 292 at 2. If the Court were to not approve the settlement, it is far from certain what rate or formula the Court would decide is the appropriate whipsaw projection rate for purposes of calculating the benefits payable to members of the Class, and it is quite possible that the selected rate or formula could result in a materially lower recovery for the Class or, especially given appeals, no recovery at all. No court has ever applied ERISA § 502(a)(3) to "equitably reform" a plan's whipsaw projection rate, let alone in a plan such as this, where there was a no-guaranteed-minimum crediting rate, and the Court of

Appeals offered no explicit directions here, which means this Court would have essentially nothing to guide it other than the parties' dueling arguments and the Court's own research.

Moreover, if the Court determined that, as urged by Defendants, a trial was necessary to evaluate the various potential alternatives, both sides and the Court (and almost certainly the Court of Appeals) would be required to expend significant additional costs and resources, and the payment of additional benefits, if any, could be delayed for several more years. As noted above, a mere 8-10% discount from the amount that both sides estimate would be owed to the Class if they were to prevail after a trial and appeal is a very small price to pay for receipt of a risk-free payment now, and insurance against the possibility of a significantly lesser recovery. *See In re Prudential Sec. Ltd. P'ships Litig.*, 163 F.R.D. 200, 210 (S.D.N.Y. 1995) ("Instead of the lengthy, costly, and uncertain course of further litigation, the settlement provides a significant and expeditious route to recovery for the Class").

**D. The Proposed Method for Distributing Relief is Effective**

The Agreement includes well-established procedures in ERISA cases for efficiently distributing the non-reversionary Net Settlement Fund to all 16,000 members of the Class in a simple and direct way: Class members do not have to prove anything, but will automatically receive their additional benefit which they can keep as a direct payment or rollover to an IRA.

**E. Class Counsel's Fee Request Is Fair and Reasonable**

As outlined above and shown below in Section II, Class Counsel's request for an award of attorneys' fees equal to one-third of the settlement amount is fair and reasonable under the standards set forth in *Goldberger*, 209 F.3d 43.

**F. All Class Members Are Treated Equitably Relative to Each Other**

The settlement does not grant preferential treatment to anyone, since each Plaintiff's and Class member's additional lump sum will be calculated in exactly the same manner, based upon

the information specific to that Class member, such as their age, date of original payment, and original payment amount.

## G.    The *Grinnell* Factors Are Also Met

### 1.    The Complexity, Expense, and Likely Duration of the Litigation Supports Approval of the Settlement

The first *Grinnell* factor overlaps with the Rule 23(e)(2)(C)(i) "the costs, risks, and delay of trial and appeal" factor addressed above, which as shown there is plainly satisfied here.

### 2.    The Reaction of the Settlement Class to the Settlement

While the deadline for filing objections has not passed, thus far the Class's reaction has been very positive.  *See* Barkan Decl. ¶ 8; 12/13/22 Gottesdiener Decl. ¶ 7.  Assuming there are few or no objections, that would be indicative of a favorable class reaction which would "significant[ly]" support the proposed settlement's reasonableness.  *See, e.g., Wal-Mart Stores, Inc.*, 396 F.3d at 119.  Moreover, the named Plaintiffs, who were active participants in the prosecution of the case and the negotiations that led to the proposed settlement, wholeheartedly endorse it.  *See* Dkts. 295, 296 ¶¶ 6-7.

### 3.    The Stage of the Proceedings

After more than 18 years, Class Counsel's knowledge of the merits and potential weaknesses of the claims alleged permitted them to intelligently weigh the strengths and weaknesses of their case and to engage in effective settlement discussions with Defendants.

### 4.    The Risk of Establishing Liability and Damages

The fourth and fifth *Grinnell* factors are addressed above under Rule 23(e)(2)(C)(i) ("costs, risks, and delay of trial and appeal").  For the same reasons explained above, the proposed settlement satisfies the fourth and fifth *Grinnell* factors.

5. **The Risks of Maintaining the Class Action Through Trial**

Defendants oppose certification as confirmed by their July 2020 decertification motion, and have indicated that if the litigation continues and the opportunity presents itself, they intend to ask the Court to revisit its certification order. *See* 9/19/22 Gottesdiener Decl. ¶ 20. The risk that this case might not be maintained on a class-wide basis through trial and appeal weighs in favor of the settlement. *In re Bear Stearns Companies, Inc. Sec., Deriv, and ERISA Lit.*, 909 F.Supp.2d 259, 268-69 (S.D.N.Y. 2012).

6. **The Ability of Defendants to Withstand a Greater Judgment**

"This factor is typically relevant only when a settlement is less than what it might otherwise be but for the fact that the defendant's financial circumstances do not permit a greater settlement." *In re Namenda Direct Purchaser Antitrust Litigation*, 462 F.Supp.3d 307, 314 (S.D.N.Y. 2020). Here, Plaintiffs do not contend that Defendants could not withstand a greater judgment. "This factor, therefore, drops out." *Id.* at 315.

7. **The Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation**

The eighth and ninth *Grinnell* factors are addressed above under Rule 23(e)(2)(C)(i) ("costs, risks, and delay of trial and appeal"). For the same reasons explained above, the proposed settlement satisfies the eighth and ninth *Grinnell* factors.

## II. CLASS COUNSEL'S REQUESTED FEE SHOULD BE APPROVED

If the Settlement Agreement is approved, the Court should grant Class Counsel's request for attorneys' fees of one-third of the $267 million common fund created by the settlement, which is $89 million. A district court has discretion to override the fee arrangement negotiated between counsel and class representatives if "supported by adequate findings." *Goldberger*, 209 F.3d at 57; *see also In re CRM Holdings, Ltd. Sec. Litig.*, 634 F.Appx. 59, 60-61 (2d Cir. 2016)

(vacating fee award that crossed out class counsel's 33% fee request and "wrote in 20.3% with no explanation").[2]  In this case, the two-part assessment required by *Goldberger* provides no objective basis to award anything less than one-third, as confirmed by the analysis recently applied by this Court in *Grice v. Pepsi Beverages Co.*, 363 F.Supp.3d 401 (S.D.N.Y 2019).

## A.      *Ex Ante* Test:  The Fee That a Fully Informed Class Would Have Agreed to Pay in the Particular Circumstances of This Case is One-Third of the Common Fund, With No Reduction Based on the Amount of the Recovery

The first branch of the two-part assessment required by *Goldberger* asks the court to infer, to the extent feasible, what compensation arrangement would have been agreed to at the beginning of the case between counsel and "a fully informed group of plaintiffs able to negotiate collectively." *Goldberger*, 209 F.3d at 52 ("market rates, where available, are the ideal proxy for [class counsel's] compensation").  *Accord McDaniel*, 595 F.3d at 420, 422 (district court should "approximate the reasonable fee that a competitive market would bear," "assess[ing] case-specific considerations at the outset"; focus should be "on mimicking a market"); *Nortel Networks*, 539 F.3d at 133 (goal is to use the "market rate").

Market rates comport with the law of restitution, the body of law upon which lawyers' rights to fee awards are based.  Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 Cornell L. Rev. 656, 700 (1991); Douglas Laycock, *Modern America Remedies* 488 (1985) ("Quasicontract proceeds on the fiction of an implied promise to pay.... If there were a real promise, it would probably be to pay the market value, and the implied promise

---

[2] A court also has discretion to determine fees based on the lodestar method rather than a percentage of the fund if there is a rational basis to do so, for example "where the district court can calculate the relevant parameters (hours expended and hourly rate) more easily than it can determine a suitable percentage to award." *Goldberger*, 209 F.3d at 50 (cleaned up).  That is certainly not the situation here. Furthermore, since at least 2005 "[t]he trend in this Circuit [has been] toward the percentage method, which directly aligns the interests of the class and its counsel." *Wal-Mart Stores*, 396 F.3d at 121; *see also Perks v. TD Bank, N.A.*, 2022 WL 1451753, *2 (S.D.N.Y. May 9, 2022) ("the percentage method continues to be the trend of district courts in this Circuit").

is analogized to that"). Market rates both incentivize lawyers to maximize claimants' recoveries and protect class members against over-payment. *See Goldberger*, 209 F.3d at 52.

Using the market rate for counsel's services negotiated *ex ante* in cases like this makes sense because it is in the nature of a contingency fee agreement that both sides are *gambling* on both the outcome and the amount of work and outlays needed to secure that outcome. To mimic the market, *i.e.*, determine the *ex ante* fee the parties would have reached, *Goldberger* instructs courts to look to (1) "'hard data' on … the fees sophisticated corporate plaintiffs typically agree to pay their attorneys" in analogous high stakes contingency cases, *Goldberger*, 209 F.3d at 52; and (2) the contingency risk in "the unique circumstances" of the specific case at hand, measured as of when the case was filed, *id.* at 52-53, 55. Both confirm that a well-informed Class with negotiating power would have agreed to the one-third fee Counsel is requesting here.[3]

### 1. Sophisticated Plaintiffs Pay Their Lawyers at Least One-Third in Analogous High-Stakes, High-Risk Contingency Cases Like This One

Starting with the first source of relevant information, the fee negotiated by sophisticated corporate plaintiffs in contingent class actions and other high-stakes litigation, the available data "all points to the same conclusion: sophisticated clients … always choose the percentage method," not a rate based on hours; and "they choose to pay fixed ***one-third*** percentages *or even higher escalating percentages based on litigation maturity*," with no lodestar or multiplier cap. Brian Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L.

---

[3] The *Grinnell* factors that the *Goldberger* panel reiterated should be considered in awarding fees—including the magnitude and complexities of the litigation, the risk of the litigation, and the requested fee in relation to the settlement—all matter in the private market transactions where contingent percentages are set. *Grinnell*'s additional, public policy consideration permits courts to decide that, as a matter of public policy, it makes sense to use percentage fees paid by sophisticated clients as a guide.

Rev. 1151, 1170 (2021) (hereinafter "*A Fiduciary Judge's Guide*") (emphases added).[4]  This is true even of Fortune 500 companies "at the very top of that list" in litigation seeking "enormous" damages:  "these sophisticated clients did not negotiate lower fee percentages," but rather "appear perfectly happy with the percentage method and perfectly happy with the same fixed percentage of one-third that most unsophisticated clients also choose"—***regardless of the size of the anticipated potential recovery***.  *A Fiduciary Judge's Guide*, 89 Fordham L. Rev. at 1160-62.

In other words, under the first leg of *Goldberger*'s *ex ante* what-would-have-been-negotiated test, available market data—"the ideal proxy for [class lawyers'] compensation," 209 F.3d at 52—overwhelmingly points to a contingent fee in a high-stakes case like this of one-third.  While in some cases, judges have assumed that a fully informed, sophisticated class with bargaining power would negotiate a lower percentage when the potential or actual recovery is more than $100 million "simply because the recovery is large," *A Fiduciary Judge's Guide*, 89

---

[4] While the *Goldberger* panel in 2000 said that "hard data" on the fees that sophisticated corporate clients typically agree to pay their attorneys was "sketchy," *id.*, that is no longer true, as evidenced by the study cited above (which also cites multiple other surveys and studies).  *See also Flournoy v. Honeywell Int'l, Inc.*, 2007 WL 1087279, at *2 (S.D. Ga. Apr. 6, 2007) ("[40%] fee contracts are common for complex and difficult litigation"); *Meyenburg v. Exxon Mobil Corp.*, 2006 WL 2191422, at *2 (S.D. Ill. July 31, 2006) ("The Court is independently aware that 33-1/3 % to 40% (plus the cost of litigation) is the standard contingent fee percentages in this legal marketplace for comparable commercial litigation"); *In re Remeron Direct Purchaser Antitrust Litig.*, 2005 WL 3008808, at *16 (D.N.J. Nov. 9, 2005) (finding "contingent fees between 30% and 40%" the norm in all cases including cases brought by business entities "in non-class, commercial litigation").  Across practice areas, examples abound proving that the market requires that plaintiffs who wish to retain high-quality counsel for cases involving potentially significant recoveries, yet want to have no liability for attorney's fees or the cost of the litigation in case the litigation fails, need to offer counsel a very high reward for assuming that risk.  For example, in contingent patent cases, which have enormous potential damages, the going-rate is generally one-third, according to a recent study based on interviews with 44 experienced lawyers who represent plaintiffs in patent cases and the author's review of 42 contingent fee agreements.  *See* David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation*, 64 Ala. L. Rev. 335, 360 (2012).  To cite another example, in a malpractice case against an accounting firm/turnaround specialist brought by a specialty clothing store, counsel negotiated a 40% contingency agreement, which earned it a $70 million fee.  *In re Merry-Go-Round Enter., Inc.*, 244 B.R. 327, 330-45 (D. Md. 2000).  *See also* Trey Cox, *Alternative Fee Arrangements: Partnering with Clients through Legal Risk Sharing*, 66 The Advocate (Texas) 20 (2011 Texas Bar Litig. Section) (reporting fees in the 33% to 40% range, noting "[e]ven large clients, however, appreciate the budget certainty and risk-sharing inherent in a contingent fee arrangement").

Fordham L. Rev. at 1169—the truth is that "**varying a fixed percentage on recovery size like this is *unheard of in the marketplace*.**" *Id*. (emphasis added). That makes sense. Informed plaintiff-purchasers of contingent legal services are not penny-wise and pound-foolish: they do not want to blunt their attorneys' incentives to fight for the greatest recovery possible or incentivize them to settle earlier for smaller sums. *See In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 80 (S.D.N.Y. 2000) (reducing counsel's percentage as size of fund increases "can create an incentive to settle quickly and cheaply when the returns to effort are highest" and discourage counsel from "investing additional time and maximizing plaintiffs' recovery").

Bolstering that one-third is the percentage that an informed Class would have negotiated here are the agreements between Class Counsel and the named Plaintiffs. *See* 5 J. Moore, et al., *Moore's Fed. Practice – Civil* § 23.124 (2010) ("When a court determines the size of an attorney's fee award, it is appropriate for it to consider any agreement between class counsel and class representatives about fees and expenses"). Although the named Plaintiffs in this case obviously were not as well-positioned as a Fortune 500 company to negotiate with their lawyers, Mr. Laurent and Ms. Sharon are savvy, college-educated individuals who were impressive enough to be hired by one of the premier consulting firms in the world, PwC. Both agreed that in exchange for undersigned Counsel's commitment to undertake the representation of them and the putative class on a wholly contingent basis, Counsel could seek a one-third common fund award. Dkts. 295-1, 296-1; *see also* Dkts. 295, 296 ¶¶ 3-5 (also saying they are pleased with the results of the case and believe Counsel's request is fair and reasonable).

In small-stakes cases these agreements might not have much weight, but Mr. Laurent and Ms. Sharon had significant ($16,000 and $6,000, respectively) claims, so their agreement to pay one-third of any recovery to Counsel is objective evidence that it is reasonable. There is no reason to think that other members of the Class would have wanted or attempted to negotiate a

lower percentage, or would have succeeded if they tried. Indeed, Counsel was not lacking for clients seeking representation and would not have accepted this case for less than a one-third fee. *See* 12/13/122 Gottesdiener Decl. ¶ 13. On the other hand, there is every reason to believe that Class members *would* have agreed to a one-third fee for the prospect of potentially receiving additional pension benefits at no risk to them. PwC employees are a well-educated, sophisticated bunch and, as explained above, sophisticated clients virtually always choose to pay their attorneys *at least* one-third of any recovery.

### 2. The Contingency Risk in This Case at the Time of Filing Was at the Top of the Risk Spectrum, Warranting a One-Third Contingency Fee

*Goldberger* instructs that rather than rely on the 25% "benchmark" used in some circuits as the presumptive market rate for common fund class actions, district courts in the Second Circuit should try to determine the arrangement that a fully informed class able to negotiate collectively would have made with their lawyers in "the unique circumstances" of the particular case at hand. *Goldberger*, 209 F.3d at 52-53. The foremost factor in the required "searching assessment" of a case's characteristics is the contingency risk measured as of when the case was filed. *Id*. at 52-55. *See also Rein v. Socialist People's Libyan Arab Jamahiriya*, 2010 WL 11627808, *11 (E.D.N.Y. Aug. 16, 2010) ("'The most important *Goldberger* factor in determining the amount of fees and whether to award an enhancement is the risk of success in pursuing the case'").

The risk faced by Class Counsel when this case was filed was extraordinarily high. In *Goldberger*, the Court noted that many securities fraud cases are, in truth, really not that complex or risky. 209 F.3d at 52. "The same argument can be made with respect to certain antitrust class actions filed in the wake of a Department of Justice consent decree, or products-liability cases filed shortly after a government-ordered recall. These cases all have risk, the argument goes, but

the risk is limited." *In re Marsh ERISA Litigation*, 265 F.R.D. 128, 147 (S.D.N.Y. 2010). In these types of suits, "where there is some contingency risk but recovery remains virtually certain," *Goldberger* questioned whether a fully informed group of plaintiffs would agree at the beginning of a case to promise their lawyers a substantial percentage of what might turn out to be a multi-million dollar recovery. 209 F.3d at 52.

"That argument does not apply to ERISA class actions like this one." *In re Marsh ERISA Litigation*, 265 F.R.D. at 147. "ERISA is a comprehensive and reticulated statute … and is enormously complex and detailed," *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 447 (1999) (internal quotations and citations omitted) and "[f]ederal pension law is a highly specialized field," *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Ind) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346, 350 (7th Cir. 2012) (Posner, J.), making ERISA pension class actions notoriously risky. "The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel." *Silverman*, 739 F.3d at 958.[5]

Moreover, there were and are only a handful of ERISA lawyers around the country prosecuting actions like the instant case, as most large class action firms and ERISA lawyers shun them because the firms lack the requisite expertise and the cases are too risky. An informed Class would have learned that while the legal services market may be highly competitive in general, the market for lawyers with substantial ERISA pension class action experience was and is small, and that Class Counsel here "is among the most experienced, able and recognized ERISA

---

[5] *Accord Cates v. Trustees of Columbia University in City of New York*, 2021 WL 4847890, *4-5 (S.D.N.Y Oct. 18, 2021) ("the difficulty of ERISA litigation justifies the requested [one-third] fee award"); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F.Supp.3d 344, 350 (S.D.N.Y. 2014) ("ERISA concerns a highly specialized area of law" that warrants "a higher fee") (Schofield, J.); *In re Marsh ERISA Litigation*, 265 F.R.D. at 147 ("ERISA litigation has nothing like the mature body of law and practice present in the securities and antitrust fields"; awarding one-third fee).

pension class action attorneys in the country."[6]  As the attached declarations of other highly experienced ERISA class action litigators confirms, a one-third percentage fee was the market price of Class Counsel's services for ERISA pension class action cases when this case was first filed.  *See* Declarations of Stephen Bruce ("Bruce Decl."), Susan Martin ("Martin Decl."), and Mary Ellen Signorille ("Signorille Decl."), filed simultaneously herewith.

Further confirmation that the going rate for representation in a case like this was one-third is the fact that, as difficult as ERISA class action cases tend to be generally, it was foreseeable from the outset that this particular ERISA case was likely to be among the most challenging and risky ever litigated.  *See* Martin Decl. ¶¶ 7-9; Signorille Decl. ¶¶ 12-13.  This turned out to be true, as evidenced by the multiple high hurdles to recovery Plaintiffs faced and the case's unprecedented 18-year history.  This action not only involved the usual complexities and structural risks typically inherent in ERISA litigation, but was premised on thorny and unsettled nuances of ERISA law that presented ***three*** novel make-or-break questions of "first impression" in the Second Circuit—normal retirement age, the lawful projection rate in a market-based plan, and availability of equitable reformation to bring a plan's terms into compliance with the law—that had never been posed, let alone successfully litigated, by plaintiffs in any prior case.  *See id*.  Contrast this with the situation in *Goldberger*, where "'there was no groundbreaking issue which loomed significant in th[e] case,'" 209 F.3d at 54.

---

[6] *Downes v. Wisc. Energy Corp. Ret. Acct. Plan*, 2012 WL 1410023, *4 (E.D. Wis. Apr. 20, 2012) (cash balance case, finding "the market for highly-qualified ERISA counsel with the resources and track record capable of handling a case of this magnitude and complexity is small").  *Accord Ruppert v. Alliant Energy Cash Balance Pension Plan*, 08-cv-127 (W.D. Wis.), Dkt. 628 at 17 (Feb. 4, 2013), Dkt. 632 at 3 (Mar. 21, 2013) (cash balance case; Mr. Gottesdiener is one of "only a small number of lawyers who [have] the expertise and resources necessary to try ERISA class actions such as this one"; "Class counsel are talented lawyers with significant expertise on matters relating to ERISA"); *Moody, et al. v. The Turner Corp.*, 07-cv-00692 (S.D. Ohio Oct. 18, 2011), Ex. 1 at 8-9 (referring to Class Counsel as a "leading plaintiff's ERISA attorney" who "has demonstrated" "unique expertise" and complimenting the named plaintiffs for "[having] selected remarkable, talented... counsel practicing at a level that few attain").

In this case, a fully informed Class would have known at the beginning of the case that Class Counsel would be swimming against a strong current from day one and facing a well-financed, well-represented defendant (a "Big 4" accounting firm represented by white-shoe New York law firms) that would spare no effort or expense in defeating the suit. The informed Class would have known that a challenge to the legality of the Plan's 5-years-of-service "normal retirement age" had very low odds of success in light of the fact that the "1978 Revenue Ruling [that] represented the IRS's position" when Mr. Laurent filed suit "**permitted a plan to set normal retirement age at any age**, including lower than age 65, *regardless* of the age at which employees customarily retired in the particular company or industry." *Laurent III*, 794 F.3d at 288 (citing Rev. Rul. 78-120, 1978-1 C.B. 117) (italics in original).

Moreover, there was no ambiguity about whether the IRS's interpretation applied to PwC's retirement-age definition: when Class Counsel filed suit, the IRS had already *specifically blessed* the Defendant Plan's retirement age as perfectly valid. *See* PwC Mot. to Dismiss, Dkt. 17 at 9. Thus, a fully informed Class would have known before this suit was filed that in order to succeed, Class Counsel would have to convince this Court *and* the Court of Appeals *and* potentially the Supreme Court that the IRS's interpretation was "plainly inconsistent" with the statute (the standard for overruling an agency's interpretation), an obviously very tall task.[7]

As if this were not challenging enough, a fully informed Class would have known that success on the retirement-age issue would be a pyrrhic victory unless Counsel could prove to all of the same courts that the Plan's 30-year Treasury bond projection rate was illegal despite the fact that the Plan's investment structure guaranteed participants nothing, ***and*** that a monetary

---

[7] This was the polar opposite of a case in which counsel "piggy backed" on a prior governmental action that reduced the *ex ante* risks at the litigation outset. *See In re Interpublic Secs. Litig.*, 2004 WL 2397190, at *12 (S.D.N.Y. Oct. 26, 2004). To the contrary, Counsel here "were truly the authors of the favorable outcome for the class." *Meredith Corp. v. SESAC, LLC*, 87 F.Supp.3d 650, 670 (S.D.N.Y. 2015).

remedy was available to make Class members whole for the Plan's alleged statutory violations. In light of Supreme Court precedent indicating that money damages are "'[a]lmost invariably'" unavailable under ERISA, *see Laurent VII*, 2017 WL 3142067 at *9 (quoting *Great-West*, 534 U.S. at 210), this would have appeared to the informed Class as another exceptionally difficult battle (as indeed it turned out to be). The Class would have known that to win monetary relief, Counsel would likely have to invoke ERISA's equitable remedy provisions. But "anyone who litigates in this area knows that it is very hard – and most circuits have adopted a range of doctrinal hurdles making it so – to get courts to award, on equitable relief grounds, any benefits different than those expressly authorized under the plan's terms." *See* 9/19/22 Gottesdiener Decl., Ex. C *Reflections on Osberg v. Foot Locker*.

The degree of difficulty no doubt explains why no member of the class action bar had stepped up to challenge the design or attempted to join or wrest control of the litigation after seeing Class Counsel's nationally publicized complaint. As noted above, courts recognize that such a lack of competition indicates that other lawyers "saw this litigation as too risky for their practices" which "implies a higher fee." *Silverman*, 739 F.3d at 958.

This lack of enthusiasm contrasts sharply with the interest frequently seen in securities-related cases, for example. *See In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 2006 WL 2789862 (S.D.N.Y. Sept. 28, 2006) (18 law firms sought lead counsel role, 24 law firms appeared for plaintiffs). As a fully informed Class in this case would have known, unlike securities and antitrust defendants, ERISA plans and plan sponsors typically have very little incentive to settle even highly meritorious cases because they do not face the risk of jury trials, or of paying consequential or punitive damages, or liquidated double or treble damages. *See* Signorille Decl. ¶ 10. ERISA defendants know that if they lose, they will merely have to pay what they should have paid initially, with interest that is probably less than what the defendant is

earning on the withheld funds.  *Id.*  An informed Class would have recognized the importance, from a market perspective, of compensating counsel in recognition of just how risky embarking on these kinds of cases is.

In short, the results of the *Goldberger ex ante* assessment are unambiguous:  the market price for Class Counsel's services when this case was filed—in light of the normal rate of compensation in the ERISA class action market at the time, and the extraordinarily high risk of nonpayment and other "unique circumstances" of this particular case—was one-third of any common fund that Counsel was able to win for the Class.

**B.**     ***Ex Post* Assessment:  Modification by the Court of the One-Third Fee That Would Have Been Negotiated by the Class is Not Necessary to Prevent an Unearned "Windfall" Here, Which Means That There Is No Valid Basis for a Reduction**

As this Court correctly recognized in *Laurent IV*, courts can override the terms of a private contract only for a valid reason, typically where there is evidence of fraud or mistake, or in some cases where the contract is unconscionable or clashes with public policy in some other way.  2017 WL 3142067 at *8.  The Second Circuit has held that courts "ought normally to give the same deference to [*ex ante* contingency fee] agreements as we would to any contract."  *Wells v. Sullivan*, 907 F.2d 367, 371 (2d Cir. 1990).

Although this principle does not directly apply in the context here—since there is no actual contract between the Class and Class Counsel—the gist of *Goldberger* is that courts in this circuit should strive to identify what the attorney fee agreement would have been if negotiated at arm's length in an efficient market; and that this inferred contract should govern the compensation arrangement between the class and their lawyers unless there is something about the way that the case unfolded and things actually turned out indicating that, if enforced, the inferred contract would produce an unearned "windfall" that offends public policy.  *See Goldberger*, 209 F.3d at 52 (court is to act with "a jealous regard to the rights of those who are

interested in the fund"—which includes class counsel—by striving, to the extent reliable data is available, to determine the compensation arrangement that "plaintiffs in an efficient market for legal services would agree to" at the beginning of the case); *id*. at 49-50 (with an *ex post* cross-check to prevent "unwarranted windfalls for attorneys").

As shown above, the compensation arrangement that a fully informed Class in this case would have agreed to at the beginning of the case is one-third of any common fund that Counsel was able to win for the Class. Now that the case is over and Counsel has won an extraordinary recovery for the Class, it would be wrong to reduce the fee *ex post* unless there is an objectively valid basis to do so. *Goldberger* recognizes this, directing that a district court can reduce the attorneys' fee only if the court concludes, "supported by adequate findings," that a portion of the fee under the inferred contract would produce an undeserved "windfall." *Id*. at 57; *accord Fields*, 24 F.4th at 849 (attorney award under contingency fee contract in Social Security case can only be reduced on "windfall" grounds if it is "truly clear that the fee is unearned by counsel"; reversing and awarding full fee where record showed there was no windfall).

As shown below, it would be impossible to fairly characterize any portion of the success achieved by Class Counsel in this case as a "windfall." Nothing fell in Counsel's lap: every win along the arduous path of this 18-year case was earned—often against extreme odds—and the size of the resulting fund is the product of Counsel's skill and effort, not manna from heaven. Accordingly, there is no valid basis under *Goldberger* or general equitable principles to reduce the one-third fee that would have been negotiated between Counsel and a fully informed Class able to bargain collectively.

1.    **A One-Third Share of the Common Fund Is Not a "Windfall" Merely Because It Is Very Large**

Class Counsel recognize that the $89 million fee requested—one-third of the $267

million fund created by the settlement—is a lot of money. But a one-third fee in this case is both appropriate and well-deserved. Class Counsel devoted almost two decades of time, money, and resources to a complicated and difficult case that, it was clear from the outset, could have been lost or derailed at any number of stages—starting with motions to dismiss through class certification, PwC's 2008 motion for summary judgment, the 2017 judgment for PwC on the pleadings, the petition for decertification, two Second Circuit appeals, PwC's two bids for Supreme Court review, and much more in between. Through skill and persistence, Counsel overcame all of these obstacles to win a spectacular 90%+ recovery for the Class.

Contrary to a misconception expressed by some courts, "just compensation for work done and a benefit bestowed is not a windfall simply because the compensation is substantial." *Rein*, 2010 WL 11627808 at *13. "Windfall" is not a synonym for unusually large. It is fruit blown down from a tree that one happens to be sitting under, etymonline.com/word/windfall, a fortuitous gain "resulting from lucky circumstances," investopedia.com/terms/w/windfall-profits.asp. In the context of a class action, the most typical example of an unearned windfall is an easy win aided by a helpful ruling in a parallel proceeding that class counsel had nothing to do with. *See Goldberger*, 209 F.3d at 56 ("two of the defendants—Drexel and Milken—were convicted of criminal conduct bearing directly on the claims advanced in this case" and "counsel's performance was certainly helped enormously by the prior actions against [them]").

Nothing like that happened here. There was no "spadework done by federal authorities" or ruling in another case that "dramatically increased [Counsel's] chances of success," *id.* at 54. The *opposite* is true: Class Counsel was not helped by, but had to *overcome*, the IRS's three rulings expressly blessing the validity of PwC's 5-years-of-service retirement age; the Seventh and Fourth Circuits' rulings agreeing with the IRS's interpretation; the plausible legality of the 30-year Treasury projection rate given that the Plan's market-based investment structure

guaranteed participants no positive return whatsoever; the Second Circuit's statement in *Amara v. Cigna Corp.*, 775 F.3d 510 (2d Cir. 2014) that reformation "require[s] a showing of mutual mistake or mistake coupled with fraud," *id.* at 526 n.12, which Plaintiffs did not and could not allege here; and the Supreme Court's repeated emphasis that monetary damages are almost invariably unavailable under ERISA.

Starting with the normal retirement age issue: as noted above, all of the agency and court rulings most relevant to Plaintiffs' claims were *contrary* to Counsel's legal theories. When the case began, there were *three* rulings from the IRS concluding that there was nothing wrong with PwC's definition of normal retirement age as 5 years of service. *Id.* at 288; PwC Mot. to Dismiss, Dkt. 17 at 9. But that is not the half of it. As could have been anticipated at the time of filing given the IRS's position on the matter, matters only got worse as the case progressed. Five years into the case, the Seventh Circuit held that another plan's nearly identical normal retirement age definition—5 years on the job, regardless of age—was a perfectly valid retirement-age definition since, just as the IRS's 1978 ruling had said, "Under [ERISA] an age is the 'normal retirement age' because the plan's text makes it so." *Fry* v. *Exelon*, 571 F.3d 644, 647 (7th Cir. 2009) (Easterbrook, J.). Another three years after that—now 8 years into the *Laurent* litigation—the Fourth Circuit agreed with the Seventh Circuit, *see McCorkle v. Bank of America Corp.*, 688 F.3d 164, 171 (4th Cir. 2012) ("we agree with the *Fry* court"), making the score 2-0 in favor of PwC's retirement-age definition at the circuit level. Things were not looking good.

But Counsel persisted and, against all odds—facing a well-financed, well-represented, industry-supported defendant—convinced this Court that the IRS and Judge Easterbrook were wrong, defended that ruling on appeal, and then fended off a petition for certiorari in which PwC highlighted the direct circuit split that the Second Circuit's affirmance had created. There was

obviously nothing easy about any of this, and luck played no role. Indeed, the governing ERISA statutory provision is so maddeningly ambiguous that the IRS and the courts that tried to decipher it offered four *different* interpretations: (1) the IRS, the Seventh Circuit, and the Fourth Circuit read the statute to say that there are no limits on a plan's self-selected "normal retirement age" definition, making PwC's 5-years-of-service definition perfectly valid; (2) Judge Mukasey disagreed, finding that ERISA's vesting standards preclude a normal retirement age that is dependent on years of service, *Laurent v. PricewaterhouseCoopers LLP*, 448 F.Supp.2d 537, 544-49 (S.D.N.Y. 2006) ("*Laurent I*"); (3) this Court rejected both of these interpretations, finding that a plan's normal retirement age must be a chronological "age," *Laurent v. PricewaterhouseCoopers LLP*, 963 F.Supp.2d 310, 330-31 (S.D.N.Y. 2013) ("*Laurent II*"); and (4) the Second Circuit then disagreed with *all* of these interpretations and held that a plan's normal retirement age must align with the "normal" age at which its participants typically retire, *Laurent v. PricewaterhouseCoopers LLP*, 794 F.3d 272 (2d Cir. 2015) ("*Laurent III*"). It is no exaggeration to say that the make-or-break "normal retirement age" question at the heart of this case was both novel and uniquely challenging.

After the Supreme Court denied certiorari on the normal retirement age issue in early 2016—twelve years into the case—victory for the Class finally seemed within reach. *See* 2/3/16 Hrg., Dkt. 202 at 3 (this Court saying now that "cert has been denied," we are in "the final phase of the case, which I think is probably best viewed as a remedy stage for the case, … [since] the biggest issues that go to liability, I think, have now been resolved"). It was not: an even bigger challenge for Class Counsel was still yet to come. As noted above, while the parties had been busy wrangling over the validity of the PwC plan's normal retirement age definition, in 2014 the Second Circuit issued a ruling in *Amara* that said that the appropriate *remedy* for an invalid clause in an ERISA pension plan is "equitable reformation"—and that winning a right to that

remedy "require[s] a showing of mutual mistake or mistake coupled with fraud," *Amara*, 775 F.3d at 526 n.12.  In late 2016, PwC pointed out that the Complaint in this case alleged neither fraud nor mistake—and in July 2017, the Court held that even though Plaintiffs had established that the Defendant Plan's 5-year-of-service "normal retirement age" definition was illegal, PwC was nevertheless entitled to judgment on the pleadings because there was no available remedy. *See Laurent IV*, *supra*.  After 13 years, the case was seemingly over.

The Court's 2017 judgment for PwC spotlights the extreme risk that Class Counsel faced in this case every step of the way, from its very beginning until its very end.  From all appearances, the Court's unimpeachable reading of *Amara*—which did indeed say that pension reformation requires a showing of fraud or mistake—meant that 13 years of Counsel's enormous investment of time, money, resources, and opportunity cost would never be recovered.  To turn things around, Counsel would have to convince the Court of Appeals that while pension plan "reformation *does* require a showing of mutual mistake or mistake coupled with fraud," *Amara*, 775 F.3d at 526 n.12 (emphasis in original), in most contexts, that showing was not required in this case.  This was a challenging prospect, to put it mildly—particularly in light of the Supreme Court's consistently stated rule that equitable remedies are available in ERISA cases only when "the conditions that equity attached to [their] provision" are present, *Knudson*, 534 U.S. at 216; and that "'[i]t is well settled that equity would reform the contract, and enforce it, as reformed, if the mistake or fraud were shown,'" *Cigna Corp. v. Amara*, 563 U.S. 421, 440-41 (2011).[8]

But Counsel persisted and, against even longer odds than in the normal-retirement-age battle, pulled the proverbial rabbit out of the hat by convincing the Court of Appeals that the

---

[8] *See also Montanile v. Bd. of Trustees of Nat'l Elevator Industry Health Ben. Plan*, 577 U.S. 136, 142-45 (2016) (ERISA requires "turn[ing] to standard equity treatises" to determine whether, "in the circumstances presented," equitable relief "was typically available in premerger equity courts").

problematic *Amara* and Supreme Court language did not preclude reformation based solely on the PwC Plan terms' invalidity under ERISA. *See Laurent v. PricewaterhouseCoopers LLP*, 945 F.3d 739, 747-48 (2d Cir. 2019) ("*Laurent V*").[9] As Judge Schofield later explained in *Galli v. PricewaterhouseCoopers LLP*, 2020 WL 2792996, *1 (S.D.N.Y. May 29, 2020), "*Laurent v. PricewaterhouseCoopers LLP* … held as a matter of first impression that reformation of a pension plan was available under ERISA § 502(a)(3) "'where the written terms of a pension plan indisputably violate ERISA, but there is no allegation that the violation stems from traditional fraud, mistake, or otherwise inequitable conduct.'"[10]

Confirming the novelty of the interpretation that Counsel convinced the Court of Appeals to adopt, the Supreme Court (at the request of at least four Justices) asked the U.S. Solicitor General's Office for its views on the ruling. *See* 141 S.Ct. 617 (Oct. 19, 2020). Class Counsel was able to persuade the Solicitor's Office that the appeal had been correctly decided and that the government should recommend denial of certiorari. *See* Br. for the United States as Amicus Curiae, 2021 WL 2181532 (May 25, 2021). The Supreme Court declined to take the case.

Back in this Court, PwC was still not ready to concede, opposing Plaintiffs' motion for summary judgment and petitioning the Court for decertification of the Class. Class Counsel

---

[9] The Department of Labor filed an amicus brief in support of Plaintiffs, but the Second Circuit did not adopt the agency's theory that relief was available entirely under ERISA § 502(a)(1)(B)'s damages clause, instead accepting Class Counsel's argument that relief was available in 2 steps: (1) equitable reformation under ERISA § 502(a)(3) to remedy the PwC plan's violation of ERISA, followed by (2) recalculation of benefits under § 502(a)(1)(B). *Id.* at 747-49.

[10] *See also* 36 No. 2 Journal of Compensation and Benefits ART 4, *Is Plan Reformation an Available Remedy Under ERISA to Recalculate Participant Benefits? The Second Circuit Says Yes* (March/April 2020) ("The implications of the *Laurent* decision (if it is not overturned) are consequential … and even if the Supreme Court does not accept [a cert] petition in *Laurent,* the circuit split might force them to [do so] in the near future"); 28 No. 1 ERISA Litig. Rep. NL 3, *Second Circuit Declares Every ERISA Right Must Have a Remedy: Laurent v. Pricewaterhouse-Coopers LLP* (Feb. 2020) ("there is at least some significant tension between the Second Circuit's approach to interpreting Section 502(a)(3) and the approach that has traditionally been applied by the Supreme Court, so we will be keeping our eyes open to see whether the case attracts the interest of the Supreme Court itself").

persuaded the Court to deny the petition for reconsideration and grant summary judgment to the Class on liability, leaving only the question of the precise "whipsaw projection rate" to be determined. *Laurent VI*, 565 F.Supp.3d at 555-56. PwC initially insisted that it wanted a trial. But a short time later, Defendants agreed to a settlement pursuant to which Defendants will pay more than 90% of the pension benefits that the 16,000 members of the Class alleged they were shortchanged, plus interest for the delay in payment—an incredible result in this 18-year case that easily could have ended in a complete defeat at multiple turns.

Outside of the legal world, extraordinary results like these are almost never used to reduce a contingency percentage. A real estate agent who sells a property for above asking price still receives the same 6% commission. Investment managers do not reduce their percentage fee when the manager generates extraordinary results. In both instances, clients are happy to pay the full commission on every dollar. Similarly, law firms that represent corporations in high-stake contingency fee cases are never penalized with a reduction in fees when they achieve extraordinary results—in fact, they are sometimes rewarded for exceptional results with even *higher* marginal percentages. *See A Fiduciary Judge's Guide*, 89 Fordham L. Rev. at 1160-61. Law firms that represent a class of *individuals* in commendable cases like this one—which is a far cry from the "nuisance" or "strike suits" that have earned class action lawyers a bad reputation in some circles—should be treated no differently.

Nothing in *Goldberger* supports the notion that, if after years of hard work and dedication and after having run a gauntlet of risk, counsel is spectacularly successful in securing a very large recovery for the class, a district court should reduce the fee percentage (or effective multiplier) that would have been negotiated *ex ante*. As Professor Fitzpatrick, author of *The Conservative Case for Class Actions* (2019), explains: it makes no sense, and would disincentivize counsel in future cases, for a court to reduce the fee that would have been

negotiated *ex ante* merely because the recovery is very large.  *A Fiduciary Judge's Guide*, 89 Fordham L. Rev. at 1169 (that practice "is even worse than the practice I described above that presumes lawyers should get less than one-third in a class action because the case is a class action.  Rather, here, courts are paying the lawyer a different percentage at the end of **the very same case** depending on whether the lawyer recovered a lot or a little") (emphasis added).[11]

To so penalize the attorneys for their *success* in a case like this would only serve to perpetuate the unfair caricature of class action lawyers representing individuals as self-serving ambulance chasers, when the truth is that in model cases *like this* all of the central players— Class Counsel, the named Plaintiffs, defense counsel, and the Courts—performed their jobs exactly the way the system wants them to, and 16,000 pensioners got the justice they deserved. Class Counsel's compensation should reflect their important role in achieving this exceptional outcome.  *See Goldberger*, 209 F.3d at 51 (fee awards should provide lawyers "with sufficient incentive to bring common fund cases that serve the public interest").

This Court could award Class Counsel a one-third fee without leaving the beaten path: there are numerous instances involving megafunds where courts, including many within this Circuit, have awarded attorneys' fees that equal or exceed the fee sought here, often in circumstances clearly involving less risk, less work, less difficulty, and/or less success:

---

[11] *Accord* Rubenstein, 5 Newberg on Class Actions § 15.80 (6th ed. through June 2022 update) (criticizing megafund "sliding scale" approach as "lack[ing] rigor because it provides no direction to courts about when to start decreasing the percentage award, nor by how much," as being inappropriate in "high fund cases [that] involve significant risks," and for "creat[ing] perverse incentives" for class counsel); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 196-97 (E.D. Pa. 2000) ("The court will not reduce the requested award simply for the sake of doing so when every other factor ordinarily considered weighs in favor of approving class counsel's request"; "It is difficult to discern any consistent principle in reducing large awards other than an inchoate feeling that it is simply inappropriate to award attorneys' fees above some unspecified dollar amount, even if all of the other factors ordinarily considered relevant in determining the percentage would support a higher percentage").

| CASE[12] | SETTLEMENT | PERCENTAGE AWARDED |
|---|---|---|
| Bain Partners | $590 million | 33.3% |
| IPO (S.D.N.Y. 2009) | $510 million | 33.3% |
| Vitamins | $365 million | 34.6% |
| Tricor | $316 million | 33.3% |
| U.S. Foodservice (D. Conn. 2014) | $297 million | 33.3% |
| Osberg (S.D.N.Y 2018) (ERISA) | $290 million | 33.3% |
| State Farm Mutual. | $250 million | 33.3% |
| Relafen Direct Rx Purch. | $242 million | 33.3% |
| Busiprone (S.D.N.Y. 2003) | $220 million | 33.3% |
| La. Wholesale Drug (S.D.N.Y. 2003) | $220 million | 33.3% |
| DeLoach v. Phillip Morris | $212 million | 33.3% |
| Neurontin | $191 million | 33.3% |
| Standard Iron Works | $163.9 million | 33% |
| In re Titanium Dioxide | $163.5 million | 33.3% |
| Haddock (D. Conn. 2017) (ERISA) | $140 million | 35% |

### 2. The Lodestar Multiplier Is Commensurate With the Extreme Risk Faced by Counsel and the Quality of Representation

The substantial time and effort required to prosecute this action for over 18 years—*i.e.*, the lodestar "cross check" encouraged by the Second Circuit—confirms the reasonableness of the requested fee.[13]

Between 2004 and today, Class Counsel's firm—together with appellate and Supreme Court specialists Julia Penny Clark and Leon Dayan of Bredhoff & Kaiser PLLC, brought on

---

[12] *See* 12/13/22 Gottesdiener Decl. ¶ 16 for full citations and summaries showing, where information was available, that each referenced case involved less risk, less difficulty, and/or less success than this one.

[13] When performing a lodestar cross-check in a case applying the percentage method of awarding fees, "the hours documented by counsel need not be exhaustively scrutinized by the district court. Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case." *Goldberger*, 209 F.3d at 50. The requested fee should be granted even if the Court elects to employ the lodestar-plus-multiplier (versus the percentage of the fund) method because, as shown in this subsection, both the lodestar and the lodestar multiplier are reasonable.

board to assist Class Counsel in both of Plaintiffs' two successful Second Circuit appeals and to oppose both of Defendants' petitions for certiorari in the Supreme Court—has spent a combined total of 21,322.80 attorney and other professional support hours on this matter (excluding time spent on this petition). *See* 12/13/22 Gottesdiener Decl. ¶ 20 & Ex. 1 (summary compilation of detailed time entries).[14]  The amount of time invested was necessary and appropriate given the stakes, the length of the litigation, the complexity of the claims and defenses, the level of resistance from Defendants, the prowess of their attorneys, the burden of proof that Plaintiffs bore, and the $267 million common fund achieved.  12/13/22 Gottesdiener Decl. ¶ 23.[15]

That work represents $19,108,820 in lodestar, based on Counsel's current hourly rates, *see id.* ¶ 20, that reflect "prevailing [rates] in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."  *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).[16]  These are the same rates—for attorneys with at least 25 years of experience, $1,060 per hour; for attorneys with 15-24 years of experience, $900 per hour; for attorneys with 5-14 years of experience, $650 per hour; for attorneys with 2-4 years of experience, $490 per hour; and, for paralegals and law clerks, $330 per hour—that were approved last year in another high-stakes ERISA class action litigated in this district, *Cates v. Columbia University*, 2021 WL 4847890, *4-5 (S.D.N.Y October 18, 2021).  They are essentially the same rates approved 4

---

[14] Class Counsel's detailed billing entries are available on request.

[15] Indeed, the amount of time invested is commendably low for a complex case like this that included litigation before 3 different district court judges, 2 appeals, and extensive discovery over an 18-year time span. *Compare Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase*, 09-cv-03701 (S.D.N.Y.), Dkt. 368 (31,914 hrs. over just 6 years); *Osberg*, 07-cv-1358 (S.D.N.Y.), Dkt. 406 (33,744 hrs. over 11 years).

[16] Per the Supreme Court, the Second Circuit, and district courts in this Circuit, current versus historic hourly rates should be used to calculate the base lodestar figure as a means of compensating for the delay in receiving payment, inflation, and the loss of interest. *See In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 WL 7323417, at *15 (S.D.N.Y. Dec. 19, 2014).

years ago for Class Counsel and their appellate specialists Bredhoff & Kaiser in the *Foot Locker* case (discussed above and more fully below), No. 07 Civ. 1358 (KBF) (S.D.N.Y. June 8, 2018), Dkt. 428, and 3 years ago for Class Counsel in *Durand v. Hanover Ins. Group, Inc.*, 07-cv-130 (W.D. Ky. March 25, 2019), Dkt. 296, taking into account inflation and rising rates since then. 12/13/22 Gottesdiener Decl. ¶ 21.[17]

Counsel's rates compare favorably with the much higher rates for counsel of similar skill and experience that this Court found "reasonable" in *Fertitta v. Knoedler Gallery, LLC*, 2018 WL 4961454, *1 (S.D.N.Y. Oct. 15, 2018) (Oetken, J.) (agreeing that the rates approved in *Regeneron Pharmas., Inc. v. Merus N.V.*, 2018 WL 3425013, at *4-5 (S.D.N.Y. June 25, 2018)—of up to $1,355 for partners and up to $965 for associates—were "reasonable"). In *Fertitta*, this Court also considered the 2017 National Law Journal rates survey in determining appropriate rates: that survey shows rates for Gibson Dunn and comparable firms well over $1,000 for partners. *See Fertitta*, 2018 WL 4961454, *1 and Dkt. 180-6.[18] Indeed, courts routinely approve rates for Gibson Dunn lawyers at rates higher or comparable to Class Counsel's here.[19]

Using these rates, Counsel's one-third request represents a 4.65 multiplier, which is reasonable given the level of risk involved. *See, e.g., McDaniel*, 595 F.3d at 424 (identifying

---

[17] *See Rozell v. Ross-Holst*, 576 F.Supp.2d 527, 546 (S.D.N.Y. 2008) (prior rates "should not necessarily be considered a cap, however, since the rates charged by attorneys have generally increased since these cases were decided").

[18] *Accord Pearlstein v. BlackBerry Limited*, 2022 WL 4554858, *10 (S.D.N.Y. Sept. 29, 2022) (approving rates of up to $1,200); *Trustees of NY State Nurses Assoc. Pension Plan v. White Oak Global Advisors LLC*, 2022 WL 815273, *11 (S.D.N.Y. Mar. 17, 2022) ("In this district, partner billing rates in excess of $1,000 routinely are upheld as reasonable"; gathering cases).

[19] *See Vista Outdoor Inc. v. Reeves Fam. Tr.*, 2018 WL 3104631, *6 (S.D.N.Y. May 24, 2018) (approving rates up to $1,260 for Gibson Dunn partners and up to $694 for associates); *MSC Mediterranean Shipping Co. Holding S.A. v. Forsyth Kownacki, LLC*, 2017 WL 1194372, *3 (S.D.N.Y. Mar. 30, 2017) (finding reasonable rates of $1,048 for Gibson Dunn partners and up to $753 for associates).

risk as "perhaps the foremost factor to be considered in assessing the propriety of a multiplier").

A 4.65 multiplier is well within the range of multipliers approved by district courts in the Second Circuit and in ERISA class actions generally.[20] *See, e.g., In re Colgate-Palmolive Co. ERISA Litig.*, 36 F.Supp.3d 344, 353 (S.D.N.Y. 2014) (Schofield, J.) (ERISA pension class action, approving a 5.2 multiplier).[21] As noted, Counsel's 4.65 multiplier here is even lower than the one approved by Judge Forrest in awarding counsel one-third of the $290 million common fund in the *Foot Locker* pension benefit class action that was no riskier than this one (as shown below). Moreover, even higher multipliers have been approved in other megafund cases, including in this district:

| CASE[22] | SETTLEMENT | MULTIPLIER |
|---|---|---|
| Doral (S.D.N.Y. 2007) | $130 million | 10.3 |
| Busiprone (S.D.N.Y. 2003) | $220 million | 8.5 |
| New England Carpenters | $350 million | 8.3 |
| Ramah | $940 million | 7.1 |
| Rite-Aid | $126 million | 6.9 |
| Credit Default Swaps (S.D.N.Y. 2016) | $1.9 billion | 6.2 |
| Cardinal Health | $600 million | 6 |
| Roberts v. Texaco (S.D.N.Y. 1995) | $115 million | 5.5 |
| In re Enron | $7.2 billion | 5.2 |
| Osberg (S.D.N.Y 2018) (ERISA) | $290 million | 4.8 |

---

[20] In reality, the multiplier will be lower than 4.65 because after final approval there will be significant additional tasks relating to the implementation and enforcement of the settlement. *See Clem v. KeyBank, N.A.*, 2014 WL 2895918, at *10 (S.D.N.Y. June 20, 2014) (recognizing same).

[21] *See, e.g., Yuzary v. HSBC Bank USA, N.A.*, 2013 WL 5492998, at *11 (S.D.N.Y. Oct. 2, 2013) (approving 7.6 multiplier); *Beckman v. KeyBank N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013) (6.3 multiplier); *Davis v. J.P. Morgan Chase*, 827 F.Supp.2d 172, 185 (W.D.N.Y. 2011) (5.3 multiplier).

[22] *See* 12/13/22 Gottesdiener Decl. ¶ 17 for full citations.

In this litigated-to-summary-judgment case, the 4.65 multiplier is a mathematical expression of two positive features of this case: (1) the efficiency of the Class's lawyers working an intensely demanding, complex matter over a long period, coupled with (2) their extraordinary achievement of a 90%+ recovery, $267 million fund.

A reduction of the 4.65 multiplier would effectively penalize Counsel for *not* insisting on litigating this case to its bitter end and wasting the Court's time with further proceedings (a likely trial followed by appeals and possibly even additional post-appeal proceedings) that would have probably achieved nothing of material value—except to reduce Counsel's lodestar multiplier. *Beckman*, 293 F.R.D. at 482 (awarding one-third of fund, representing a 6.3 multiplier, in part to avoid "penalizing plaintiffs' counsel for achieving an early settlement, particular where, as here, the settlement amount is substantial"). Indeed, further proceedings to determine the reformed projection rate, though they would have almost certainly driven Counsel's lodestar multiplier to well below 4, held the prospect of very little potential upside for the Class. Dkt. 293-1 (Plan administrator estimating liability in the "$250 million - $300 million" range). Counsel should not be penalized for doing the right thing for the Class and the court system by settling for 90+ cents on the dollar when they did.[23]

Consistent with *Goldberger*'s instruction that "[r]isk falls along a spectrum, and should be accounted for accordingly," 209 F.3d at 54, the Court should find that the multiplier here is commensurate with the extreme risk that Counsel faced in the circumstances of this specific

---

[23] Class Counsel certainly cannot be blamed that it took 18 years of litigation to secure a fair settlement from PwC. *See, e.g.*, 3/4/13 Hrg. Tr. (Dkt. 145) 10:19-24 (THE COURT: "isn't it a consequence of [PwC's] repeated motions for reconsideration that we're still at the motion to dismiss stage?" "[Isn't the reason] we haven't even gotten further along in the case because of your tactics?"); Dkt. 211 (2016 belated motion for judgment on the pleadings extending litigation another 5 years). During mediation as part of PwC's first appeal in 2014, PwC rejected Plaintiffs' offer to settle the case for $150 million. *See* 12/13/22 Gottesdiener Decl. ¶ 30.

case.  *Id.* at 53.  As discussed above, the evidence shows that taking into account the multiple obstacles that had to be overcome here, the odds of success in this case were surely not more than 20%.  This translates to an *ex ante* multiplier of at least 5 to have made filing the case economically sensible on a risk-adjusted basis—just for Counsel to break even.[24]  Moreover, the case not only started out in a hole, but there was nothing that ever came along to fortuitously make Counsel's job to crawl out of that hole any easier.  As explained above, the opposite is true—which means there is no valid basis to cap or reduce the requested one-third percentage or the reasonable 4.65 lodestar multiple here.

### 3. "Economies of Scale" Do Not Justify a Reduction in the Fee Percentage or Lodestar Multiplier in the Particular Circumstances of This Case

As discussed above, while in some class actions courts have found that a reduction in the fee percentage and/or lodestar multiplier are warranted because of the economies of scale presented by the case, such a reduction would not be appropriate here.

First, the recovery that Counsel won for the Class in this case is exceptionally large not because there are many Class members, but primarily because Counsel's skill and persistence over 18 years resulted in an exceptionally large average per capita recovery of almost $17,000.  If Counsel had won a more typical class action per capita recovery of a few hundred dollars, the fund would be $2-3 million dollars and a one-third attorneys' fee routine.[25]  Even a recovery of

---

[24] Even a multiplier of 5 would not fully compensate for the exceptionally long delay in reimbursement of out-of-pocket expenses and lawyer/staff hours.  Using current hourly rates cushions the loss to some degree, but annual increases in hourly rates have not matched the lost opportunity cost from investments and interest that in a typical case would have been earned by now on a fee award received many years ago.  *See Awarding the Attorney's Fees in Class-Action Litigation*, 23 J. Legal Stud. 185, 199-200 (1994).

[25] *See, e.g.*, Mayer Brown LLP, Do Class Actions Benefit Class Members? An Empirical Analysis of Class Actions (2013), *available at* https://perma.cc/FRM4-2EZ3 ("Many class settlements… produce negligible benefits for class members"; giving examples); kiplinger.com/article/spending/t037-c000-s002-6-things-you-must-know-about-class-action-lawsuits.html ("class members rarely see a fat payday").

an impressive $1,000 per capita would have produced a fund of $16 million, likely garnering approval of a one-third fee with little hesitation. In other words, any concern about the megafund-size of the recovery in the "unique circumstances" of ***this case***, *Goldberger*, 209 F.3d at 53, is in truth a concern that Counsel won an extraordinarily large average amount for each member of the Class—a result that should be rewarded, not fretted about.

Second, even if it may be true that it typically does not take 10 times as much *time* to prosecute a $267 million case as a $26.7 million case, PwC's internal estimate that a loss would cost it $250-$300 million made the case significantly more *risky* for Class Counsel—and even just a doubling of risk can have a more significant impact on case economics than a tenfold increase in the estimated investment of hours and expense. If the claim had been worth only $26.7 million, Counsel would have known before taking the case that PwC would be highly likely to consider a settlement (payable from its $2 billion pension fund) if its motion to dismiss were to be denied, or after denial of an early motion for summary judgment (as PwC attempted and lost in 2008). But $300 million is fight-to-the-death money, as confirmed by the 18-year battle that ensued after Counsel filed suit, pitted against the best defense attorneys that money can buy.

Had the claim been worth "only" $26.7 million, Counsel's initial odds of winning a fair settlement might have been around 30%. It is no exaggeration to say that having $300 million at stake—as Class Counsel knew was the case and a fully informed Class also would have known—made the case at least twice as risky (from inception) because it was foreseeable that PwC would use its immense resources to fight Plaintiffs' claims and resist a fair settlement, both of which proved to be true. A case with double the risk of one with 30% odds translates to odds of less than 20%, which as explained above is consistent with a lodestar multiplier of at least five. Counsel would not have taken this case if they believed that a court would impose a

lodestar multiplier cap that would have the effect of overriding the one-third percentage fee

negotiated with the named Plaintiffs.  *See* Gottesdiener Decl. ¶ 12.[26]

Counsel respectfully submit that this Court should not reach back and retroactively

change the calculus based on the now-known fact that Counsel won.  *See In re Synthroid*

*Marketing Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) (explaining that the best time to "estimate

the terms of the contract that private plaintiffs would have negotiated with their lawyers, had

bargaining occurred at the outset of the case (that is, when the risk of loss still existed)… is the

beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness,

and sunk costs make it impossible for the lawyers to walk away if the fee is too low)").

## C.    A One-Third Fee Is Consistent with the Fee Recently Awarded in This District in a Remarkably Analogous $290 Million ERISA Class Action

Although "[w]hat constitutes a reasonable fee is properly committed to the sound

discretion of the district court," *Goldberger*, 209 F.3d at 47, courts are of course obliged to make

their rulings as consistent as reasonably possible with previous judicial decisions on the same

subject.  A "basic principle of justice [is] that like cases should be decided alike."  *Martin v.*

*Franklin Cap. Corp.*, 546 U.S. 132, 139 (2005) (citing Henry J. Friendly, *Indiscretion About*

*Discretion*, 31 Emory L.J. 747, 758 (1982)).  And "[t]he jurisprudential rule of like treatment

demands consistency not only between cases that are precisely alike but among those where the

---

[26] In the circumstances of this exceptionally risky case, its scale was the only thing that made it economically rational for Class Counsel to file suit—and then to keep fighting for the Class without compromise for nearly two decades despite the many setbacks that happened along the way.  As described above, it was clear from the outset that this case was going to be exceptionally challenging and the odds of success low.  If there had been only 1,000 members in the class, or if the expected per capita recovery had been only $1,000, it would have been financial suicide for Counsel to file such a challenging and risky lawsuit:  the anticipated investment of time and money simply would not have been worth the risk-adjusted potential attorney fee.  But the large class, together with the large per capita recovery potential, made the lawsuit economically rational—assuming that a win would result in a one-third fee.  In other words, the scale of the case and potential one-third fee are the only things that made the math work—and made this lawsuit, and its well-deserved recovery for the Class, a reality.

differences are not significant."  Friendly, *Indiscretion About Discretion*, 31 Emory L.J. at 758.

Just 4 years ago, in the *Foot Locker* case, Judge Forrest awarded one-third of the $290 million common fund won by class counsel in a high-stakes ERISA class action that, like this case, lasted more than a decade—including two trips to the Court of Appeals—and was otherwise remarkably analogous to this case in almost every regard:

|  | *Osberg v. Foot Locker* | *Laurent v. PwC* |
|---|---|---|
| Common fund | $290 million | $267 million |
| Recovery percentage | 100% | 92%+ |
| Class size | 16,400 | 16,000 |
| Relief sought | Equitable reformation + monetary relief (additional pension benefits under the plan's reformed terms) | Equitable reformation + monetary relief (additional pension benefits under the plan's reformed terms) |
| Years litigated | 11 years | 18 years |
| Setback that class counsel overcame | District Court dismissal of the case with prejudice | District Court dismissal of the case with prejudice |
| Litigation result | Liability Judgment (after trial) | Liability Judgment (summary judgment) |
| Plaintiffs' Wins in Court of Appeals | 2 | 2 |
| Defendant petitions for certiorari | 1 | 2 |
| Supreme Court expressions of interest | None | 1 |
| Defendants' amicus (appeals and cert) | Chamber of Commerce | Chamber of Commerce |
| Defendant size | Multi-billion annual revenues | Multi-billion annual revenues |

|  | *Osberg v. Foot Locker* | *Laurent v. PwC* |
| --- | --- | --- |
| Defendant law firms | Proskauer / Gibson Dunn | Kirkland Ellis / Gibson Dunn |
| Attorneys' fee | 1/3 | 1/3 (requested) |
| Lodestar multiple | 4.8 | 4.65 (requested) |

The close similarity between the two cases strongly supports a fee award of one-third and approval of a 4.65 multiplier here. Indeed, it is difficult to discern an objective basis for a lower percentage or lower multiplier in this case. If anything, the percentage and lodestar multiplier in this case should be higher, were it not for Class Counsel's commitment to the named Plaintiffs at the beginning of the case to seek no more than one-third. In contrast to the uniformly uphill battle Class Counsel faced at every stage of this case, the plaintiffs in *Osberg* had the benefit of the parallel litigation in *Amara v. Cigna*, particularly the Second Circuit's 2014 ruling, 775 F.3d 510 (2d Cir. 2014), that provided a roadmap for *Osberg*'s final stages. *See Osberg v. Footlocker, Inc.*, 138 F.Supp.3d 517 (S.D.N.Y. 2015), *aff'd,* 862 F.3d 198 (2d Cir. 2017) (Judge Forrest's 2015 ruling for the class, which includes a 3-page section titled "The *Amara* litigation" and 44 favorable citations to rulings in that case); *Osberg* Plaintiffs' Appeal Br., 2016 WL 2913434 at *1 (May 17, 2016) (telling the Second Circuit that "This ERISA [class action] is in all relevant respects a mirror image of *Amara*"); *Osberg v. Foot Locker, Inc.*, 862 F.3d 198 (2d Cir. 2017) (citing *Amara* 36 times in affirming district court ruling for the class).

There was no help from other cases here. To the contrary, as noted above, all of the relevant case law lined up *against* Class Counsel's claims and remedy theories, and no whipsaw case had ever been filed challenging a plan's use of a 30-year Treasury bond rate for projecting the future return of an investment crediting rate that did not guarantee participants any positive

return, let alone a return in excess of 30-year Treasury rate. Add this to the fact that this case lasted 7 years longer than *Osberg* and depended on winning a remedy theory that was so novel that the Supreme Court asked the Solicitor General for its views, and it is inarguable that the risk in this case was materially higher than in *Osberg*. Since the risk of success is the foremost factor that courts in this circuit are supposed to account for in determining the appropriate attorneys' fee—and the other minor differences between this case and *Osberg* "are not significant," Friendly, *Indiscretion About Discretion*, 31 Emory L.J. at 758—it would be inappropriate to award less than the one-third fee awarded in *Osberg*. *See Martin*, 546 U.S. at 139 ("like cases should be decided alike").[27] *See also* two other megafund cases from this Circuit which awarded counsel 35% and 33.3% of the fund, respectively, in circumstances involving less risk, less work, and/or less success than in this case.[28]

## D. The Three-Step Test Applied by This Court in a Recent Common Fund Case Confirms That a One-Third Percentage is Reasonable and Appropriate Here

The discussion above shows that a one-third attorneys' fee and 4.65 lodestar multiplier is strongly supported by the six "traditional criteria in determining a reasonable common fund fee":

---

[27] *See also generally In re Nortel Networks*, 539 F.3d at 134 ("we are troubled by the district court's failure to discuss [an award in a very similar case] and why it believed the fee award here to be more reasonable"); *In re CRM Holdings*, 634 F.Appx. at 60-61 (reversing where district court crossed out proposed percentage award, inserted a lower percentage, and pronounced that amount fair and reasonable in light of a number of factors it listed but without explaining how those factors applied to the case at bar); *Mba v. World Airways, Inc.*, 369 F.Appx. 194, 199 (2d Cir. 2010) (reversing and remanding due to inadequately explained common fund fee determination).

[28] In *Haddock v. Nationwide Fin. Serv., Inc.*, 01-cv-1552, Dkt. 601 (D. Conn. Apr. 9, 2015), an ERISA case that lasted 13 years, the court awarded an attorney fee equal to 35% of a $140 million fund, but that case settled prior to any ruling on summary judgment. *Id.* Similarly, *In re U.S. Foodservice, Inc. Pricing Litig.*, a 8-year long fraud case, awarded counsel a one-third fee of a $297 million fund, but that case also settled prior to any ruling on summary judgment. Moreover, whereas here Counsel recovered more than 90% of Class members' damages, the best that counsel could say in *U.S. Foodservice* was that they had recovered a "significant" percentage of class members' damages and, in requesting approval of the settlement, cite a case which held approval was appropriate where class members were receiving a mere *8%* of the damages they suffered. Dkt. 510-1 at 26; Dkt. 499-2 at 10; *id.* Dkt. 499-3 ¶ 5.

(1) the risk of the litigation; (2) the magnitude and complexities of the litigation; (3) the quality of representation; (4) the time and labor expended by counsel; (5) the requested fee in relation to the settlement; and (6) public policy considerations. *Goldberger*, 209 F.3d at 50.

Further confirming that a one-third fee is reasonable and appropriate in this case is the three-step approach applied by this Court in a recent class action. In *Grice v. Pepsi Beverages Co.*, 363 F.Supp.3d 401 (S.D.N.Y 2019) (Oetken, J.), the Court followed the test used by Judge Schofield in several ERISA and other common fund cases, which "'applies the percentage of the fund method and considers the *Goldberger* factors in three steps.'" *Id*. at 406. Under Judge Schofield's approach, "[t]he first step is to determine a baseline reasonable fee with reference to other common fund settlements of a <u>similar size and complexity</u>, based on the <u>subject matter</u> of the claims." *In re Colgate-Palmolive Co. ERISA Litigation*, 36 F.Supp.3d 344, 348 (S.D.N.Y 2014) (Schofield, J.) (underlines added). A comprehensive compilation of all major ERISA class actions settled or decided since 2000 reports that there have been five ERISA common fund cases that won benefits for plan participants of more than $200 million, in the same range (*i.e.*, "similar size and complexity") as the $267 million won for the class here. *See* <u>ERISA Violation Tracker</u> (April 3, 2019). The average attorneys' fee in these five cases was 29.9%.[29]

While the sample size is obviously limited—because ERISA cases that win in excess of $200 million for plan participants are rare—that is no reason to throw more run-of-the-mill ERISA cases or non-ERISA cases (none of which are "of a similar size and complexity, based on the [same] subject matter") into the mix just to get a larger number of data points into the

---

[29] *See* 12/13/22 Gottesdiener Decl. ¶ 18 for full citations. If the three cases with common funds between $100 million and $199 million are included, the average is 28.4%. *See id*. at ¶ 19.

average, regardless of the added data's relevance.[30]  That would be like telling Tom Cruise that his compensation should be comparable to the average of all movie actors rather than in line with Leonardo DiCaprio or Brad Pitt.  As Judge Schofield emphasized, "a higher fee is warranted in ERISA cases as compared with some other types of cases," and the "baseline fee" should be based on "ERISA cases of ***comparable size***."  *In re Colgate ERISA Litigation*, 36 F.Supp.3d. at 350-51 (emphasis added).  The baseline fee for "ERISA class actions of a similar magnitude" to this one, *id*. at 353, is 29.9%, *supra*.

Step two of Judge Schofield's approach is to assess whether the case in question was "exceptional in ***any*** of the three" *Goldberger* factors of "risk of litigation, the quality of representation and any remaining policy considerations," in which case "an increase or decrease of the baseline percentage would be warranted.  *Id*. at 351 (emphasis added).  As shown above, this case was exceptional in *all three* of these areas:  contingency risk was enormous from inception and only got worse, Counsel won a nearly-unprecedented recovery of more than 90% of the Class's estimated damages (which *Goldberger* says is the primary measure of representation "quality"), and this case established an important new precedent that now allows ERISA plan participants to sue for reformation of illegal plan terms *and* recover monetary benefits that had been unlawfully withheld from them under those illegal terms.  In *Behazadi v.*

---

[30] If the Court desires additional survey data confirming that 29.9% is a reasonable baseline for a case like this one, Professor William Rubenstein of Harvard Law School, author of the *Newberg on Class Actions* treatise, reports that in the class actions in his database that were successfully tried to verdict, the average fee award (among cases with available data) was **36%**, and the median 45%.  *See* Rubenstein Decl. ¶19, Dkt. 461-1, *Krakauer v. Dish Network*, No. 14-333 (M.D.N.C. May 7, 2018).  This case was successfully litigated to a verdict on liability, and the fact that the verdict was secured on summary judgment rather than after a trial—because the Court did not deem a trial necessary to reach its verdict—should be viewed as a plus, not a minus.  As explained above, Counsel determined that rather than continue this already endless litigation, it was in the best interest of the Class to settle for a discount of less than 10%.  Applying the Enrolled ERISA Actuary's estimate of an 8% settlement discount to the 36% fee average, *supra*, yields an attorney fee in this case of **33.1%**, essentially identical to the fee Counsel has requested.

*International Creative Mgmt. Partners, LLC*, 2015 WL 4201906 (S.D.N.Y. July 9, 2015), Judge Schofield found that a step-one baseline fee of between 25% and 32.3% warranted an upward adjustment to **<u>one-third</u>** because the case met *one* of the three Goldberger adjustment factors: "significant risk from the uncertainty in the law." *Id*. at *3. In this case, where all three adjustment factors support an upward adjustment, an increase of the 29.9% baseline to one-third is clearly warranted.

The third step of Judge Schofield's approach is to apply a lodestar cross-check as a "sanity check" to ensure that an otherwise-reasonable percentage (determined in steps one and two) would not lead to a "windfall." *In re Colgate ERISA Litigation*, 36 F.Supp.3d. at 353. In *Colgate*, Judge Schofield found that while a lodestar multiplier of **five** might be "on the high end," it was not "grossly disproportionate" to counsel's investment of time in the case and thus did not justify a reduction from the one-third fee identified in steps one and two as reasonable and appropriate. *Id.*; *see also In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *17 (S.D.N.Y. July 17, 2007) ("multipliers of nearly 5 have been deemed 'common' by courts in this District").

In *Fort Worth Employees' Ret. Fund*, *supra* n.15, this Court found that while a reduction in counsel's requested fee percentage was warranted because a Second Circuit ruling *in another case* had fortuitously boosted class counsel's prospects, *id.*, Dkt. 382 (Tr. 7:9-12)—*i.e.*, reduction was warranted pursuant to the *Goldberger* "windfall" cross-check—the post-adjustment implied multiplier of 4.6 presented no problem even though the common fund was $338 million. *Id.*, Dkt. 379. *See also Osberg, supra* (4.8 multiplier in $290 million ERISA class action).[31]

---

[31] While the Second Circuit's and this Court's rulings for Plaintiffs in this case were obviously important in convincing PwC ultimately to settle on fair terms, court rulings *in the case at issue* in a fee application are not factored into the *Goldberger* fee analysis as fortuitous "windfalls" that warrant a reduction in

### III. THE REQUESTED EXPENSE REIMBURSEMENT SHOULD BE GRANTED

Counsel are also seeking reimbursement of the $489,484.38 in out-of-pocket expenses they incurred prosecuting this lawsuit. This is a reasonable amount that is well in line with what is typically expended in similar cases. The vast majority of these charges were for experts, especially the Class's actuarial expert, Mr. Deutsch, who provided invaluable assistance practically from the case's inception. The balance was for transcripts, travel, computerized research, database management, duplication of documents, and other incidental expenses typical of complex litigation that customarily would be charged to clients in non-contingency cases. *See* 12/13/22 Gottesdiener Decl. ¶ 27 & Ex. 2 (detailing same). Where, as here, the expenses requested "reflect[ ] the typical costs of complex litigation . . . courts should not depart from the common practice in this Circuit of granting expense requests." *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Amer. Corp.*, 318 F.R.D. 19, 27 (S.D.N.Y. 2016). Similarly, the reimbursement sought for settlement administration costs of $125,000 (principally, to pay the Notice Administrator) is also reasonable, *see* 12/13/22 Gottesdiener Decl. ¶ 28, and should be granted.

### IV. THE REQUESTED SERVICE AWARDS SHOULD BE APPROVED

The Court should also authorize Counsel to pay out of their fee award a $50,000 service award to Plaintiff Timothy Laurent and a $40,000 award to Plaintiff Smeeta Sharon in recognition of the burdens they bore as class representatives (since 2004 and 2006, respectively) and crucial role they played in vindicating the private enforcement of our pension laws. Both

---

attorney fees. To the contrary, favorable rulings in the case at issue warrant *fee enhancements*—at least where, as here, the rulings secured by class counsel answer novel questions and/or establish important new principles or precedents. *Compare Fort Worth, supra,* and *Goldberger*, 209 F.3d at 56 (fee reduction appropriate in part because "counsel's performance was certainly helped enormously by" the "parallel criminal proceedings" in which the defendants "were convicted of criminal conduct bearing directly on the claims advanced in this case"), *with Osberg, supra,* Dkts. 423, 428 (awarding a one-third fee in part because class counsel secured a Second Circuit ruling vacating the district court's dismissal of the case, and then on remand won a liability judgment that led to a $290 million ERISA recovery for the class).

named Plaintiffs risked their reputations and alienation from employers "in bringing an action against a prominent [firm] in their community," *Kruger v. Novant Health, Inc.*, 2016 WL 6769066, at *6 (M.D.N.C. Sept. 29, 2016). Moreover, they devoted significant time and effort to the case, making valuable contributions far beyond merely lending their names to the lawsuit.

Throughout the pendency of the case, both named Plaintiffs were actively engaged in the litigation and contributed to its success by, among other things: assisting in Counsel's investigation of the case and answering Counsel's questions; reviewing and commenting on pleadings and motions; responding to interrogatories; identifying and collecting materials in response to document requests; authenticating documents; preparing for and sitting for day-long depositions; discussing litigation strategy and making themselves readily available for any necessary communications with counsel. *See* 12/13/22 Gottesdiener Decl. ¶ 29. Both were active participants in the 2008 and 2014 unsuccessful mediations and the successful 2021-22 negotiations that led to the proposed settlement. *Id.*

The requested payments are well-deserved and well within the range of previous awards in comparable situations.[32]

## CONCLUSION

WHEREFORE, for the reasons stated herein and for such other reasons as may appear to the Court, Plaintiffs respectfully request that the Court grant this motion in its entirety.

---

[32] *In re Flag Telecom Holdings*, 2010 WL 4537550, at *31 (S.D.N.Y. Nov. 5, 2010) (awarding $100,000 to lead plaintiff based on his involvement over eight years of litigation); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 2018 WL 6250657, at *4 (S.D.N.Y. Nov. 29, 2018) ($50,000 and $100,000 to respective named plaintiffs); *Bellifemine v. Sanofi-Aventis U.S. LLC*, 2010 WL 3119374, at *7 (S.D.N.Y. Aug. 6, 2010) ($75,000 to each of five named plaintiffs); *Bd. of Trustees of AFTRA Ret. Fund*, 2012 WL 2064907 at *3 (S.D.N.Y. June 7, 2012) ($50,000 to each of three class representatives); *Wright v. Stern*, 553 F.Supp.2d 337, 342-48 (S.D.N.Y. 2008) ($50,000 to each of eleven named plaintiffs).

Dated:  December 13, 2022

Respectfully submitted,

  /s/ *Eli Gottesdiener*
Eli Gottesdiener
Albert Huang
Gottesdiener Law Firm, PLLC
498 7th Street
Brooklyn, New York 11215
Email:  eli@gottesdienerlaw.com
Telephone:   (718) 788-1500

*Counsel for Plaintiffs and the Class*